## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **AUSTIN THOMPSON HUGHES** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.** |
| | § | |
| **CITY OF HOUSTON, HARRIS** | § | |
| **COUNTY, ART ACEVEDO, KIM OGG,** | § | **JURY TRIAL DEMANDED** |
| **MICHAEL GARCIA, JOSHUA FEW,** | § | |
| **JAMES SEYMOUR, and TIFFANY** | § | |
| **ALFRED** | § | |
| | § | |
| **Defendants.** | | |

---

## ORIGINAL COMPLAINT

---

COMES NOW, Plaintiff Austin Hughes ("Mr. Hughes" or "Plaintiff"), by and through undersigned counsel, and files this Original Complaint against Defendants City of Houston; Harris County; *former* Houston Police Department ("HPD") Chief of Police Art Acevedo ("Acevedo"); Harris County District Attorney Kim Ogg ("Ogg"); HPD Officers Michael Garcia ("Garcia") and Joshua Few ("Few"); HPD Sergeant James Seymour ("Seymour"); and Assistant District Attorney Tiffany Alfred ("Alfred") (collectively, "Defendants"), and in support thereof, states as follows:

## INTRODUCTION

1.       In the early hours of March 25, 2019, Mr. Hughes was awoken to banging on his door by HPD Officers Garcia and Few. The officers claimed to be following up on a driving while intoxicated ("DWI") incident that Mr. Hughes had witnessed days earlier, on March 23, 2019, while driving for Uber Technologies, Inc ("Uber"). Mr. Hughes recognized the officers as the same officers who had responded to the scene of the DWI incident in response to his 911 call.  The

1

officers insisted that they needed to see Mr. Hughes's phone in order to verify the details of the Uber ride that was ongoing at the time that he witnessed the drunk driver. Though Mr. Hughes had already provided the details of the Uber ride, and had even emailed screenshots of the ride details from his Uber driver's application (hereinafter, "Uber App") to Officer Garcia on the night of the incident, he nonetheless, retrieved his phone and opened the door to comply with the officers' request. However, instead of retrieving the phone, Defendants Few and Garcia physically pulled Mr. Hughes out of his apartment and arrested him on charges of impersonating a public officer. Mr. Hughes, who had never been arrested previously, was then booked into jail and not released until over twenty-four hours later.

2.      Mr. Hughes had been arrested by Defendants pursuant to a warrant on a charge of impersonating a public servant for his lawful (and commendable) actions on March 23, 2019, when he reported a drunk driver to 911 and prevented the driver from leaving the scene until police arrived. On June 17, 2019, after hiring a lawyer to defend him on the bogus charge, the case against him was dismissed for the unsurprising reason that "[n]o probable cause exist[ed]… to believe the defendant committed the crime." Indeed, no probable cause ever existed to believe that Mr. Hughes committed the crime of impersonating a public servant. Instead, Defendants relied on the outlandish narrative of the DWI suspect, who was admittedly intoxicated, and which contained several inconsistencies and was contradicted by overwhelming evidence available to Defendants at the time Defendants pursued the arrest warrant and criminal charge against Mr. Hughes and at all times thereafter.

3.      Nonetheless, the warrant was obtained through the wrongful acts of Defendants, which included but is not limited to, making several material omissions and false statements in the probable cause affidavit and Defendants included several material omissions and misstatements

2

Still, Defendants pursued the charge against Mr. Hughes, knowing that probable cause did not exist, and attempted to conceal their wrongdoing by including

4.      This lawsuit concerns the unlawful actions of Defendants, both individually and collectively, for violating Mr. Hughes's constitutional rights in connection with Mr. Hughes's unlawful arrest on March 25, 2019, pursuant to a warrant obtained through the wrongful institution of the legal process, and his subsequent criminal prosecution.

## SUBJECT MATTER JURISDICTION AND VENUE

5.      This action arises under 42 U.S.C. § 1983 and § 1988. This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3).

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in Harris County and Defendants are residents of Harris County and, thus, subject to personal jurisdiction in this District.

## PARTIES AND PERSONAL JURISDICTION

7.      Plaintiff Austin Hughes is a resident of Houston, Texas.

8.      Defendant City of Houston is a municipal corporation organized under the laws of the State of Texas. At all times relevant to this action, HPD was an agency of the City of Houston through which the city fulfills its policing functions. HPD sets city-wide policies for the police officers it employs.

9.      Defendant Harris County is a political subdivision of the State of Texas, organized and existing by virtue of the laws of Texas.  At all times relevant to this action, the Harris County District Attorney's Office was an agency of Harris County, which, in addition to its prosecutorial functions, was assigned investigative functions related to suspected crimes occurring in the county.

10.     At all times relevant to this action, Defendant Acevedo, who is being sued in his official capacity, was employed as the Chief of Police for HPD, was a final policy maker for HPD and set city-wide policy for HPD police officers.

11.     At all times relevant to this action, Defendant Ogg, who is being sued in her official capacity, was employed as the Harris County District Attorney for the Harris County District Attorney's Office, was a final policy maker for the District Attorney's office, and set county-wide policies for Harris County assistant district attorneys.

12.     At all times relevant to this action, Defendant Garcia was employed by the City of Houston as an HPD police officer. All of Defendant Garcia's actions and/or inactions were taken under color of state law and within the scope of his employment as an HPD officer. He is being sued in his individual capacity.

13.     At all times relevant to this action, Defendant Few was employed by the City of Houston as an HPD police officer. All of Defendant Few's actions and/or inactions were taken under color of state law and within the scope of his employment as an HPD officer. He is being sued in his individual capacity.

14.     At all times relevant to this action, Defendant Seymour was employed by the City of Houston as an HPD police sergeant. All of Defendant Seymour's actions and/or inactions were taken under color of state law and within the scope of his employment as an HPD officer. He is being sued in his individual capacity.

15.     At all times relevant to this action, Defendant Alfred was employed by Harris County as an Assistant District Attorney with the Harris County District Attorney's Office. All of Defendant Alfred's actions and/or inactions were taken under color of state law and within the

scope of her employment as a Harris County Assistant District Attorney. She is being sued in her individual capacity.

**FACTS**

**A.     Plaintiff's Background**

16.     Mr. Hughes is a native of Detroit, Michigan, where his father served as a reserve police officer in the Detroit Police Department for many years.

17.     Mr. Hughes earned his bachelor's degree in criminal justice from Wayne State University, located in Detroit, Michigan, in 2010, and shortly thereafter, served as a police officer in the Auburn Hills Police Department, a suburb north of Detroit. Mr. Hughes worked as an officer for the Auburn Hills Police Department from approximately February 2012 through July 2014.

18.     During his time as an Auburn Hills police officer, Mr. Hughes made many lawful arrests, including for charges of operating a vehicle while intoxicated and operating a vehicle while visibly impaired. Mr. Hughes received many commendations from his colleagues and superiors for his work while at the Auburn Hills Police Department.

19.     In approximately August 2014, following his departure from the Auburn Hills Police Department, Mr. Hughes moved from Michigan to Houston, Texas and has remained a resident ever since.

20.     While living in Houston, Mr. Hughes has primarily worked as a medical sales representative, and has supplemented his income through security jobs and driving for Uber.

**B.     The Drunk Driving Incident Reported by Mr. Hughes**

21.     At the time of the incident, on or around March 23, 2019, Mr. Hughes had recently left his job as a medical sales representative and was seeking employment with another company in the medical sales field. While searching for a new medical sales position, Mr. Hughes was

employed as security for NettBar, a local bar located at 4504 Nett St., Houston, TX 77007 ("Nettbar") and was supplementing his income by working as a driver for Uber.

22.     In the early morning hours of March 23, 2019, at approximately 2:00 A.M., Mr. Hughes drove his vehicle, a black Jeep Wrangler, to Nettbar to pick up his paycheck.

23.     Upon leaving Nettbar, Mr. Hughes turned on his Uber driver's application (hereinafter, "Uber App") to try and pick up a fare before proceeding home. Soon after, at approximately 2:26 A.M., Mr. Hughes received a ride request through the Uber App from nearby passengers. He accepted the request and immediately left NettBar to pick up the passengers at the corner of Nett Street and Parker Street. Mr. Hughes picked up two female passengers (hereinafter, the "Uber Passengers") and proceeded to drive them to their requested destination located on Main Street in Houston, TX 77025.

24.     While driving on highway I-610 South on the way to the Uber Passengers' requested destination, Mr. Hughes observed a white GMC Sierra (hereinafter, the "Sierra") driving extremely erratically in front of him. In particular, Mr. Hughes observed the Sierra recklessly swerving back and forth across multiple lanes in a highly dangerous manner. Based on Mr. Hughes's observations and experience, he suspected that the driver of the Sierra, later identified as Edgar Gomez (hereinafter, the "Sierra Driver" or "Gomez"), was highly intoxicated and constituted a danger both to himself and others.

25.     Accordingly, Mr. Hughes turned on the flashers of his vehicle and called 911 to request police assistance while continuing to follow the Sierra.

   i.     *Mr. Hughes's First Recorded Phone Call with 911*

26.     Mr. Hughes's first recorded phone call to 911 began at approximately 2:37 A.M., just minutes after he picked up the Uber Passengers (hereinafter, the "First 911 Call"). Mr. Hughes

requested that the dispatcher send police to his location on I-610 South near the Highway 59 exit because a white GMC Sierra, which he later identified by license plate number, was driving very erratically in front of him on the highway. Mr. Hughes explained that he was a "former" police officer and, based on the Sierra's erratic driving, suspected that the driver was drunk. Mr. Hughes informed the dispatcher that he was driving a black Jeep Wrangler with his flashers on and was continuing to follow behind the Sierra. Mr. Hughes then proceeded to describe the Sierra's movements to the 911 dispatcher in real time.

27.     In particular, Mr. Hughes informed the dispatcher that the Sierra Driver was "running between like 3 or 4 lanes."  At one point, approximately one and one-half minutes into the First 911 Call, the Uber Passengers can be heard shrieking in the background of the recorded call, with one of the passengers clearly stating that the Sierra Driver "hit the curb." Upon hearing the Uber Passengers shrieking, the dispatcher asked Mr. Hughes if the Sierra Driver "crash[ed] into anyone," to which Mr. Hughes responded that "he hit the median."

28.     The dispatcher then asked if the Sierra had stopped, to which Mr. Hughes responded "no, he's keeping going." One minute later, at approximately 2:40 A.M., Mr. Hughes told the dispatcher that the Sierra Driver was "about to hit the right median right now," followed by confirmation that he "definitely just hit the right median." Immediately after the Sierra Driver hit the right median, Mr. Hughes told the dispatcher that the Sierra was finally "stopping right now."

29.     When asked if he thought the Sierra Driver needed medical attention, Mr. Hughes responded that police were going to have to draw blood on him due to his extreme intoxication. Mr. Hughes was then transferred to a medical dispatcher to continue the 911 call.

ii.     *Mr. Hughes's Second Recorded Phone Call with 911*

30.     In his second 911 recording with medical dispatchers (hereinafter, the "Second 911 Call"), Mr. Hughes again identified his location and explained that he is reporting a "drunk driver." Mr. Hughes then told the dispatcher that he was about to get out of his own vehicle, explaining:

> **"I need to get them [the Sierra Driver] out of the car because, I mean, <u>they're going to kill somebody</u>."**

31.     Approximately two minutes later, Mr. Hughes returned to his phone, telling the dispatcher "I'm here. I took the keys." Mr. Hughes can then be heard shouting at the Sierra Driver to "stay" and "get back in the car" multiple times, later explaining to the dispatcher that he was "**just trying to keep him [the Sierra Driver] from not getting hit**."

32.     When the dispatcher asked Mr. Hughes whether anyone was in need of medical assistance, Mr. Hughes again responded by telling the dispatcher that officers would "have to draw blood on him" because "**that's how drunk he is.**" Finally, the dispatcher informed Mr. Hughes that police and medical assistance were on the way and ended the call.

### iii.     Mr. Hughes's Lawful Detention of the Sierra Driver

33.     In addition to the erratic driving, Mr. Hughes also observed several obvious signs of intoxication on the Sierra Driver, including glassy eyes, slurred speech, loss of coordination, and a strong odor of alcohol. Moreover, when Mr. Hughes approached the Sierra to retrieve the driver's keys, the Sierra Driver was attempting to continue to drink alcohol from bottles found in his car. Mr. Hughes then took the driver's keys, alcohol bottles, and driver's license, which was sitting in the cupholder of the Sierra, and returned to his own vehicle to continue the call with 911.

34.     After Mr. Hughes retrieved the driver's car keys and returned to his own vehicle, the driver made multiple attempts to flee on foot in the direction of the highway. As previously indicated, Mr. Hughes can be heard in the Second 911 Call making multiple verbal attempts to

prevent the Sierra Driver from running onto the highway with repeated directions to "get back in the car," "close the door," and "stay right there," but to no avail.

35.     Because the Sierra Driver would not comply with Mr. Hughes's instructions to stay in his vehicle and/or out of the road, Mr. Hughes had no choice but to attempt to physically restrain the Sierra Driver in order to prevent him from proceeding onto the highway and injuring himself and/or others.  When the Sierra Driver continued to strenuously resist Mr. Hughes's attempts at restraint, Mr. Hughes retrieved handcuffs from his vehicle and used them to detain the struggling driver while they waited for police to arrive.  In the meantime, Mr. Hughes's Uber Passengers ordered another ride, and were picked up on the shoulder of I-610 prior to police officer's arrival on the scene.

36.     At no point in the interaction between Mr. Hughes and the Sierra Driver did Mr. Hughes ever identify himself to the Sierra Driver as a police officer or even a former police officer. Instead, Mr. Hughes took action as a private citizen under the authority of Texas law to prevent the Sierra Driver from continuing to drive under the influence and/or otherwise pose a danger to himself and others.

*iv.     Third-Party Witness Phone Call to 911*

37.     At the same time that Mr. Hughes was on the phone with 911 dispatchers, a third-party witness also called to report the Sierra for drunk driving and gave dispatchers a nearly identical account to the one given by Mr. Hughes.  In particular, at 2:39 A.M., just two minutes after Mr. Hughes initially dialed 911, the witness stated the following in a separate, recorded 911 call (the "Witness Call"):

> "I need police. **There is actually a drunk driver driving right now** and we're like trying to drive behind him. But… **he's… running into the sides and everything**….

> He's like stopped over to the side of the road but he just ran into
> like the side, and I'm pretty sure he's drunk because he's been
> going like side to side."

38.     When asked if she thought the driver of the Sierra needed medical attention, the

witness responded:

> "I don't know. **He just needs off the road because he just almost
> caused like a wreck. He's like literally swerving side to side to
> side**."

39.     The witness then stated that she is "pulled behind him [the Sierra Driver] right now

with my hazards on because **he just stopped because he hit the wall**."  The witness also confirmed

to the dispatcher that the intoxicated driver was driving a white GMC Sierra, with the same license

plate number as that identified by Mr. Hughes.

40.     The witness then described seeing Mr. Hughes, who she identified as the driver of

a "black Jeep" that was pulled behind the Sierra. The witness told the dispatcher that "[t]here's a

guy trying to get him [the Sierra Driver] out of the car now," in reference to Mr. Hughes, and stated

that the guy "came and… took alcohol bottles out of his [the Sierra Driver's] car." Shortly

thereafter, the witness hung up with 911 and left the scene before police officers arrived.

*v.     Initial Investigation by Defendants Garcia, Few, and Alfred*

41.     According to the police report submitted by Defendant Few following the incident

(hereinafter, the "Police Report"), Defendants Few and Garcia arrive on the scene at 2:54 A.M.,

approximately nine minutes after Mr. Hughes's Second 911 Call was disconnected.

42.     Once Defendants Few and Garcia arrived on the scene, Mr. Hughes gave them the

Sierra Driver's car keys and driver's license. Defendant Garcia then switched out the handcuffs on

the Sierra Driver for his own and placed the Sierra Driver into the back of his patrol car. Defendants

Few and Garcia also requested Mr. Hughes's driver's license, which he immediately provided to

them, and requested that Mr. Hughes meet them at the nearby Shell station at I-59 and Chimney Rock so that the officers could take his statement. Mr. Hughes agreed and drove his Jeep from the scene to the location instructed by Defendants.

43. When Defendants Few and Garcia arrived at the Shell station, Defendant Few approached Mr. Hughes to take his statement while Defendant Garcia interviewed the Sierra Driver.

44. In his interview with Defendant Few, Mr. Hughes relayed his observations regarding the Sierra Driver's erratic driving on I-610 and described his own efforts to prevent the Sierra Driver from continuing to drink alcohol and drive or to flee onto the highway on foot. Like Mr. Hughes explained to the 911 dispatcher, Mr. Hughes described observing the Sierra swerving back and forth across multiple lanes on the highway, and even hitting the median, before coming to a stop on the right shoulder of the road. Mr. Hughes explained that he was a former police officer in Michigan, and based on that experience and his observations, he believed that the Sierra Driver was highly intoxicated. Mr. Hughes also explained that he felt as though he had to do something to intervene before the Sierra Driver killed someone. Indeed, Mr. Hughes's actions in calling 911 to report the drunk driver and subsequently detaining the Sierra Driver until police arrived, were taken with the sole intention of preventing the Sierra Driver from continuing to pose a threat to the safety of himself and others.

45. Regarding Mr. Hughes's detention of the Sierra Driver, and according to Defendant Few's police report, Mr. Hughes stated that he had "informed his Uber fairs [*sic*] they needed to call another ride as he had to stop the [Sierra Driver] from driving off… and then went and started to detain the [Sierra Driver] who struggled with him." Defendant Few also recorded that Mr. Hughes told him that he had the handcuffs because "he was a police officer… at one time."

46.     Meanwhile, Defendant Garcia was interviewing the Sierra Driver in Spanish. According to Defendant Garcia's written report, the Sierra Driver told him the following outlandish narrative:

> "On 3-23-2019 I was at **a flea market** with Jesse and his friends (Uber drivers [*sic*] alias). Jesse said that we could go back to his place and that he lived on 59 south near downtown. I told Jesse that I lived on I10 and he said that he would take me home later. I said okay because **I had been drinking on night [*sic*] and had more than 7 beers. I was too drunk to drive** but I had a friend at **the bar** that could of [*sic*] taken me home. **Jesse said let's go to his house and he offered to drive so we went**. Mid way during the trip I was not familiar with where I was at. I started to ask Jesse where he was taking me. I finally asked Jesse to just take me home and that is when he got mad. Jesse asked if I had something going on with his wife. I told Jesse no. Jesse then asked me what I got going on with his wife. I was confused and asked what he meant. Jesse said he knows there is something going on**. Jesse stopped my truck on the freeway and got out of it.** He came to my passenger side door and was trying to get me out of the car. I was confused at this point and only wanted to know what was going on. Jesse kept telling me I am fucked and how I was going to be deported. I was on the freeway so I could not just get away from Jesse. Finally Jesse told me to turn around and put my hands behind my back. When I did not do it fast enough Jesse kneed my legs to force me to comply. **I asked Jesse why he was doing this and who gave him the right to do this. Jesse told me he was a police officer. Jesse then put me in handcuffs.** My leg was hurting making it hard for me to stand and I had scratches on my wrists from him trying to handcuff me."

47.     Not only did the Sierra Driver admit to drinking "more than 7 beers" and being "too drunk to drive," his stories also contained several inconsistencies and was belied by the evidence available to Defendants Garcia and Few at the time of the incident. Some of the facial inconsistencies in the Sierra Driver's story include the following:

- Mr. Hughes's name is not Jesse;
- the Sierra Driver initially says he was at "a flea market" with Jesse when he agreed to go back to Jesse's house, but then refers to his friend "at the bar;"
- flea markets are not open at 2 AM;
- the Sierra Driver claimed that he had not been driving, but Mr. Hughes and the Sierra Driver were the only two people at the scene, and there were two vehicles at the scene – the Sierra and Mr. Hughes's black Jeep;
- it is unclear where Mr. Hughes obtained the handcuffs and/or what his motive or purpose was for handcuffing the Sierra Driver or who called police.

48.     Still, after taking the Sierra Driver's statement, Defendant Garcia approached Mr. Hughes to request the names and contact information of the Uber Passengers in his vehicle at the time he witnessed the Sierra driver's erratic driving. Mr. Hughes informed Defendants Garcia and Few that he did not have the Uber Passengers names or contact information due to Uber's privacy policies, but he was able to show them the Uber trip details that were available in his Uber App for the ride. After giving his statement and showing officers the Uber trip information, Defendants Garcia and Few informed Mr. Hughes that he could leave, at which point Mr. Hughes drove his Jeep to his apartment located at 3810 Law Street.

49.     According to the incident report, Defendant Garcia also called and spoke with Defendant Alfred after interviewing the Sierra Driver. According to Defendant Garcia's report, Defendant Alfred told Defendant Garcia that she "would like from [him] to contact one of the Uber passengers to cooperate [sic] [Mr. Hughes's] story before accepting a DWI charge." Defendant Alfred also instructed Defendant Garcia "to do the SFST's [standard field sobriety tests] to preserve the evidence in case [they] needed to revisit the DWI charge in the future." In directing Defendant Garcia on gathering evidence, Defendant Alfred was performing investigative functions as opposed to the prosecutorial functions of her job.

50.     Defendant Garcia reported that he performed horizontal gaze nystagmus ("HGN") on the Sierra Driver and "got 6/6 clues," providing a strong indication that the Sierra Driver was highly intoxicated and over the legal limit to drive. Defendant Garcia reported that he was "unable to complete the other test because the [Sierra Driver]'s leg was pretty banged up."

51.     According to the incident report, and pursuant to Defendant Alfred's instructions, Defendant Garcia then called Mr. Hughes in another attempt to get the contact information for the Uber Passengers.

52.     Mr. Hughes had recently arrived home and was taking a shower when he missed multiple calls from a blocked number. Defendant Garcia called again at around 4:00 A.M. and Mr. Hughes was able to answer the phone. It was Defendant Garcia, who requested that Mr. Hughes return to the scene to speak with him. Mr. Hughes asked Defendant Garcia why he wanted Mr. Hughes to return to the scene, and Defendant Garcia responded that they needed additional information to be able to charge the Sierra Driver with a DWI.

53.     Mr. Hughes expressed that he could not see a reason why they would need him to return to the scene at that hour and suggested that the officers could come to his apartment to get more information or that he could give them additional information over the phone, but that he would not be returning to the scene at that time. Defendant Garcia then asked Mr. Hughes for the contact information for the Uber Passengers for a second time. Mr. Hughes reiterated that he did not have the Uber Passengers contact information but offered to send Defendant Garcia screenshots of the trip details provided by Uber to Defendant Garcia's police department email address.

54.     Defendant Garcia accepted this offer, and at 4:02 A.M., Mr. Hughes sent an email to Defendant Garcia at michael.garcia@houstonpolice.org with the subject line "3/23/19 DUI 610 S @ 59" containing screenshots of the Uber trip details. The images that were emailed to Defendant Garcia reflect the following facts:

   a. the Uber ride was requested on March 23 at 2:26 AM with a pickup location on Nett Street, Houston, TX 77007 and a requested drop off location on Main Street, Houston, TX 77025;

   b. Mr. Hughes picked up the Uber Passengers at the corner of Nett Street and Parker Street at approximately this time;

   c. the license plate number of the vehicle registered to the Uber driver was the same as the license plate number of Mr. Hughes's black Jeep Wrangler that Defendants observed the scene of the suspected DWI;

14

d.  the duration of the Uber ride was 9 minutes and 35 seconds and the distance traveled was 6.43 miles, which matches the approximate drive time and driving distance between the location at which the Uber Passengers were picked up and the location on I-610 where Mr. Hughes stopped behind the Sierra.

55.     Accordingly, the Uber receipts provided by Mr. Hughes corroborated his version of events and debunked the Sierra Driver's narrative.

56.     Nonetheless, after receiving the ride details, Defendant Garcia falsely reported that "the email stated the fare started on Neff and ended on Main which is not the stopping point of [Mr. Hughes's] location on the freeway." This is incorrect. The Uber App trip details reflected the start and end point of the ride request, as input by the passengers, and not where the ride actually ended. Defendant Garcia's incorrect assumption that Main St. was the actual end point of the ride was inconsistent with all of the other evidence provided, including but not limited to the time that the ride occurred, the duration of the ride, and the distance traveled, which were all provided in the trip details sent by Mr. Hughes.

57.     Regardless, the Uber trip details clearly state that the ride was requested at 2:26 A.M. and lasted nearly ten minutes. According to the officers' own narrative, they were dispatched to the scene at 2:48 A.M. This timeline is completely inconsistent with the Sierra Driver's story, as Mr. Hughes could not have been with the Sierra Driver at a flea market or bar, nor driving the Sierra from a flea market or bar, when provided evidence that he was driving Uber passengers in his own vehicle at the time.

58.     Instead of focusing on the actual crime that occurred – the DWI –Defendant Garcia next called the Detroit and Auburn Hills Police Departments to verify that Mr. Hughes was in fact a former police officer in the Detroit area. After confirming that Mr. Hughes previously worked as an officer in the Auburn Hills Police Department, Defendant Garcia then "contacted the Harris

County DA's Office and talked to ADA Alfred again." On that call, Defendant Garcia reported that he "explained the new details about this case and ADA Alfred stated she would accept impersonating a police officer charges" on Mr. Hughes. Defendant Alfred not only directed the course of the reckless investigation, she instructed Defendant Garcia on the information that was necessary for each charge, and told Defendant Garcia that she would accept the charge against Mr. Hughes, despite the unreliability of the witness and the exculpatory information of which she was aware.

59.     Unbelievably, Defendants Few and Garcia then allowed the Sierra Driver's family to come and pick him up from the scene and did not arrest him or charge him with DWI despite the overwhelming evidence against him on that charge. Defendants Few and Garcia also did not request medical attention for the Sierra Driver, despite the fact that Defendant Garcia claimed that he could not complete the remaining SFSTs on the Sierra Driver because his leg was too "banged up."

60.     Meanwhile, Mr. Hughes, who had simply tried to do the right thing in preventing a drunk driver from returning to the road, was unaware that he was being investigated for his actions on March 23, 2019, or that a charge of impersonating a peace officer had already been accepted by the Harris County District Attorney's Office in reliance on the DWI suspect's fabricated tale.

**C.     Unlawful Arrest and Malicious Prosecution of Mr. Hughes for Impersonating a Public Servant**

61.     Two days later, in the early morning of March 25, 2019, Defendants Garcia and Few purportedly "did a follow up investigation on a impersonating a police officer" charge against Mr. Hughes. That same morning, Defendant Garcia wrote a probable cause affidavit replete with material omissions and misstatements and delivered it to the Harris County District Attorney's Office, who, through Defendant Alfred, had already agreed to accept the charges while the

investigation was ongoing. Based on Defendant Garcia's fraudulent affidavit, Mr. Hughes was charged by complaint for the felony offense of impersonating a public servant in Cause No. 1625741 (Offense Report No. 36316419) in the 262nd Criminal District Court of Harris County, Texas, and officers were given a warrant for Mr. Hughes's arrest.

62.     Defendants Garcia and Few then "walked the warrant… and got permission from Sgt Seymour to do a knock and talk." At or around 3:00 A.M. on March 25, 2019, Defendants Garcia and Few began banging on the front door of Mr. Hughes's apartment. Mr. Hughes, who had been celebrating his anniversary the previous night, was asleep in bed with his wife when he heard the began to hear the pounding at his door. Alarmed, he went to see who it was, and attempted to peer out the peephole but could not see anything because someone was blocking the peephole from the outside. Eventually, as the knocking continued, the individual removed their hand from the peephole and Mr. Hughes was able to identify Defendants Garcia and Few as the officers who investigated the DWI incident a couple nights prior.

63.     Mr. Hughes spoke through the door to ask the officers what they needed, especially at such an early hour. The officers responded that they needed to see Mr. Hughes's Uber App. Mr. Hughes reminded the officers that he had already sent the information from his Uber App to Defendant Garcia's city email. The officers were not swayed and insisted that they needed Mr. Hughes's actual cell phone to be able to review the trip details themselves through the Uber App. Mr. Hughes retrieved his phone and cracked open the door to give it to the officers. However, instead of taking the phone, officers grabbed Mr. Hughes's outstretched arm and pulled him out of his apartment into the hallway and handcuffed him

64.     Mr. Hughes was not dressed at the time, and Officers allowed his wife to put clothes on him, before escorting him down to the squad care and taking him to the Harris County Joint

Processing Center to be booked. Mr. Hughes was told that he would be booked and released, but that was not the case. He was placed in the jail's general population for over 24 hours until he was finally allowed to be released the following day, March 26, 2019, at or around 11:00 A.M.

65.     On the day he was released, Mr. Hughes was scheduled for a job interview at 1:45 p.m. for a medical sales representative position. Mr. Hughes attended the interview, despite his mental distress, and was not offered the job. Likewise, due to the felony charge of impersonating a peace officer, Mr. Hughes was immediately barred from driving for Uber and his driver account was suspended

66.     Prior to this incident, Mr. Hughes had never been to jail or been arrested.

67.     At the time of Mr. Hughes's arrest, no reasonable official, with the information available to Defendants, could have objectively concluded that probable cause existed to support the arrest warrant or the criminal charge brought against Mr. Hughes.

68.     Mr. Hughes was forced to hire an attorney to defend him against the frivolous felony charge he was facing as a direct result of Defendants' collective misconduct.

69.     On June 17, 2019, the State of Texas requested that the criminal action against Mr. Hughes be dismissed on the basis that "[n]o probable cause exist[ed]… to believe the defendant committed the crime." That same day, Harris County Judge Lori Chambers Gray ordered that the case against Mr. Hughes be dismissed.

70.     Mr. Hughes subsequently filed for expunction of the charge against him, and on February 13, 2020, Mr. Hughes's petition for expunction of the criminal case against him was finally granted.

**D.     Defendants Lacked Probable Cause to Arrest and Charge Plaintiff with Impersonating a Peace Officer**

71.     Defendants charged Mr. Hughes with impersonating a public servant and arrested him pursuant to a warrant on March 25, 2019, without probable cause to do so. Defendants' purported probable cause was based solely on the probable cause affidavit prepared by Defendant Garcia on the morning of March 25, 2019, which contained numerous material omissions and false statements.

72.     Defendant Garcia's probable cause affidavit was made in support of the charge that on March 23, 2019, Mr. Hughes "unlawfully, intentionally impersonate[d] a public servant, namely, a peace officer with intent to induce Edgar Gomez to submit to his pretended official authority and to rely on his pretended official acts, by stating he was a Police Officer."

73.     In an attempt to gin up probable cause for this charge, Defendant Garcia knowingly and/or with reckless disregard for the truth, made numerous material omissions and false statements in his affidavit. Although Defendant Garcia purported to relay both Mr. Hughes's and Gomez's version of events, he omits all reference to the evidence and circumstances that corroborate Mr. Hughes's story and definitively undermine Gomez's story. The omissions and false statements are critical to the finding of probable cause, which relies almost entirely on Gomez's uncorroborated allegation that Mr. Hughes told Gomez that he was a police officer. This did not occur, and had Defendant Garcia not made the material omissions and false statements in his affidavit, this one statement from a discredited witness with ulterior motives would certainly have been insufficient to support a finding of probable cause.

74.     Defendant Garcia's affidavit reported Mr. Hughes's statement as follows:

> "I spoke to [Mr. Hughes] who told me that he was an Uber driver and while taking two females to their destination, he saw [Gomez] driving a white pickup truck. [Mr. Hughes] stated that [Gomez] hit a concrete barrier on the driver's side of the truck and then veered right and came to a stop on the right shoulder of the freeway. [Mr. Hughes] told me that he stated to the two females that he had to take

action and that he was a former police officer and had the two females get out of the car and find another ride home, while he tried to detain [Gomez]."

75.     Defendant Garcia later states that he "listened to a call that [Mr. Hughes] made to 911 and heard [Mr. Hughes] tell 911 dispatch that he was a former police officer and asking [Gomez] for identification." Defendant Gomez also states that he "asked [Mr. Hughes] to provide the names and phone number of the two females in the vehicle with him when he observed [Gomez] but he would not do so."

76.     Defendant Garcia fails to include the evidence and information verifying Mr. Hughes's narrative and providing context for his actions. For instance, Defendant Garcia fails to include critical information from Mr. Hughes's 911 call, even though he expressly **admits** that he listened to the call. Specifically, Defendant Garcia omits that:

- Mr. Hughes called 911 for the express purpose of reporting a drunk driver, later identified as Gomez, who was driving the Sierra in front of him on the highway;

-  Mr. Hughes stated that he was driving a black Jeep behind the Sierra, and continued to describe the Sierra's erratic movements, including swerving across multiple lanes and hitting both medians, in real-time to the 911 operator on the call, while two female voices can be heard shrieking in the background with one stating that the drunk driver "hit the curb;"

- Mr. Hughes, again in real time, describes stopping behind the Sierra; states that he is going to approach the Sierra in an effort to stop him from "kill[ing] somebody;" and later returns to the 911 call and informs the operator that he retrieved the driver's keys; and

- Mr. Hughes can be heard in the 911 call repeatedly yelling to Gomez to "stay" and "get back in the car," explaining that he is "just trying to keep [Gomez] from not getting hit."

77.     Defendant Garcia also fails to mention that there is a third-party 911 call reporting the Sierra as a drunk driver, which completely corroborates Mr. Hughes's description and confirms that Gomez was indeed driving the Sierra while intoxicated.

78.     Defendant Garcia also includes several misstatements regarding concerning Mr. Hughes's actions. First, Defendant Garcia swore under oath that he "listened to a call that the Defendant [Mr. Hughes] made to 911 and **heard the Defendant** tell 911 dispatch that he was a *former* police officer and **asking the complainant [the Sierra Driver] for identification**." (emphasis added). However, Mr. Hughes never asked the Sierra Driver for identification (he simply took it from the cupholder) and undoubtedly cannot be heard doing so on his 911 calls.

79.     Additionally, Defendant Garcia claimed that he asked Mr. Hughes to provide the names and phone numbers of the two females in the vehicle with him when he observed Gomez but that Mr. Hughes "would not do so." This is misleading at best. As Mr. Hughes explained multiple times, he was unable to give Defendants the Uber Passengers' contact information because Uber does not provide its drivers with their passengers' contact information for privacy purposes. Defendant Gomez failed to mention that Mr. Hughes did provide him with screenshots of the Uber ride details with these female passengers, which verified Mr. Hughes's version of events and completely discredited the Sierra Driver's story, as previously explained.

80.     Just as Defendant Garcia omitted material information from the probable cause affidavit that tended to corroborate Mr. Hughes's story, he also omitted material information that discredited Gomez's story.

81.     In relaying Gomez's statement in the affidavit, Defendant Garcia first claimed that Gomez told him that Mr. Hughes "search his car before [officers] arrived" and claims that "Officer A. Walters… told [Defendant Garcia] that [Mr. Hughes] handed documents to him that he said he retrieved from [Gomez's] vehicle." However, Officer Walters is not mentioned once in the incident reports, or anywhere other than the probable cause affidavit, and moreover, Mr. Hughes did not

"search" Gomez's vehicle or take any "documents" from the Sierra. He retrieved only the car keys, alcohol bottles, and Gomez's driver's license.

82.     Defendant Garcia then continued describing Gomez's statement as follows:

"Gomez told me that while he was being detained and handcuffed by [Mr. Hughes], he asked [Mr. Hughes if he was a police officer and [Mr. Hughes] replied, 'Yes, I am a police officer.' [Gomez] stated that when he refused to turn around, [Mr. Hughes] struck him multiple times with knees to his legs. [Gomez] stated that he had been drinking at a flea market on Airline Dr. and met [Mr. Hughes] and his two female friends there. [Gomez] stated that they talked most of the night and [Mr. Hughes] invited [Gomez] to his house to have some drinks. [Gomez] stated that [Mr. Hughes] offered to drive his white pickup truck and [Gomez] agreed since he had been drinking. [Gomez] stated that [Mr. Hughes] told him he lived on the 59 freeway going to downtown. [Mr. Hughes] and [Gomez] headed out and two females drove [Mr. Hughes's] jeep. [Gomez] stated that mid trip he became uncomfortable with the situation and asked to be taken home. [Gomez] stated that an argument began and [Mr. Hughes] got upset and pulled the vehicle over on the freeway. [Gomez] stated that [Mr. Hughes] got out and began ordering him out of the vehicle. [Gomez] stated he was forced out of the vehicle and then handcuffed. [Gomez] stated that he was hit several times in the leg during this process by [Mr. Hughes]. [Gomez] stated the [sic] he felt pain and wanted to pursue charges."

83.     Not only does this version inexplicably include more detail than the version in the incident report, Defendant Garcia also included several statements from Gomez's narrative in the affidavit that he knew to be demonstrably false and omitted key pieces of information that would have demonstrated the statement's falsity. Specifically, Defendant Garcia fails to state that at the time he took Gomez's statement, he and Defendant Few were investigating Gomez for DWI, and that Mr. Hughes and another unrelated party had called in to report Gomez for DWI and describing his reckless driving. Likewise, Defendant Garcia fails to state that he performed HGN on Gomez and got "6/6 clues," demonstrating Gomez's high level of intoxication at the time his statement was taken.

84.     Defendant Garcia also does not include the fact that Gomez identified Mr. Hughes by the wrong name, or that Mr. Hughes provided Defendant Garcia with Uber receipts

demonstrating that Mr. Hughes could not have been drinking with Gomez at a flea market all night, or driving his pickup, since he was driving Uber Passengers in his Jeep approximately starting at approximately 2:30 A.M. – mere minutes before police officers were dispatched to the scene.

85.     Had Defendant Garcia included all material information and/or omitted the false information identified from his affidavit, there would have undisputedly been no probable cause for Mr. Hughes's arrest.

86.     Probable cause for an arrest exists "if at the time of the arrest, facts and circumstances within the officers' knowledge, **and of which they had reasonably trustworthy information**, were sufficient to warrant a prudent officer to believe the crime had been committed." *See Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534 (1991).

87.     Given the facts and circumstances available to Defendants at the time of Mr. Hughes arrest, no reasonably prudent officer could have believed that Mr. Hughes had committed the crime of impersonating a peace officer on March 23, 2019.

88.     Under Texas law, a person commits the offense of impersonating a peace officer if he "impersonates a public servant with intent to induce another to submit to his pretended official authority or to rely on his pretended official acts ..." Tex. Pen.Code § 37.11(a)(1). Here, there was no probable cause to believe that Mr. Hughes either (1) impersonated a public servant or (2) did so with the intention that the Sierra Driver submit to his "pretended official authority" or rely on "pretended official acts," let alone both.

89.     Regarding the first element, the only purported evidence that Mr. Hughes impersonated a public servant was the Sierra Driver's statement that "Jesse" told the Sierra Driver that he was a police officer prior to handcuffing him. This single statement from a discredited

witness with ulterior motives during his telling of a narrative that was demonstrably false is undoubtedly insufficient to support probable cause.

90.     Regarding the second element, Mr. Hughes could not have intended that the Sierra Driver "submit to his **pretended official authority**," when he was acting pursuant to the actual authority granted by Texas law to "any… person" to "arrest an offender when the offense is committed in his presence or within his view, if the offense is one classed as a felony or as an offense against the public peace." Tex. Code Crim. Proc. art. 14.01(a).

91.     Whether an act constitutes an offense against the public peace depends on the particular circumstances of each case but typically "requires evidence that 'the person's conduct poses a threat of continuing violence or harm to himself or the public." It is clear that Gomez's drunken driving and subsequently running onto the highway  posed a continuing threat of har to both himself and the public. Moreover, Texas courts have long accepted DWI as an offense that is by its nature one against the public peace." *Denkowski v. State*, No. 14-16-00273-CR, 2017 WL 3568760, at *4 (Tex. App. – Houston [14th Dist.] Aug. 17, 2017, no pet.) (quoting *Miles v. State*, 241 S.W.3d 28, 40-42 (Tex. Crim. App. 2007)); *see also Funes v. State*, No. 08-19-00053-CR, 2020 WL 4353185, at *3 (Tex. App. – El Paso July 29, 2020, no pet.) (not designated for publication) ("driving while intoxicated is considered a 'breach of the peace' for purposes of the citizen's arrest statute") (collecting cases).

92.     Mr. Hughes also had probable cause to make a citizen's arrest of Gomez for driving while intoxicated based on his observations of Gomez's extremely erratic driving, visible signs of intoxication observed by Mr. Hughes, Gomez's continued attempts to drink alcohol from bottles found in his car, and Gomez's continued attempts to flee in the direction of traffic. *See id.* (collecting cases finding probable cause for DWI based on observations of erratic driving and

driver's visible signs of intoxication); *Miles*, 241 S.W.3d at 40-42 (affirming trial court's determination that probable cause existed for a citizen's arrest for DWI testified that he had observed the behavior of numerous drunk drivers in his capacity as a wrecker driver, further stated that appellant "didn't seem coordinated, he didn't have good coordinational skills" and that appellant's "motor skills seemed to be off"); *LeCourias v. State*, 341 S.W.3d 483, 489 (Tex. App.–Houston [14th Dist.] 2011, no pet.) (holding probable cause that defendant drove while intoxicated existed when witness informed 911 dispatcher of defendant's erratic driving and defendant's performance on the field-sobriety tests was "dismal").

93.     Given the facts and circumstances available to Defendants at the time of Mr. Hughes's arrest, no reasonable officer could have objectively concluded that probable cause existed to support the arrest warrant.

**E.     The Customs, Policies and/or Practices of HPD and the Harris County District Attorney's Office Directly Caused the Violations of Plaintiff's Constitutional Rights.**

94.     Mr. Hughes was unlawfully arrested as a result of several faulty customs, policies and/or practices in place at HPD and the Harris County District Attorney's Office.

95.     First, HPD has a long-held custom, policy and/or practice of deliberately and/or recklessly mishandling incidents of DWI and failing to train HPD officers on the proper handling of DWI charges. Indeed, shortly after Mr. Hughes's arrest, in June 2019, Defendant Acevedo admitted that Houston and Harris County are the "worst city and the worst county… for DWI and the scourge of DWI," and admitted that there is a need for HPD officers to undergo additional training related to the enforcement of DWI laws and the proper handling of DWI investigations and arrests.[1] As of the March 23, 2019 incident, HPD officers were still inadequately trained on the handling of DWI incidents pursuant to HPD's long-standing custom.

---

[1] *See* https://www.youtube.com/watch?v=FAEc8ufnsOk.

96.     As a direct result of HPD's failure to train and deliberate or reckless indifference to DWI incidents, Defendants Garcia and Few recklessly mishandled the DWI incident here, by letting the drunk driver (Gomez) go without consequence and pursuing baseless charges against a responsible citizen who intervened for the safety of the community. Thus, the violation of Mr. Hughes's constitutional rights occurred as a direct result of this custom and/or policy.

97.     HPD has also maintained a custom, policy and/or practice that allows and approves of HPD officers making material omissions and false statements in probable cause affidavits in order to obtain warrants at times when probable cause does not actually exist to support the warrants. More egregious, when confronted with instances of officer misconduct involving dishonesty in probable affidavits – HPD has a custom of failing to appropriately punish the offending officer and downplays the seriousness of the conduct. HPD's practice of turning a blind eye towards dishonesty in policing fosters an environment where HPD officers are encouraged and/or feel comfortable in continuing to make false statements and material omissions in probable cause affidavits in order to secure warrants that lack the requisite probable cause. Such a policy routinely causes HPD officers to violate the constitutional rights of Houston citizens, and indeed, caused such a violation here.

98.     Some examples demonstrating HPD and Defendant Acevedo's continued policy of disregarding HPD officer's dishonesty to secure warrants without probable cause include the following:

- HPD officer lied about material facts in a probable cause affidavit to secure a search warrant leading to the Harding Street drug raid that ended in two citizens being murdered. Defendant Acevedo commented that he didn't "have any indication it's a pattern or practice," but the following evidence shows otherwise:

  o The Houston Chronicle found numerous instances in which HPD officers "filed false affidavits when they asked judges for search warrants or arrest warrants[;]… performed sloppy investigative work and misrepresented

their use of confidential informants, according to disciplinary records and court documents." The investigation also uncovered few consequences for officers that do lie in affidavits, for instance one HPD officer was suspended for just 10 days for filing false police reports in six incidents;[2]

- o When asked about the Houston Chronicle investigation, and particularly the number of other instances of officers filing false affidavits, Defendant Acevedo stated as follows: "one of the incidents that was reported on by the *Chronicle*, I think when it is all said and done, it's not going to be the smoking gun that it was portrayed as early on. But I'll wait until those facts come out. And they will come out. When you look at our department and you look at the kind of work they've done, I think that on balance, there's been a lot worse out there…" This is typical of Defendant Acevedo and HPD's policy of downplaying misconduct, particularly the filing of false affidavits. Defendant Acevedo has also publicly stated that HPD officers "had probable cause to be there," at the Harding Street raid, despite the HPD officer lying in his probable cause affidavit. These kinds of statements demonstrate to officers that such conduct is acceptable to HPD leadership;

- Former HPD officers claim that they tried to warn officials back in 2018 that other officers were fabricating evidence and lying to judges but that nothing was done about it;[3]

- HPD officer lied about material facts of an alleged DWI offense leading to a conviction of a Houston citizen, who served 11 years in prison before exonerating himself and learning that the HPD officer at issue had been found guilty of misconduct by HPD 35 times, including other instances of dishonesty.[4]

99.     These are just a few instances of a pervasive policy that fosters routine dishonesty in probable cause affidavits for the purpose of securing warrants by any means necessary.

100.     Defendant City of Houston, through HPD and Defendant Acevedo, has approved of and allowed a policy and/or custom at HPD whereby officers are comfortable submitting false affidavits in order to secure warrants without the requisite probable cause.

---

[2] https://www.houstonchronicle.com/news/houston-texas/houston/article/deadly-Houston-misconduct-botched-raid-police-14850548.php.
[3] https://abc13.com/harding-street-botched-raid-deadly-houston-police-department/10277716/.
[4] https://www.usatoday.com/in-depth/news/investigations/2019/10/14/brady-lists-police-officers-dishonest-corrupt-still-testify-investigation-database/2233386001/.

101.    Written policies of HPD and the Harris County District Attorneys' Office also operate to ratify a joint policy whereby HPD officers and assistant district attorneys work in concert to secure warrants and/or criminal charges without probable cause. In particular, through the written policies, Harris County Assistant District Attorneys work with HPD officers in the investigations of crimes and then they collectively determine which evidence to gather and submit in order to successfully secure a warrant.

102.    The relevant written policies include HPD General Order 500-07, which states that "[t]he Houston Police Department shall work cooperatively with district attorney's offices to help reduce the number of cases dismissed… as well as protect officers from frivolous Internal Affairs complaints." General Order 500-07 further requires HPD officers to speak with an assistant district attorney "before filing charges… to ensure that the charges will be accepted." In accordance with this policy, HPD officers and Harris County assistant district attorneys then work together to ensure that the affidavits contain sufficient information to secure a charge or warrant, regardless of its veracity and without including any disqualifying information. HPD General Order 500-07 was executed by Defendant Acevedo.

103.    Likewise, Defendant Ogg established a similar written policy for the Harris County District Attorney's Office. Defendant Ogg's Policy, Evidence Integrity HCDAO 2017 CAP, also has the stated intention that Harris County assistant district attorneys "collaborate with law enforcement agencies… [to] solve and prosecute crimes more effectively."  In accordance with this policy, the Harris County District Attorney's Office "is responsible for review of every criminal case that law enforcement seeks to file in Harris County, making it the literal 'front door' of our local criminal justice system." Indeed, "[u]nlike most jurisdictions where police officers 'direct file' their cases following arrest, in Harris County, the District Attorney reviews all cases

prior to filing charges or authorizing the jailing of an individual." The policy further admits that the application of the probable cause standard by the district attorney at such an early stage "prior to an accused even appearing in court is nationally unique."

104.    The resulting policy and/or custom is that Harris County Assistant District Attorneys direct police officers in the investigation to ensure that probable cause can be established to secure a warrant or charge, regardless of if the totality of the facts and circumstances available to the officer would in fact demonstrate probable cause. The policy allows police officers to be intentionally selective, at the direction of the district attorney, in both gathering and presenting evidence to ensure that the affidavit demonstrates probable cause, whether or not it actually exists.

105.    Pursuant to these written policies, Defendant Garcia called Defendant Alfred at the outset of the case to determine the best way to conduct the investigation and present the evidence in order to allow the Defendants to bring a charge of impersonating a public servant against Mr. Hughes, despite overwhelming evidence that he did not commit such an offense. Working together, Defendants Alfred, Garcia and Few were able to manipulate the investigation, as well as the facts presented in the probable cause affidavit, to charge Mr. Hughes though probable cause clearly did not exist under the totality of the circumstances.

## COUNT ONE – 42 U.S.C. § 1983
## VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS
### *Unlawful Arrest Through the Wrongful Institution of Legal Process*
*(Defendants Garcia, Few, Seymour and Alfred, in their individual capacities)*

106.    Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

107.    The Fourth Amendment, as incorporated and applied to the states through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses,

papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; amend.

XIV. It is clearly established that the Fourth Amendment specifically protects the people's right

"to be free from police arrest without a good faith showing of probable cause." *Winfrey v. Rogers,*

901 F.3d 483, 494 (5th Cir. 2018).

108.    As described in the in the preceding paragraphs, Defendants Garcia, Few, Seymour

and Alfred (hereinafter, the "Individual Defendants"), while acting individually, jointly and in

conspiracy, as well as under color of law and within the scope of their employment, deprived

Plaintiff of his clearly established constitutional rights, including the right to be free from police

arrest without probable cause under the Fourth and Fourteenth Amendments.

109.    At the time of Plaintiff's arrest, the Individual Defendants knew or should have

known that they did not have probable cause to arrest Plaintiff on the charge of impersonating a

peace officer.

110.    In the manner described more fully above, the Individual Defendants conducted a

reckless criminal investigation, and knowingly included false statements and material omissions

in the warrant used to justify Plaintiff's arrest. Absent this misconduct, the arrest and subsequent

prosecution of Plaintiff could not and would not have been pursued.

111.    Additionally, and as explained more fully in the preceding paragraphs, Defendant

Garcia, while acting under the color of state law, deprived Plaintiff of his clearly established rights

under the Fourth Amendment, as applied to the states through the Fourteenth Amendment, by:

   a. Knowingly preparing a probable cause affidavit for an arrest warrant that contained
      numerous material omissions and false statements;

   b. Presenting the affidavit knowing of its falsity and material omissions, yet swearing
      under oath to the truthfulness of its contents;

   c. Obtaining an arrest warrant based on that faulty affidavit authorizing the arrest of
      Plaintiff on a felony charge;

d.  Going, together with Defendant Few and with the express approval of Defendant Seymour, all acting under color of law, to execute the arrest warrant against Plaintiff and transport him to jail to be booked on the baseless charge.

112.    Defendants would not have obtained the arrest warrant and/or charged Plaintiff if the probable cause affidavit did not include the material omissions and false statements.

113.    Each of the Individual Defendants participated in the reckless criminal investigation of Plaintiff and planned, executed and/or approved of the arrest and prosecution of Plaintiff knowing that probable cause did not exist for the charge against him. Defendant Garcia made the material omissions and false statements in the probable cause affidavit at the direction of and/or in cooperation with Defendants Few and Alfred, as part of their reckless criminal investigation. Defendant Seymour expressly approved and allowed Plaintiff's arrest despite the fact that he knew and/or should have known of the material omissions and false statements in the affidavit as a result of the reckless investigation.

114.    The Individual Defendants' misconduct, as described fully herein, directly resulted in the unjust arrest and criminal prosecution of Plaintiff, in violation of his rights under the Fourth and Fourteenth Amendments of the United States Constitution.

115.    Alternatively, the Individual Defendants are liable for failing to intervene in the violation of Plaintiff's rights. The Individual Defendants had a duty to intervene and a reasonable opportunity to intervene to prevent other Defendants from violating Plaintiff's rights in the manner described above but failed to do so.

116.    Thus, the Individual Defendants violated 42 U.S.C. § 1983 by detaining Plaintiff in violation of his Fourth Amendment expectation of privacy and guarantee to security from unreasonable search and seizure without reasonable suspicion and/or probable cause and by failing to provide supervision and/or proper training, where it was necessary and/or required by law.

117.    The Individual Defendants' misconduct, as described in this Count, was objectively unreasonable in light of the facts and circumstances known to them at the time, and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

118.    At the time of Individual Defendants' actions described herein, Defendant Alfred was assisting officers in the investigation of the crime, prior to a finding of probable cause, and was not acting in a prosecutorial capacity. Therefore, Defendant Alfred is not entitled to absolute immunity.

119.    At the time of Individual Defendants' actions described herein, no reasonable officer or investigator with the same information could have believed that his or her actions were lawful in light of clearly established law. Therefore, the individually named Defendants are not entitled to qualified immunity

120.    As a direct and proximate result of the Defendants' misconduct and the violations of Plaintiff's constitutional rights, Plaintiffs suffered, and will continue to suffer, embarrassment, humiliation, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent.

**COUNT TWO – 42 U.S.C. § 1983**
**VIOLATION OF FOURTEENTH AMENDMENT**
*Violation of Procedural Due Process for Filing False Report*
*(Defendant Garcia, in his individual capacity)*

121.    Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

122.    Defendant Garcia knowingly provided a false report to law enforcement and the Harris County District Attorney's Office regarding the incident.

123.    But for the false report, Plaintiff would not have been criminally charged. *See e.g. Cole v. Carson*, 802 F.3d 752 (5th Cir. 2015), *vacated on other grounds sub nom.*, Hunter v. Cole, 137 S.Ct. 497 (2016).

124.    An objectively reasonable police officer would have known that providing a false statement to law enforcement for the purpose of causing an unlawful arrest and continued detention, would violate clearly established law

125.    As a direct and proximate result of the Defendant Garcia's conduct, Plaintiffs suffered, and will continue to suffer, embarrassment, humiliation, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent.

### COUNT THREE – 42 U.S.C. § 1983
### VIOLATION OF FOURTH AND FOURTEENTH AMENDMENT
*Malicious Prosecution Causing Continued Loss of Liberty*
*(Defendants Garcia, Few, Seymour and Alfred, in their individual capacities)*

126.    Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

127.    The initiation of criminal charges without probable cause, which results in a deprivation of liberty, is a constitutional injury. *See e.g., Winfrey*, 882 F.3d at 196.

128.    The Individual Defendants' misconduct, as described fully herein, directly resulted the criminal charge against Plaintiff being filed without the requisite probable cause.

129.    As a result of the criminal charge being filed, Plaintiff's physical detention and loss of liberty was extended.

130.    As a result of Plaintiff's innocence and the lack of probable cause against him, the charge was dismissed.

131.    An objectively reasonable official would have known that no probable cause existed to arrest and charge Plaintiff, and that doing so would cause their continued detention in custody in violation of clearly established law.

132.     As a direct and proximate result of the Individual Defendants' conduct, Plaintiffs suffered, and will continue to suffer, embarrassment, humiliation, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent.

### COUNT FOUR– 42 U.S.C. § 1983:
### MUNICIPAL LIABILITY
***Constitutional Deprivation through Policy, Custom or Practice***
*(Defendants City of Houston and Harris County)*

133.     Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

134.     Local governing bodies, or municipalities, may be held liable under 42 U.S.C. §1983 for constitutional deprivations committed pursuant to a policy, custom, or practice of the municipality. Even absent an officially adopted policy, a custom or practice that is so persistent and widespread that it fairly represents a municipal policy will support liability against the municipality. A pattern of unconstitutional conduct may be shown on the part of municipal employees who are not policymakers.

135.     In addition, a failure to train may give rise to municipal liability if the failure to train amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton v. Harris*, 489 U.S. 378, 388 (1989).

136.     Defendants City of Houston and Harris County (collectively, "Municipal Defendants") knowingly failed to maintain policies, practices, and training that met the minimum standards in the industry.

137.     At all times relevant to this action, Defendants City of Houston and Harris County have maintained policies, customs and/or practices that caused and were the moving force behind the violation of Plaintiff's constitutional rights, as described in this Complaint.

138.    The acts and/or omissions of each Individual Defendant was caused by said policies, customs or practices.

139.    The policymakers for Defendants City of Houston and Harris County had actual or constructive knowledge about said policies, customs or practices and/or were deliberately indifferent as to said policies, customs or practices.

140.    Said policies, customs and practices include the following:

    a.  Defendant City of Houston's policy or custom of allowing HPD officers to use false affidavits to obtain warrants, including arrest warrants;

    b.  Defendant City of Houston's failure to train HPD officers on properly handling DWI incidents;

    c.  Defendant City of Houston's policy or custom of allowing HPD officers to violate policies related to criminal investigations and collection/reporting of evidence;

    d.  Municipal Defendants' written policies that encourage HPD officers and assistant district attorneys to manipulate investigations and the presentation of evidence in order to secure warrants without the requisite probable cause;

    e.  Municipal Defendants' failure to train HPD officers and assistant district attorneys on how to work together to conduct a proper criminal investigation, as opposed to cherry-picking facts to support probable cause;

    f.  Defendant Harris County's policy of assigning assistant district attorneys with criminal investigation responsibilities without properly training them regarding those investigatory responsibilities.

141.    Municipal Defendants, through their policymakers, including Defendants Acevedo and Ogg, had actual or constructive knowledge about, but were deliberately indifferent to, all of the policies, customs, and practices of HPD and the Harris County District Attorney's Office referenced in this Complaint. All such policies, customs, and practices were the moving force behind, and cause of, the deprivation of Plaintiff's constitutional rights and resulting damages. The conduct of each Individual Defendant as described in this Complaint was caused by said policies, customs, and practices.

142.    As a a direct and proximate result of the Defendants' conduct, Plaintiff suffered, and will continue to suffer, embarrassment, humiliation, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent.

**COUNT FIVE– 42 U.S.C. § 1983:**
**<u>SUPERVISORY LIABILITY</u>**
***Failure to Adequately Train and Supervise***
*(Defendants Acevedo and Ogg)*

143.    Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

144.    In order to establish supervisor liability for constitutional violations committed by subordinate employees, a Plaintiff must show, as relevant here, that the supervising personnel was "personally involved" in the alleged constitutional violations. *Turner v. Driver*, 848 F.3d 678, 695-96 (5th Cir. 2017); *Peha v. City of Rio Grande City*, 879 F.3d 613, 620 (5th Cir. 2018).

145.    To show personal involvement, the supervisor must know about the violation and personally direct the violation, facilitate it, approve it, condone it, turn a blind eye to it for fear of what he might see, or acquiesce in its continuance. *Turner*, 848 F.3d at 696 & n.88 (citing *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012); *Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996)).

146.    Defendants Acevedo and Ogg implemented and/or failed to implement the aforementioned policies, training, and supervision, which were the moving force that caused Plaintiff's constitutional injuries.

147.    Defendant Acevedo enforced a policy that authorized police officers to make false statements and omit material information in incident reports and probable cause affidavits in order to support false charges, which was relied upon by Individual Defendants to violate Plaintiff's constitutional rights.

148.    Defendant Acevedo enforced a policy that authorized Defendant Garcia's unlawful statement to law enforcement.

149.    Defendant Acevedo knew that HPD officers routinely made false statements and material omissions in affidavits for the purpose of securing warrants without probable cause, but failed to discipline officers for doing so.

150.    Defendant Acevedo through approval, as well as, repeated failures of oversight and deliberate indifference, fostered an environment where police officers felt comfortable directing and allowing police officers to include material omissions and false statements in probable cause affidavits to support unlawful arrests on charges unsupported by probable cause.

151.    Defendant Acevedo had the authority to prevent the false criminal charges from being filed, and to withdraw the criminal charges once they were filed but refused to do so.

152.    An objectively reasonable police chief would have known that maintaining such deficient policies and training would violate clearly established law.

153.    Defendant Ogg enforced a policy that authorized Assistant District Attorneys to direct HPD officers to make false statements and omit material information in probable cause affidavits in order to support bringing criminal charges without probable cause. Said policy was relied upon by Defendant Alfred to violate Plaintiff's constitutional rights.

154.    Defendant Ogg enforced a policy that authorized Defendant Garcia's unlawful statement to law enforcement.

155.    Defendant Ogg knew that assistant district attorneys, who lacked adequate training in the investigation of crimes, worked with law enforcement to secure criminal charges through probable cause affidavits that they knew containing material omissions and/or false statements but failed to discipline assistant district attorneys for doing so.

156.     Defendant Ogg through approval, as well as, repeated failures of oversight and deliberate indifference, fostered an environment where assistant district attorneys felt comfortable directing and allowing police officers to include material omissions and false statements in probable cause affidavits to support unlawful arrests on charges unsupported by probable cause.

157.     Defendant Ogg had the authority to prevent the false criminal charges from being filed, and to withdraw the criminal charges once they were filed but refused to do so.

158.     An objectively reasonable District Attorney would have known that maintaining such deficient policies and training would violate clearly established law.

159.     As a direct and proximate result of the Defendants' conduct, Plaintiffs suffered, and will continue to suffer, embarrassment, humiliation, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent

### COUNT SIX – 42 U.S.C. § 1983:
### <u>CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS</u>

160.     Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

161.     Following the March 23, 2019 incident, the Defendants reached an agreement with the Gomez and amongst themselves to unlawfully pursue Plaintiff for the crime of impersonating a police officer without probably cause, thereby depriving Plaintiff of his constitutional rights, as described in this Complaint.

162.     In this manner, Defendants, acting in concert with one another, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

163.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

164.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

165.     As a result of the Defendants' misconduct and the violations of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to financial harm and emotional distress.

## DAMAGES

166.     As a result of the foregoing unlawful and wrongful acts of Defendants, jointly and severally, Plaintiff has been caused to suffer general damages which include, but are not limited to, the following: both physical and emotional injury, pain and suffering, and emotional and mental distress, and shock.

167.     Said injuries have caused Plaintiff to incur special damages which include but are not limited to: lost wages, medical expenses, attorney's fees and the cost of his bond.

168.     Pursuant to the Civil Rights Attorney's Fees Award Act, 42 U.S.C.S. §1988, a prevailing party in a §1983 case is entitled to recover its attorney's fees. Hence, Plaintiff further prays for all costs and attorney fees associated with bringing the present case to trial.

169.     In addition, Plaintiff prays for punitive damages against the individual Defendant. Punitive damages are designed to punish and deter persons such as the individual Defendants who have engaged in egregious wrongdoing. Punitive damages may be assessed under §1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.

## JURY DEMAND

170.  Plaintiff hereby demands a trial by jury on all issues so triable.

## PRAYER

WHEREFORE, Plaintiff prays for judgment against Defendants for:

(a)    Compensatory damages to compensate for out-of-pocket losses, pain, suffering, and emotional distress suffered as a result of Defendants' actions or inactions articulated in this Original Complaint;

(b)    Punitive damages in a sum as to deter the Defendants from conduct of this nature in the future;

(c)    A declaration that Defendants' conduct, as set forth in this Original Complaint violated Plaintiff's rights under the Fourth Amendment to the United States Constitution;

(d)    An award of attorneys' fees and costs;

(e)    Such other relief as this Court deems just and proper.

Respectfully submitted this 17th day of June, 2021.

LAW OFFICE OF COURTNEY WARREN PLLC

By:  /s/ *Courtney B. Warren*
        Courtney B. Warren
        Texas Bar No. 24110511
        402 Hunt Street
        Houston, TX 77003
        courtney@cwarrenlaw.com
        Telephone: (512) 797-3855
        ***Attorney for Plaintiff***