**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **AUSTIN THOMPSON HUGHES** § | |
| § | |
| **Plaintiff,** § | |
| § | |
| **v.** § | **CIVIL ACTION NO. 4:21-cv-01994** |
| § | |
| **CITY OF HOUSTON, HARRIS** § | **(JURY TRIAL DEMANDED)** |
| **COUNTY, ART ACEVEDO, KIM OGG,** § | |
| **MICHAEL GARCIA, JOSHUA FEW,** § | |
| **JAMES SEYMOUR, and TIFFANY** § | |
| **ALFRED** § | |
| § | |
| **Defendants.** § | |

---

**PLAINTIFF'S SECOND AMENDED COMPLAINT**

---

COMES NOW, Plaintiff Austin Hughes ("Mr. Hughes" or "Plaintiff"), by and through undersigned counsel, and files this Second Amended Complaint against Defendants City of Houston; Harris County; *former* Houston Police Department ("HPD") Chief of Police Art Acevedo ("Acevedo"); Harris County District Attorney ("DA") Kim Ogg ("Ogg"); HPD Officers Michael Garcia ("Garcia") and Joshua Few ("Few"); HPD Sergeant James Seymour ("Seymour"); and Assistant District Attorney ("ADA") Tiffany Alfred ("Alfred") (collectively, "Defendants"), and in support thereof, states as follows:

## INTRODUCTION

1.     This case arises out of the Defendants' wrongful arrest and prosecution of a concerned citizen, Mr. Hughes, for his role in reporting and temporarily restraining a visibly drunk driver (hereinafter, "DWI Suspect") as he waited for HPD officers to arrive on the scene.

2.      Specifically, on March 23, 2019, at approximately 2:37 A.M., while Mr. Hughes was driving two female passengers to their specified destination for Uber Technologies, Inc. ("Uber"), he observed a white GMC Sierra (hereinafter, "Sierra") driving erratically in front of him on I-610 South. Mr. Hughes, a former police officer himself, recognized the signs of a very intoxicated driver, turned on the flashers of his Jeep, and called 911 to report the incident. After providing the 911 call-taker with his own identifying information, a detailed description of the Sierra, and their specific location on I-610, Mr. Hughes went on to describe the Sierra's movements in real-time as it weaved dangerously back and forth across multiple lanes of the interstate, hitting the concrete divider walls, and eliciting audible shrieks from Mr. Hughes's Uber passengers. The Sierra finally veered dramatically to the shoulder of the road and came to an abrupt stop. Mr. Hughes pulled behind the Sierra to await police.

3.      After stopping, Mr. Hughes got out of his Jeep and approached the Sierra to retrieve the driver's car keys and ensure that the DWI Suspect could not continue to drive, thereby, posing a further imminent threat to himself and others. In doing so, Mr. Hughes observed the DWI Suspect, in an obviously intoxicated state, sitting in the driver's seat of the Sierra attempting to continue drinking alcohol from bottles found in the vehicle. And so, in addition to the suspect's keys, Mr. Hughes also retrieved the alcohol bottles and the suspect's driver's license, which was visible in the Sierra's center cupholder, before returning to his Jeep. At that point, while still on the phone with 911, Mr. Hughes observed the DWI Suspect exit the Sierra and attempt to flee towards the center of the interstate on foot. Mr. Hughes can be heard yelling at the driver multiple times to "stay" and "get back in the car," before explaining to the 911 operator that he was "just trying to keep him [the DWI Suspect] from not getting hit." The operator assured Mr. Hughes that emergency units were being dispatched to the location and disconnected the call at approximately

2:45 a.m., 8 minutes after the call was made. HPD Officers Garcia and Few did not arrive on the scene until 2:54 a.m. – approximately 17 minutes after Mr. Hughes initiated the call to 911 and 9 minutes after the call ended.[1]

4.      In the meantime, the DWI Suspect continued to try and venture onto I-610 on foot in the way of oncoming and refused to get back in his vehicle or stay off of the interstate, as Mr. Hughes repeatedly instructed. With no officers in sight, and afraid for the safety of both the DWI Suspect and the other drivers on I-610, Mr. Hughes retrieved a set of handcuffs from his Jeep and used them to restrain the DWI Suspect and direct him to the side of the highway to continue to wait for police. Mr. Hughes had also suggested to his Uber passengers that they may want to request another ride, as he suspected that he would need to remain on the scene for some time after the officers finally arrived. The passengers ordered another Uber, and tellingly, the driver arrived to pick up the women from the same location on I-610 in response to an Uber request before HPD officers arrived in response to the two emergency calls reporting the Sierra as a drunk driver minutes earlier.

5.      When HPD Officers Garcia and Few did finally arrive at the scene, they swapped their handcuffs for the ones that Mr. Hughes had placed on the DWI Suspect and placed the suspect in the back of their squad car. After giving the officers the DWI Suspect's car keys and license, as well as his own driver's license, Mr. Hughes agreed to meet Defendants Garcia and Few at a nearby gas station to give them his statement. Once he had answered all of the officers' questions and

---

[1] The average response time for Defendant Garcia and Few's beat (18F20) in 2018 was 6.5 minutes for Priority 1 calls, defined as calls where "a potential threat to life or… of serious bodily injury is in progress." *See* Gen. Order 600-04, "Response Management," Houston Police Department (June 19, 2020); "Channel 2 Investigates: Houston Police Response Times," Feb. 18, 2019, available at: https://www.click2houston.com/news/2019/02/19/channel-2-investigates-houston-police-response-times. Although Mr. Hughes and an unrelated third party both called 911 to report the Sierra as a drunk driver and both informed the call-taker that the driver was weaving side-to-side across I-610, hitting the walls of the interstate, and needed off the road because he was going to cause a crash and/or kill someone, Defendants' response time was nearly 3x the average response time for Priority 1 calls.

provided them with the details of the Uber ride that were available to him, Mr. Hughes drove home in his Jeep – satisfied in thinking that the situation had been handled.

6.     Unbeknownst to him, once he left the scene, Defendants Garcia and Few, in coordination with Defendant Alfred, had inexplicably shifted the focus of their investigation from the clear DWI violation to a fabricated charge of impersonating a police officer against Mr. Hughes. To do so, Defendants seemingly adopted the outlandish story of the admittedly intoxicated DWI Suspect, the crux of which, was that the suspect had actually been a passenger in the Sierra and Mr. Hughes (whom the suspect called "Jesse") had been driving them both back to Mr. Hughes's house (because the suspect said he was "too drunk to drive"), when Mr. Hughes (a.k.a. "Jesse") suddenly got mad, pulled over to the side of the road and, while claiming to be a police officer, forcibly handcuffed the suspect for allegedly having "something going on with his wife." Despite the fact that the DWI Suspect was confirmed to be intoxicated, had clear motive to lie, and told a non-sensical story that was directly contradicted by all available evidence, Defendants relied solely on the DWI Suspect's version of events to fabricate charges against Mr. Hughes and unlawfully obtain a warrant for his arrest.  Likewise, despite having undeniable probable cause to arrest the DWI Suspect on a driving while intoxicated ("DWI") charge, Defendants simply let the suspect be picked up by family without further investigation or so much as a citation.

7.     Two days after the DWI incident, on March 25, 2019, at approximately 3:00 a.m., an unsuspecting Mr. Hughes was abruptly awoken to banging on his apartment door by Officers Garcia and Few. The officers claimed to be following up on the DWI incident that Mr. Hughes had witnessed days earlier and were insisting that they needed to see Mr. Hughes's phone in order to verify the details of the Uber ride that he'd been engaged in at the time he reported the DWI. Although Mr. Hughes had already emailed screenshots of the ride details from his Uber driver's

application (hereinafter, "Uber App") to Officer Garcia on the night of the incident, he nonetheless, retrieved his phone and opened the door to comply with the officers' request. Instead of taking the phone, however, Defendants Garcia and Few grabbed Mr. Hughes by the arm and pulled him out of his apartment and into the hallway of his building. Still half-dressed and half-asleep, the officers proceeded to handcuff Mr. Hughes and arrest him on charges of impersonating an officer. Mr. Hughes, who had never been arrested previously, was then taken to jail, where he was booked and not released for over twenty-four hours.

8.      After spending thousands of dollars to hire a lawyer, the charges against Mr. Hughes would eventually be dismissed by the prosecution on June 17, 2019 for the unsurprising reason that "[n]o probable cause exist[ed]… to believe the defendant committed the crime." Indeed, no probable cause ever existed to believe that Mr. Hughes committed the crime of impersonating an officer. Instead, acting in accordance with the policies and practices of HPD and the Harris County District Attorney's Office, Defendants, individually and collectively, violated Mr. Hughes's Fourth and Fourteenth Amendment rights under the Constitution of the United States by both engaging in and allowing acts leading to his unlawful arrest and prosecution, including but not limited to: woefully mismanaging the investigations of the DWI Suspect and, subsequently, of Mr. Hughes; failing to arrest and charge the DWI Suspect despite having clear probable cause to do so; relying on the DWI Suspect's clearly false statements to try and procure an arrest warrant against Mr. Hughes despite knowing of the statement's falsity; knowingly providing a probable cause affidavit in support of the arrest warrant that contained several material omissions and false statements, without which, probable cause could not have been found; and, in accordance with the fraudulently-obtained warrant, charging, arresting and incarcerating Mr. Hughes without sufficient probable cause.

## SUBJECT MATTER JURISDICTION AND VENUE

9.      This action arises under 42 U.S.C. § 1983 and § 1988. This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3).

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in Harris County and Defendants are residents of Harris County and, thus, subject to personal jurisdiction in this District.

## PARTIES AND PERSONAL JURISDICTION

11.     Plaintiff Austin Hughes is a 34-year-old black male residing in Houston, Texas.

12.     Defendant City of Houston is a municipal corporation organized under the laws of the State of Texas. At all times relevant to this action, HPD was an agency of the City of Houston through which the city fulfills its policing functions. HPD sets city-wide policies for the police officers it employs.

13.     Defendant Harris County is a political subdivision of the State of Texas, organized and existing by virtue of the laws of Texas. At all times relevant to this action, the Harris County District Attorney's Office was an agency of Harris County, which, in addition to its prosecutorial functions, was assigned investigative functions related to suspected crimes occurring in the county.

14.     At all times relevant to this action, Defendant Acevedo, who is being sued in his individual capacity, was employed as the Chief of Police for HPD, was a final policy maker for HPD and set city-wide policy for HPD police officers.

15.     At all times relevant to this action, Defendant Ogg, who is being sued in her individual capacity, was employed as the Harris County District Attorney for the Harris County District Attorney's Office, was a final policy maker for the District Attorney's office, and set county-wide policies for Harris County assistant district attorneys.

16.     At all times relevant to this action, Defendant Garcia was employed by the City of Houston as an HPD police officer. All of Defendant Garcia's actions and/or inactions were taken under color of state law and within the scope of his employment as an HPD officer. He is being sued in his individual capacity.

17.     At all times relevant to this action, Defendant Few was employed by the City of Houston as an HPD police officer. All of Defendant Few's actions and/or inactions were taken under color of state law and within the scope of his employment as an HPD officer. He is being sued in his individual capacity.

18.     At all times relevant to this action, Defendant Seymour was employed by the City of Houston as an HPD police sergeant. All of Defendant Seymour's actions and/or inactions were taken under color of state law and within the scope of his employment as an HPD officer. He is being sued in his individual capacity.

19.     At all times relevant to this action, Defendant Alfred was employed by Harris County as an Assistant District Attorney with the Harris County District Attorney's Office. All of Defendant Alfred's actions and/or inactions were taken under color of state law and within the scope of her employment as a Harris County Assistant District Attorney. She is being sued in her individual capacity.

## FACTS

**A.     Plaintiff's Background**

20.     Mr. Hughes is a native of Detroit, Michigan, where his father served as a reserve police officer in the Detroit Police Department for many years.

21.     In 2010, Mr. Hughes graduated from Wayne State University, located in Detroit, Michigan, with a bachelor's degree in criminal justice.

22.     On or around June 15, 2012, Mr. Hughes graduated from the Oakland Police Academy in Auburn Hills, Michigan, a suburb of Detroit, and was licensed by the Michigan Commission on Law Enforcement Standards (MCOLES) as a police officer. Mr. Hughes then joined the Auburn Hills Police Department, where he served as a police officer from approximately 2012 to 2014.

23.     As part of Mr. Hughes's MCOLES licensing requirements and in accordance with the national standards for "DWI Detection and Standardized Field Sobriety Testing" developed by the National Highway Traffic Safety Administration ("NHSTA") and International Association of Chief of Police ("IACP"), he was trained to recognize when a motorist is impaired by alcohol and/or drugs and to properly administer Standardized Field Sobriety Tests ("SFST").  Specifically, with regard to detection, Mr. Hughes was trained, in part, to recognize the cues identified by the NHSTA as being associated with a high probability of driver impairment. These cues, described in the NHSTA publication entitled "The Visual Detection of DWI Motorists," include (1) problems maintaining proper lane position (i.e., weaving across lane lines, almost striking a vehicle or other object), (2) speeding and braking problems (i.e. stopping abruptly for no apparent reason), (3) vigilance problems (i.e. failure to signal), and (4) judgment problems (i.e. improper or unsafe lane change, driving on other than the designated roadway).

24.     While an Auburn Hills police officer, Mr. Hughes made many lawful arrests, including arrests for charges of operating a vehicle while intoxicated ("OWI") – the Michigan equivalent of Texas's driving while intoxicated ("DWI") charge.[2]

---

[2] *Compare* Mich. Comp. Laws Ann. § 257.625 (1) ("A person, whether licensed or not, shall not operate a vehicle on a highway or other place open to the general public or generally accessible to motor vehicles, including an area designated for the parking of vehicles, within this state if the person is operating while intoxicated.") *with* Tex. Penal Code Ann. § 49.04(a) ("A person commits an offense if the person is intoxicated while operating a motor vehicle in a public place.").

25.     Mr. Hughes received many commendations for his work from colleagues and superiors at the Auburn Hills Police Department.

26.     In approximately August 2014, following his departure from the Auburn Hills Police Department, Mr. Hughes moved from Michigan to Houston, Texas, where he has resided ever since. While living in Houston, Mr. Hughes has primarily worked as a medical sales representative and has periodically supplemented his income by working security jobs and driving for Uber.

**B.     The Drunk Driving Incident Reported by Mr. Hughes**

27.     At the time of the incident, on or around March 23, 2019, Mr. Hughes had recently left his job as a medical sales representative and was seeking employment with another company in the medical sales field. While searching for another position, Mr. Hughes was also employed as security for NettBar, a local bar located at 4504 Nett St., Houston, TX 77007 ("Nettbar") and driving for Uber.

28.     On March 23, 2019, at approximately 2:00 A.M., Mr. Hughes drove his vehicle, a black Jeep Wrangler, to Nettbar to pick up his latest paycheck.

29.     After getting his paycheck and briefly socializing with his co-workers, Mr. Hughes left Nettbar and turned on his Uber driver's application (hereinafter, "Uber App") to try and pick up a fare before proceeding home. Soon after, at approximately 2:26 A.M., Mr. Hughes received a ride request through the Uber App from nearby passengers. He accepted the request and immediately left NettBar to pick up the passengers at the corner of Nett Street and Parker Street (approximately 0.1 miles away). Mr. Hughes picked up the two female passengers (hereinafter, the "Uber Passengers") and proceeded to drive them to their requested destination located on Main Street in Houston, TX 77025.

30.     While driving on highway I-610 South in the direction of the Uber Passengers' requested destination, Mr. Hughes observed a white GMC Sierra (hereinafter, the "Sierra") driving extremely erratically in front of him. Specifically, Mr. Hughes observed the Sierra recklessly weaving back and forth across multiple lanes of I-610 in a highly dangerous manner and at a high rate of speed. Based on Mr. Hughes's observations, as well his training and experience as a former police officer, he believed that the driver of the Sierra, later identified as Edgar Gomez (the DWI Suspect or "Gomez"), was highly intoxicated and constituted an imminent danger both to himself and others.

31.     Accordingly, Mr. Hughes turned on the flashers of his vehicle and called 911 to request police assistance while continuing to follow the Sierra on I-610.

### i.     *Mr. Hughes's First Recorded Phone Call with 911*

32.     Mr. Hughes's first recorded phone call to 911 began at approximately 2:37 A.M. (hereinafter, "First 911 Call"). On the call, Mr. Hughes stated that he was a "***former*** cop" from Michigan and was calling to request that police be sent to his location on I-610 South near the Highway 59 exit because a white GMC Sierra, which he also identified by license plate number, was driving very erratically in front of him on the freeway, specifically "running between like 3 or 4 lanes." During the call, Mr. Hughes also provided the call-taker with his name and contact information and informed her that he was driving a black Jeep Wrangler with his flashers on and would be continuing to follow behind the Sierra.

33.     While answering the call-taker's questions, Mr. Hughes periodically interrupted himself to describe the Sierra's erratic movements to the 911 call-taker in real time. At one point, approximately one and one-half minutes into the First 911 Call, Mr. Hughes starts to provide his call back number when he quickly interjects by saying "oh shit, he's about to…" Before he can

finish his thought, Mr. Hughes is interrupted by the sound of the Uber passengers shrieking in the background of the call, with one of the passengers clearly stating that the DWI Suspect "hit the curb." Upon hearing the Uber Passengers shrieking, the dispatcher asked Mr. Hughes if the suspect "crash[ed] into anyone," to which Mr. Hughes responded that "he hit the median." At the same time one of the Uber Passengers can be heard repeating that "he hit the curb."

34.     The dispatcher then asked: "Did he stop?" To which Mr. Hughes responded, "no, he's keeping going." One minute later, at approximately 2:40 A.M., Mr. Hughes can be heard telling the dispatcher "they're about to hit the right median right now," followed immediately with "and they definitely just hit the right median." The dispatcher again asked "are they stopping or they're still going?," to which Mr. Hughes responded "they're stopping right now."

35.     Because of the suspected high level of intoxication of the DWI Suspect, when Mr. Hughes was asked if he thought the DWI Suspect needed medical attention, he responded that the police would probably have to draw blood on him. The call-taker asked Mr. Hughes to stay on the line for Houston Medical and that police and ambulance would be dispatched. He was then transferred to a Houston Medical call-taker to continue the 911 call.

*ii.     Mr. Hughes's Second Recorded Phone Call with 911*

36.     Mr. Hughes's second 911 recording with the Houston Medical call-taker (hereinafter, the "Second 911 Call") began at approximately 2:40 a.m. Mr. Hughes was again asked to identify his location, and after doing so, told the call-taker that he was about to get out of his own vehicle, explaining:

> **"I need to get them [the DWI Suspect] out of the car because, I mean, <u>they're going to kill somebody</u>."**

37.     Approximately two minutes later, Mr. Hughes returned to his phone, telling the call-taker "I'm here. I took the keys." The call-taker then asked Mr. Hughes for his name and phone

number, which he gave, and asked what he was reporting.  Mr. Hughes again stated that he was a "***former*** police officer…from Michigan" and was reporting a "drunk driver," who he described as a "Latino man."

38.     In between his answers to the second call-taker, Mr. Hughes can be heard yelling at the DWI Suspect to "get back in the car" and "stay there" multiple times. At one point in the recording, a vehicle door is audibly closed, and Mr. Hughes immediately instructs the DWI Suspect to "get back in the car," to which the suspect can be heard responding "okay, okay, okay." Mr. Hughes is heard again telling the suspect again to "get back in the car" and then "stay, stay right there, close the door," which is followed immediately by the sound of the vehicle door once again closing once. Mr. Hughes later explains to the call-taker: "**I'm just trying to keep him [the DWI Suspect] from… getting hit**."

39.     When asked if anyone is needing medical assistance, Mr. Hughes tells the call-taker: "you guys are going to have to draw blood on him [the DWI Suspect] – **that's how drunk he is.**"

40.     Finally, the Houston Medical call-taker informed Mr. Hughes that emergency units were being dispatched to his location and ended the Second 911 Call at approximately 2:45 a.m.

### iii.     *Mr. Hughes's Lawful Detention of the DWI Suspect*

41.     At the time that Mr. Hughes approached the Sierra to retrieve the DWI Suspect's keys, while still on the phone with 911, Mr. Hughes had observed the DWI Suspect, in an obviously intoxicated state, seated in the front seat of the Sierra trying to drink alcohol from bottles found in his vehicle. Mr. Hughes also observed that the DWI suspect exhibited several other signs of intoxication, apart from his erratic driving, including the appearance of glassy eyes, slurred speech, loss of coordination, a strong odor of alcohol, and extremely erratic behavior.

42.     Mr. Hughes retrieved the DWI Suspect's keys, alcohol bottles and driver's license visible from the Sierra's center cupholder before returning to his Jeep. At that point, while still on

the phone with 911, Mr. Hughes observed the DWI Suspect exit the Sierra and attempt to flee towards the center of the interstate on foot, which prompted Mr. Hughes to instruct the suspect to return to his vehicle and stay off the highway several times.

43.    After the Second 911 Call ended, the DWI Suspect again exited the Sierra and continued to try and venture onto the interstate in the path of oncoming traffic. Mr. Hughes renewed his attempts to verbally restrain the suspect by instructing him to stay where he was or to get back into the Sierra, but to no avail.

44.    Mr. Hughes did not see any police officers approaching the scene and did not know how much longer it would take for officers to arrive. In the meantime, Mr. Hughes was worried for the safety of the DWI Suspect and other I-610 drivers, as the suspect would not comply with Mr. Hughes's instructions to stay in his vehicle and/or off the road. Given the imminent danger caused by the DWI Suspect's repeated attempts to walk onto the interstate in the direction of oncoming traffic, Mr. Hughes felt that the best and safest option would be to physically restrain the suspect and stand with him near their vehicles while they continued to wait for HPD police.

45.    Accordingly, Mr. Hughes retrieved handcuffs from his Jeep and used them to temporarily detain the DWI Suspect until police arrived. At no point in this interaction, or in any interaction between Mr. Hughes and the DWI Suspect, did Mr. Hughes ever identify himself as a police officer to the DWI Suspect or otherwise act under the guise of being a police officer. Instead, Mr. Hughes was simply acting as a concerned citizen who, having just witnessed an offense against the public peace – namely DWI, had the authority under Texas law to temporarily detain and/or make a citizen's arrest of the offender to prevent him from continuing to pose a danger to himself

and/or others.[3] Mr. Hughes had probable cause to effect the temporary detention and/or arrest of the DWI Suspect, especially given his training and previous experience as a police officer, because he personally observed the DWI Suspect (1) driving erratically on the highway, including weaving back and forth across multiple lanes, hitting the median, and stopping abruptly; (2) drinking alcohol in the front seat of his vehicle; (3) exhibiting several signs of intoxication; and (4) posing an imminent threat to himself and others by walking on to the interstate at night without regard to oncoming traffic.

46.     Mr. Hughes also suggested to his Uber Passengers that they may want to request another ride to take them home, as he suspected that the police would likely want him to stay and answer questions once they had finally arrived on the scene. The Uber Passengers took Mr. Hughes's suggestions and ordered another Uber driver. The second Uber drive arrived at their location on I-610 to pick up the Uber Passengers in response to their app request while Mr. Hughes and the handcuffed DWI Suspect continued to wait for HPD officers to arrive at the same location, though two separate emergency calls (one from Mr. Hughes and another from a third-party witness) had each been placed several minutes prior to the passengers' app request. Because of the HPD Officers' delayed response time, the Uber Passengers were no longer at the scene by the time Defendants arrived.

### iv.     *Third-Party Witness Phone Call to 911*

---

[3] *See e.g.* Tex. Code Crim. Proc. Ann. art. 14.01(a) ("[a] peace officer *or any other person*, may, without a warrant, arrest an offender when the offense is committed in his presence or within his view, if the offense is one classed as… an offense against the public peace"); *Denkowski v. State*, No. 14-16-00273-CR, 2017 WL 3568760, at *4-5 (Tex. App. – Houston [14th Dist.] Aug. 17, 2017, no pet.) (mem. op., not designated for publication) (noting that "Texas courts have long accepted DWI as an offense that is by its nature one against the public peace" and collecting cases finding that a citizen's arrest was appropriate because the citizen observed the arrestee likely driving while intoxicated).

47.     At approximately 2:39 a.m., just two minutes after Mr. Hughes initiated his 911 call, another third-party witness called into 911 to report the Sierra for drunk driving at the same location (the "Witness Call"). This third-party witness also identified the Sierra by color (white), make (GMC), model (Sierra), and license plate number, and gave the 911 call-taker a nearly identical account of the Sierra's erratic driving as the one given by Mr. Hughes. In particular, the witness told the call-taker as follows:

> "I need police. **There is actually a drunk driver driving right now** and we're like trying to drive behind him. But… **he's…running into the sides and everything**….
>
> **He's like stopped over to the side of the road but he just ran into like the side, and I'm pretty sure he's drunk because he's been going like side to side.**"

48.     When asked if she thought the driver of the Sierra needed medical attention, the witness responded:

> "I don't know. **He just needs off the road because he just almost caused like a wreck. He's like literally swerving side to side to side.**"

49.     The witness then stated that she is "pulled behind him [the Sierra Driver] right now with my hazards on because **he just stopped because he hit the wall**."  The witness then described seeing Mr. Hughes, who she later identified as the driver of a "black Jeep" that was pulled behind the Sierra. The witness explained to the call-taker that "[t]here's a guy trying to get him [the DWI Suspect] out of the car now," in reference to Mr. Hughes, and further stated that the guy "just came and… took alcohol bottles out of his [the DWI Suspect's] car." Shortly thereafter, the witness hung up with 911 stating that she planned to leave the scene because she didn't feel comfortable. The witness left the scene before HPD Officers arrived.

C.     **Defendants Garcia, Few, and Alfred's Gross Mismanagement of the DWI Investigation and Subsequent Fabrication of Charges Against Plaintiff**

   i.     *HPD Officers' arrival at the scene and Mr. Hughes's statement*

50.     Defendants Garcia and Few finally arrived on the scene at 2:54 A.M. – approximately 17 minutes after Mr. Hughes initiated his First 911 Call, 15 minutes after the Witness Call was initiated and 9 minutes after Mr. Hughes's Second 911 Call ended. The officers did not explain why their response time to the 911 calls, which each clearly described a potentially life-threatening situation, was 3x longer than the average response time for officers responding to similarly dangerous calls in their beat (18F20).[4]

51.     Nonetheless, once they arrived, Defendants Garcia swapped out the handcuffs on the DWI Suspect for his own and placed the suspect in the back of the squad car. Mr. Hughes then gave the officers the DWI Suspect's car keys and driver's license, as well as, his own driver's license, at the officers' request. Defendants Garcia and Few requested that Mr. Hughes meet them at the nearby Shell station at I-59 and Chimney Rock so that the officers could take his statement. Mr. Hughes agreed and drove his Jeep from the scene to the location instructed by Defendants.

52.     When Defendants Garcia and Few arrived at the Shell station, Defendant Few approached Mr. Hughes to take his statement while Defendant Garcia interviewed the DWI Suspect in Spanish.

53.     In Mr. Hughes's interview with Defendant Few, Mr. Hughes relayed his observations regarding the DWI Suspect's erratic driving on I-610 and described his own efforts to prevent the DWI Suspect from continuing to drink alcohol, drive and proceed onto the interstate

---

[4] *See* Gen. Order 600-04, "Response Management," Houston Police Department (June 19, 2020) (defining Priority 1 calls as calls where "a potential threat to life or… of serious bodily injury is in progress"); "Channel 2 Investigates: Houston Police Response Times," Feb. 18, 2019, available at: https://www.click2houston.com/news/2019/02/19/channel-2-investigates-houston-police-response-times (showing the average response time to Priority 1 calls for beat 18F20 as 6.5 minutes).

on foot. In particular, like Mr. Hughes explained to the 911 call-taker, he told Defendant Few that

he had observed the Sierra swerving back and forth across multiple lanes of the interstate, and even

hitting the median, before coming to a stop on the right shoulder of the road. Mr. Hughes explained

to Defendant Few that he used to be a police officer in Michigan and explained the signs of

intoxication that he had witnessed the DWI Suspect exhibiting. Based on that experience as well

as his own personal observations, Mr. Hughes explained that he believed the DWI Suspect was

highly intoxicated while driving the Sierra. Mr. Hughes also explained that he felt as though he

had to do something to intervene before the DWI Suspect killed someone through his reckless

driving, and later, through his reckless attempts to walk onto the interstate in the way of oncoming

traffic. Indeed, Mr. Hughes's actions in calling 911 to report the drunk driver and subsequently

detaining the DWI Suspect until police arrived, were taken with the sole intention of preventing

the DWI Suspect from continuing to pose a threat to the safety of himself and others.

54.     Indeed, a video produced by HPD just months before this incident described drunk

driving as "a gamble, a game of Russian roulette played on the road."[5] The video also included a

statement from a police sergeant stating "every arrest that we make for driving while intoxicated

saves a life, no question. Either the life of the person that was driving or the lives of the people

they were about to kill."  Sentiments that were echoed by the Chief of  the Vehicular Crimes

Division for the Harris County DA's Office months after the incident, when he explained,

"offenders for DWI are ticking time bombs[,] [e]very single one of them is just one quick wrong

turn or mistake away from taking one of our lives,"[6] later stating that the DWI problem in Harris

---

[5] "10,000 Lives," Produced by HPD, June 29, 2018, available at: https://www.youtube.com/watch?v=gPEGfCfsyjE.
[6] https://abc13.com/repeat-offenders-for-dwi-are-ticking-time-bombs-das-
office/5514302/?fbclid=IwAR3mXGKCP2tOIu9zgmaBJeg6yx9EiJQ0slF7iSCAQNdmFDHLOzLhvPty_4o.

County "is a catastrophic problem; it's a health crisis," and "[y]ou save lives when you take these people off the roads before the worst happens."[7]

55.      Thus, according to HPD and the Harris County DA's Office, Mr. Hughes's actions here saved lives. And yet, he would be punished for these actions by those very organizations.

### ii.      *Defendant Few and Garcia's Incident Report for Impersonating an Officer*

56.      Although there was clear evidence of a DWI and officers were called to the scene for a suspected DWI, Defendants Few and Garcia only submitted an incident report under the offense report title of "Impersonating an Officer" (hereinafter, "the Report"). The Report, submitted by Defendant Few, identified Mr. Hughes as the "suspect," and the DWI Suspect, Edgar Gomez, as the "Complainant." However, the Report seemed to acknowledge that Mr. Hughes was the one who called to report a crime, as it lists "Reportee Statement" to be the "same as the suspect." The Report accused Mr. Hughes of the offenses of "impersonating an officer" and "unlawful restraint – false imprisonment."

57.      Regarding Mr. Hughes's detention of the DWI Suspect, the Report describes Mr. Hughes as stating that he had "informed his Uber fairs [*sic*] they needed to call another ride as he had to stop the [DWI Suspect] from driving off… and then went and started to detain the [DWI Suspect] who struggled with him." Defendant Few also recorded that Mr. Hughes told him that he had the handcuffs because "he was a police officer… ***at one time***." (emphasis added).

58.      Meanwhile, Defendant Garcia was interviewing the DWI Suspect in Spanish, who, according to Defendant Garcia's written version of events in the Report, provided the following narrative:

> "On 3-23-2019 I was **at a flea market** with **Jesse** and his friends (**Uber drivers alias**). Jesse said that we could go back to his place and that he lived on 59 south

---

[7] https://www.click2houston.com/news/investigates/2019/12/10/a-catastrophic-problem-tracking-dwi-arrests-in-harris-county/.

near downtown. I told Jesse that I lived on I10 and he said that he would take me home later. I said okay because **I had been drinking on night [*sic*] and had more than 7 beers. I was too drunk to drive** but I had a friend **at the bar** that could of [*sic*] taken me home. Jesse said let's go to his house and he offered to drive so we went. Mid way during the trip I was not familiar with where I was at. I started to ask Jesse where he was taking me. I finally asked Jesse to just take me home andthat is when he got mad. Jesse asked if I had something going on with his wife. I told Jesse no. Jesse then asked me what I got going on with his wife. I was confused and asked what he meant. Jesse said he knows there is something going on**. Jesse stopped my truck on the freeway and got out of it.** He came to my passenger side door and was trying to get me out of the car. I was confused at this point and only wanted to know what was going on. Jesse kept telling me I am fucked and how I was going to be deported. I was on the freeway so I could not just get away from Jesse. Finally Jesse told me to turn around and put my hands behind my back. When I did not do it fast enough Jesse kneed my legs to force me to comply. **I asked Jesse why he was doing this and who gave him the right to do this. Jesse told me he was a police officer. Jesse then put me in handcuffs.** My leg was hurting making it hard for me to stand and I had scratches on my wrists from him trying to handcuff me."

59.     Not only did the DWI Suspect admit to drinking "more than 7 beers" and being "too drunk to drive," his stories also contained several facial inconsistencies and was belied by the evidence available to Defendants Garcia and Few at the time of the incident. Even assuming that Defendants had not heard the 911 calls by the time they arrived on the scene, it is clear that they knew Mr. Hughes was the one who called 911 to report the incident, and the DWI Suspect's statement itself contained the following facial inconsistencies:

- Mr. Hughes's name is not Jesse;

- the DWI Suspect initially says he was at "a flea market" with Jesse when he agreed to go back to Jesse's house, but then refers to his friend "at the bar;"

- no flea market in Houston is open at 2 AM;

- the DWI Suspect claimed that he had not been driving, but he and Mr. Hughes were the only two people at the scene, and both the DWI Suspect's Sierra and Mr. Hughes's Jeep were present at the scene;

- if Mr. Hughes was driving the suspect's Sierra, it is unclear where he would have obtained the handcuffs;

- it is unclear what Mr. Hughes's motive could have been for handcuffing the DWI Suspect allegedly for "having something going on with his wife" and then calling 911 to report the incident and waiting for police to show up;

- if the DWI Suspect knew "Jesse" enough to go back to his house, why wouldn't he know whether Jesse was a police officer; etc.

60.     Still, after taking the DWI Suspect's statement, Defendant Garcia approached Mr. Hughes to request the names and contact information of the Uber Passengers in his vehicle at the time he made the 911 call. Mr. Hughes informed Defendants that he did not have the Uber Passengers' names or contact information due to Uber's privacy policies, but he was able to show them the Uber trip details that were available in his Uber App for the ride. Defendant Garcia stated in the Report that Mr. Hughes said "so I am unbaked [unable] [sic] to get a phone number or name of the fare in my car because of privacy laws."

61.     However, Mr. Hughes showed Defendant Garcia his Uber App and the information available for his latest ride. After Mr. Hughes finished giving his statement and showing the officers his Uber trip information, Defendants Garcia and Few informed Mr. Hughes that he could leave, at which point Mr. Hughes drove his Jeep to his apartment located at 3810 Law Street.

### iii.     Defendants' Unreasonable Failure to Arrest and/or Charge the DWI Suspect Despite Clear Probable Cause that He Committed a DWI Offense.

62.     Although the Report prepared by Defendants Garcia and Few appears to only relate to a suspected offense of "impersonating an officer" by Mr. Hughes, the investigation into Mr. Hughes is inextricably intertwined with the DWI investigation, or lack thereof, against Mr. Gomez – the DWI Suspect and Complainant against Mr. Hughes.

63.     In the Report, Defendant Garcia describes his initial actions as follows:

> "Upon arrival I Officer Garcia switched out handcuffs and searched the prisoner for any weapons. I Officer Garcia **placed the suspect into my patrol car. Officers moved the accident off the freeway**

**to an open location to conduct the DWI investigation.** Officer
Few gathered information from the **suspect** while I spoke Spanish
and gathered information from the **Complainant**."

64.     However, the incident report defines Mr. Hughes as the suspect and Gomez (the

DWI Suspect) as the Complainant. Defendant Garcia never placed Mr. Hughes in his squad car

but did place Gomez in his squad car at the scene of the DWI. At best, this is an example of

Defendant Garcia conflating the DWI investigation and subsequent baseless investigation into Mr.

Hughes. At worst it's a bold-faced lie. However, Defendant Garcia does appear to admit that

Defendants knew they were called to the scene to conduct a DWI investigation, as he states that

officers "*moved the accident* off the freeway… *to conduct the DWI investigation*."

65.     Nonetheless, according to the incident report, after Defendant Garcia interviewed

the DWI Suspect, he called and spoke with Defendant Alfred before proceeding further. Defendant

Garcia claims that Defendant Alfred told him that she "would like for [him] to contact one of the

Uber passengers to cooperate [sic] [Mr. Hughes's] story before accepting a DWI charge." He also

states that Defendant Alfred instructed him "to do the SFST's [standard field sobriety tests] to

preserve the evidence in case [they] needed to *revisit* the DWI charge in the future." In directing

Defendant Garcia on gathering evidence, Defendant Alfred was performing investigative functions

as opposed to the prosecutorial functions of her job.

66.     Accordingly, the report demonstrates that Defendant Alfred instructed and/or

approved of Defendants Few and Garcia's decision to change the focus of the investigation from

the DWI, of which there was probable cause, to pursuing charges against Mr. Hughes.  Defendant

Alfred also unreasonably instructed and/or approved of Defendant Few and Garcia's decision not

to arrest the DWI Suspect or continue pursuing a DWI charge that night, despite the clear existence

of probable cause under Texas law.

67.     Defendant Garcia reported that he then performed horizontal gaze nystagmus ("HGN") on the DWI Suspect and "got 6/6 clues," providing a strong indication that the Sierra Driver was highly intoxicated and over the legal limit to drive. Defendant Garcia reported that he was "unable to complete the other test because the [DWI Suspect]'s leg was pretty banged up."

68.     According to the incident report, and pursuant to Defendant Alfred's instructions, Defendant Garcia then called Mr. Hughes in another attempt to get the contact information for the Uber Passengers.

69.     Mr. Hughes had recently arrived home and was taking a shower when he missed multiple calls from a blocked number. Defendant Garcia called again at around 4:00 a.m. and Mr. Hughes was able to answer the phone. It was Defendant Garcia, who requested that Mr. Hughes return to the scene to speak with him. Mr. Hughes asked Defendant Garcia why he wanted Mr. Hughes to return to the scene, and Defendant Garcia responded that they needed additional information to be able to charge the DWI Suspect.

70.     Mr. Hughes expressed that he could not see a reason why they would need him to return to the scene at that hour and suggested that the officers could come to his apartment to get more information or that he could give them additional information over the phone, but that he would not be returning to the scene at that time. Defendant Garcia then asked Mr. Hughes for the contact information for the Uber Passengers for a second time. Mr. Hughes reiterated that he did not have the Uber Passengers contact information but offered to send Defendant Garcia screenshots of the Uber trip details that he did have to Defendant Garcia's police department email address.

71.     Defendant Garcia accepted this offer, and at 4:02 A.M., Mr. Hughes sent an email to Defendant Garcia at michael.garcia@houstonpolice.org with the subject line "3/23/19 DUI 610

S @ 59" containing screenshots of the Uber trip details. The images that were emailed to Defendant

Garcia reflect the following facts:

    a.   the Uber ride was requested on Saturday, March 23 at 2:26 AM with a pickup location on Nett Street, Houston, TX 77007 and a requested drop off location on Main Street, Houston, TX 77025;

    b.   Mr. Hughes picked up the Uber Passengers at the corner of Nett Street and Parker Street at approximately this time;

    c.   the license plate number of the vehicle registered to the Uber driver was the same as the license plate number of Mr. Hughes's black Jeep Wrangler that Defendants observed at the scene of the suspected DWI;

    d.   the duration of the Uber ride was 9 minutes and 35 seconds and the distance traveled was 6.43 miles, which matches the approximate drive time and driving distance between the location at which the Uber Passengers were picked up and the location on I-610 where Mr. Hughes was stopped behind the Sierra.

    72.    Accordingly, the Uber receipts provided by Mr. Hughes corroborated his version

of events and debunked the DWI Suspect's narrative.

    73.    Nonetheless, after receiving the ride details, Defendant Garcia falsely reported that

"the email stated the fare started on Neff and ended on Main which is not the stopping point of

[Mr. Hughes's] location on the freeway." This is incorrect. The Uber App trip details reflected the

start and end point of the ride request, as input by the passengers, and not where the ride actually

ended. Defendant Garcia's incorrect assumption that Main St. was the actual end point of the ride

was inconsistent with all of the other evidence available, including but not limited to the time that

the ride occurred, the duration of the ride, and the distance traveled, which were all provided in

the trip details sent by Mr. Hughes.

    74.    Regardless, the Uber trip details clearly state that the ride was requested at 2:26

A.M. and lasted nearly ten minutes. According to the officers' own narrative, they were dispatched

to the scene at 2:48 A.M. This timeline is completely inconsistent with the DWI Suspect's story,

as Mr. Hughes could not have been with the DWI Suspect at a flea market or bar, nor driving the

Sierra from a flea market or bar, when the evidence provided to them corroborates Mr. Hughes's story and demonstrates that he was driving Uber passengers in his own vehicle at the time.

75.     Instead of focusing on the actual crime that occurred – the DWI –Defendant Garcia next called the Detroit and Auburn Hills Police Departments to verify that Mr. Hughes was in fact a former police officer in the Detroit area. After confirming that Mr. Hughes previously worked as an officer in the Auburn Hills Police Department, Defendant Garcia then "contacted the Harris County DA's Office and talked to ADA Alfred again." On that call, Defendant Garcia reported that he "explained the new details about this case and ADA Alfred stated she would accept impersonating a police officer charges" on Mr. Hughes. Defendant Alfred not only directed the course of the reckless investigation, she instructed Defendant Garcia on the information that was necessary for each charge, unreasonably refused to accept a DWI charge, and told Defendant Garcia that she would accept the charge against Mr.Hughes, despite the unreliability of the witness and the exculpatory information of which she was aware.

76.     Unbelievably, Defendants Garcia and Few, in coordination with Defendant Alfred, then allowed the DWI Suspect's family to come and pick him up from the scene without arresting him or charging him with DWI despite the overwhelming evidence against him on that charge.[8]

77.     These actions, while consistent with HPD and Harris County DA's pattern and practice of mishandling DWI investigations (explained *infra*), were in direct violation of HPD's recently promulgated written policy that purportedly required officers to "investigate and, if probable cause exists, arrest and charge persons who violate driving while intoxicated (DWI) laws of the state of Texas." The policy further states that officers who "become aware of a possible

---

[8] Defendants Few and Garcia also did not request medical attention for the Sierra Driver, despite the fact that Defendant Garcia claimed that he could not complete the remaining SFSTs on the Sierra Driver because his leg was too "banged up."

intoxicated driver shall investigate the incident to determine if probable cause exists to make an arrest for DWI." Gen. Order 500-04, "Driving While Intoxicated," Houston Police Department (Oct. 3, 2018).

78.     By unreasonably failing to further investigate, including by requesting and taking a breath and/or blood sample, arrest and/or charge the DWI suspect, Defendants Garcia, Few and Alfred collectively violated this policy and failed to act as any reasonable official would under the circumstances. This dereliction of duties ultimately led to the pursuit of charges against Plaintiff and ultimate arrest in violation of the United States Constitution.

79.     Defendants undeniably had probable cause to arrest the suspect of DWI at the scene under Texas law, and no reasonable official in Defendants circumstances could have believed otherwise. Defendants had the testimony of Mr. Hughes, a credible witness who, as a former police officer had been trained to detect intoxicated drivers, and who waited for police at the scene to relay his observations to police officers face-to-face. Mr. Hughes's observations that the DWI Suspect was driving the Sierra in a highly reckless and dangerous manner were corroborated by the evidence at the scene (*i.e.* the presence of two vehicles) and the Uber receipts that Mr. Hughes willingly provided to Defendants. Additionally, the DWI Suspect himself admitted to "having 7 beers" and being "too drunk to drive," and Defendant Garcia confirmed this fact by performing HGN on the DWI Suspect, who indicated 6/6 clues. Texas case law is clear that these facts alone are sufficient evidence of probable cause to arrest a suspect for DWI.

80.     However, even if Defendants believed it to be insufficient, they had a duty to investigate under HPD policy, and if they would have done so, would have also discovered the corroborating evidence in the two 911 calls that indisputably disproves the DWI Suspect's narrative and again, provides more than sufficient probable cause for arrest and charges.

81.     Because Defendants' Few and Garcia "failed to investigate a suspected intoxicated driver," pursuant to HPD policy, they were subject to disciplinary action up to and including indefinite suspension. Supervisors and HPD were aware of Defendant Garcia and Few's failure, as HPD policy requires supervisors to review and approve incident reports, and the incident report here clearly reflected Defendants abject failure to investigate. Additionally, Defendant Seymour approved of Mr. Hughes arrest having read the incident report and the warrant, from which, Officer Few and Garcia's failure to investigate the DWI was apparent. However, Defendants Garcia and Few were not disciplined for their failure.

82.     By not disciplining Officers Garcia and Few for their failure to investigate the DWI in violation of HPD policy, HPD and Defendants Acevedo and Seymour ratified their actions. If Defendants would have properly investigated the DWI, they would have quickly determined that the DWI Suspect's allegations against Mr. Hughes were fabricated, and he would not have been wrongfully arrested.

83.     In sum, Mr. Hughes reported the DWI Suspect to HPD and intervened in the suspect's reckless decision to drink drive in an effort to keep him from causing an accident and/or "kill[ing] somebody." HPD's failure to do their job after receiving Mr. Hughes's report was inexplicably intertwined with the ultimate decision to pursue charges against Mr. Hughes, as opposed to the DWI Suspect and in reliance on the DWI Suspect's fabricated tale.

**D.     Material Lies and Omissions in Defendant Garcia's Probable Cause Affidavit**

84.     Two days later, on March 25, 2019 at 1:59 a.m., Defendant Garcia signed a probable cause affidavit made in support of the charge that on March 23, 2019, Mr. Hughes "unlawfully, intentionally impersonate[d] a public servant, namely, a peace officer with intent to

induce Edgar Gomez to submit to his pretended official authority and to rely on his pretended official acts, by stating he was a Police Officer."

85.     In an attempt to gin up probable cause for this charge, Defendant Garcia knowingly and/or with reckless disregard for the truth, made numerous material omissions and false statements in his affidavit. Although Defendant Garcia purported to relay both Mr. Hughes's and the DWI Suspect's version of events, he omits all reference to the evidence and circumstances that corroborate Mr. Hughes's story and definitively undermine the DWI Suspect's story. The omissions and false statements are critical to the finding of probable cause, which relies entirely on the DWI Suspect's uncorroborated allegation that Mr. Hughes told the DWI Suspect that he was a police officer as Mr. Hughes was handcuffing him. This did not occur, and had Defendant Garcia not made the material omissions and false statements in his affidavit, this one statement from a discredited witness with ulterior motives would certainly have been insufficient to support a finding of probable cause. Any reasonable official knowing what Defendants Garcia, Few and Alfred knew, would have known that probable cause did not exist and would not have pursued the warrant.

86.     Defendant Garcia's affidavit reported Mr. Hughes's statement as follows:

> "I spoke to [Mr. Hughes] who told me that he was an Uber driver and while taking two females to their destination, he saw [Gomez] driving a white pickup truck. [Mr. Hughes] stated that [Gomez] hit a concrete barrier on the driver's side of the truck and then veered right and came to a stop on the right shoulder of the freeway. [Mr. Hughes] told me that he stated to the two females that he had to take action and that he was a former police officer and had the two females get out of the car and find another ride home, while he tried to detain [Gomez]."

87.     Defendant Garcia's affidavit also failed to include the evidence and information verifying Mr. Hughes's narrative and providing context for his actions. For

instance, Defendant Garcia fails to include critical information from Mr. Hughes's 911 call, even though he expressly ***admits*** in the affidavit that he listened to the recording of Mr. Hughes's 911 call. Specifically, Defendant Garcia omits that:

- Mr. Hughes called 911 for the express purpose of reporting a drunk driver, later identified as Gomez, who was driving the Sierra in front of him on the highway;

- Mr. Hughes stated that he was driving a black Jeep behind the Sierra, and continued to describe the Sierra's erratic movements in real-time to the 911 call-taker, including descriptions of the Sierra swerving across multiple lanes and hitting both medians while two female voices can be heard shrieking in the background and corroborating Mr. Hughes's descriptions of the Sierra's movements (i.e. stating "he hit the curb");

- Mr. Hughes, again in real-time, describes the Sierra hitting the outside barrier of I-610 and himself stopping behind the Sierra;

- Mr. Hughes states that he is going to approach the Sierra in an effort to stop him from "kill[ing] somebody;" and later returns to the 911 call and informs the operator that he retrieved the driver's keys; and

- Mr. Hughes can be heard in the 911 call repeatedly yelling to Gomez to "stay" and "get back in the car," explaining that he is "just trying to keep [Gomez] from not getting hit."

- In investigating the DWI, Defendant Garcia performed HGN on Gomez who exhibited 6/6 clues.

88.     Defendant Garcia also fails to mention that there is a third-party 911 call from a witness reporting the Sierra as a drunk driver, which completely corroborates Mr. Hughes's description of events and confirms that Gomez was indeed driving the Sierra while intoxicated. Indeed, it appears as though Defendants completely failed to follow up with this witness despite the fact that she provided her full name and phone number to the 911 operator, clear indicators of reliability.

89.     Defendant Garcia also includes several misstatements regarding Mr. Hughes's actions in his sworn affidavit. First, Defendant Garcia swore under oath that he "listened to a call that the Defendant [Mr. Hughes] made to 911 and **heard the Defendant** tell 911 dispatch that he

was a former police officer and **asking the complainant [the Sierra Driver] for identification**." (emphasis added). However, Mr. Hughes never asked the Sierra Driver for identification (he simply took it from the cupholder) and undoubtedly cannot be heard doing so on his 911 calls.

90.     Additionally, Defendant Garcia claimed that he asked Mr. Hughes to provide the names and phone numbers of the two females in the vehicle with him when he observed Gomez but that Mr. Hughes "would not do so." This is another material misstatement. As Mr. Hughes explained multiple times, and as Garcia expressly indicated in the Report, Mr. Hughes was "unable" to give Defendants the Uber Passengers' contact information because Uber does not provide its drivers with their passengers' contact information for privacy purposes. Defendant Gomez failed to include in the affidavit that Mr. Hughes did provide him with screenshots of the Uber ride details with these female passengers, which verified Mr. Hughes's version of events and completely discredited the DWI Suspect's story, as previously explained.

91.     Just as Defendant Garcia omitted material information from the probable cause affidavit that tended to corroborate Mr. Hughes's story, he also omitted material information that discredited Gomez's story.

92.     In relaying Gomez's statement in the affidavit, Defendant Garcia first claimed that Gomez told him that Mr. Hughes "search[ed] his car before [officers] arrived" and claims that "**Officer A. Walters… told [Defendant Garcia] that [Mr. Hughes] handed documents to him that he said he retrieved from [Gomez's] vehicle**." However, the supposed search is not recorded anywhere in the Report, and Mr. Hughes did not "search" Gomez's vehicle or take any "documents" from the Sierra. He retrieved only the car keys, alcohol bottles, and Gomez's driver's license. Moreover, "Officer A. Walters" is not mentioned once in the Report or anywhere other than the probable cause affidavit. This behavior is reminiscent of the well-known "graft" of HPD

officers to target individuals likely to challenge their crime in court and falsely list other officers

as witnesses to crimes in order to accrue more overtime pay."[9]

93.     Defendant Garcia then continued describing Gomez's statement in the affidavit

as follows:

> "Gomez told me that *while he was being detained and handcuffed by [Mr.*
> *Hughes], he asked [Mr. Hughes] if he was a police officer and [Mr.*
> *Hughes] replied, 'Yes, I am a police officer.'* [Gomez] stated that when he
> refused to turn around, [Mr. Hughes] struck him multiple times with knees
> to his legs. [Gomez] stated that he had been drinking at a flea market on
> Airline Dr. and met [Mr. Hughes] and his *two female* friends there. [Gomez]
> stated that they talked most of the night and [Mr. Hughes] invited [Gomez]
> to his house to have some drinks. [Gomez] stated that [Mr. Hughes] offered
> to drive his white pickup truck and [Gomez] agreed since he had been
> drinking. [Gomez] stated that [Mr. Hughes] told him he lived on the 59
> freeway going to downtown. [Mr. Hughes] and [Gomez] headed out and
> *two females drove [Mr. Hughes's] jeep*. [Gomez] stated that mid trip he
> became uncomfortable with the situation and asked to be taken home.
> [Gomez] stated that an argument began and [Mr. Hughes] got upset and
> pulled the vehicle over on the freeway. [Gomez] stated that [Mr. Hughes]
> got out and began ordering him out of the vehicle. [Gomez] stated he was
> forced out of the vehicle and then handcuffed. [Gomez] stated that he was
> hit several times in the leg during this process by [Mr. Hughes]. [Gomez]
> stated the [sic] he felt pain and wanted to pursue charges."

(emphasis indicates details not included in the Report).

94.     Defendant Garcia's version of the DWI Suspect's statement asserted in the

affidavit includes several fabricated details that were not documented anywhere in Defendants'

incident report, most importantly, (1) while he was being handcuffed, Gomez asked Mr. Hughes

"if he was a police officer" to which Mr. Hughes "replied, 'Yes, I am a police officer.'; and (2)

Mr. Hughes and Gomez had been drinking with Mr. Hughes's "two female friends" and that the

"two females drove the Defendant's jeep." These details are necessary to the finding of probable

---

[9]https://www.houstonchronicle.com/news/houston-texas/houston/article/Ogg-announces-new-charges-against-Houston-15380722.php;  https://www.texasmonthly.com/news-politics/drunk-with-power/  (discussing scheme of HPD officers revealed by an internal investigation to rack up overtime by adding each other's names to arrest reports so that they would all be called to testify).

cause, and to explain the evidence at the scene (i.e. that both the Sierra and Mr. Hughes Jeep were present), but were not in the Report. Defendant Garcia fabricated these details in an attempt to secure an arrest warrant for impersonation.

95.     Not only does the affidavit's version inexplicably include more detail to the DWI Suspect's statement than the one documented in the incident report, Defendant Garcia also included several statements from the DWI Suspect's narrative in the affidavit that he knew to be demonstrably false and omitted key pieces of information that would have demonstrated the statement's falsity. Specifically, Defendant Garcia fails to state that at the time he took Gomez's statement, he and Defendant Few were investigating Gomez for a suspected DWI and that Mr. Hughes and another unrelated party had called 911 to report Gomez's Sierra, identified by its license plate, as a suspected drunk driver and described the Sierra's erratic movements in real time in a consistent manner (i.e. both described the Sierra weaving across lanes and hitting the interstate's concrete barriers). Likewise, Defendant Garcia fails to state that he performed HGN on Gomez and got "6/6 clues," demonstrating Gomez's high level of intoxication at the time his statement was taken.

96.     Defendant Garcia also does not include the fact that Gomez identified Mr. Hughes by the wrong name ("Jesse"), or that Mr. Hughes provided Defendant Garcia with Uber receipts demonstrating that Mr. Hughes could not have been drinking with Gomez at a flea market all night, or driving his pickup, since he was driving Uber Passengers in his Jeep approximately starting at approximately 2:30 A.M. – mere minutes before police officers were dispatched to the scene.

97.     In sum, Defendant Garcia knowingly signed the sworn affidavit containing material omissions and false statements stating that he had "reason to believe that [Mr. Hughes],,,, committed the felony offense of Impersonating a Police Officer on March 23, 2019." No

reasonable officer could have believed that Mr. Hughes committed the offense under the circumstances known to Defendant Garcia, and Defendant Garcia knew that without his material omissions and false statements probable cause could not be found.

**E.     Unlawful Arrest and Malicious Prosecution of Mr. Hughes for Impersonating a Public Servant**

98.     Two days after the incident, in the early morning hours of March 25, 2019, Defendants Garcia and Few purportedly "did a follow up investigation on an impersonating a police officer" charge against Mr. Hughes. That same morning, Defendant Garcia wrote the aforementioned probable cause affidavit replete with material omissions and falsehoods and delivered it to the Harris County District Attorney's Office, who, through Defendant Alfred, had already agreed to accept the charges while the investigation was still ongoing. Based on Defendant Garcia's fraudulent affidavit, Mr. Hughes was charged by complaint for the felony offense of impersonating a public servant in Cause No. 1625741 (Offense Report No. 36316419) in the 262nd Criminal District Court of Harris County, Texas, and officers were given a warrant for Mr. Hughes's arrest.

99.     Defendants Garcia and Few then "walked the warrant… and got permission from Sgt Seymour to do a knock and talk." At all times before approving the walking of the warrant, Defendant Seymour had a duty as the officers' supervisor and pursuant to HPD policy to review the evidence in support of the warrant prepared by his officers, and at least the incident report and probable cause affidavit.[10] Had he done so, Defendant Seymour would have or should have noted the discrepancies between the incident report and probable cause affidavit, noticed the material

---

[10] *See e.g.* Gen. Order 200-08, "Conduct and Authority," Houston Police Department (May 9, 2019); *see also* Gen. Order 300-27, "Standards of Productivity," Houston Police Department (Aug. 23, 2018) (noting that supervisors are expected to monitor and review the daily activities of subordinates with respect to areas including but not limited to quality of work, quality of investigations and/or reports, interactions with citizens, judgment, etc.).

lies and omissions in the probable cause affidavit set forth by Garcia, realized that probable cause did not exist to arrest Mr. Hughes, and intervened before Mr. Hughes's rights were violated. Defendant Seymour's failure to intervene and/or adequately supervise Defendants Garcia and Few and his approval of their walking of the warrant, was a direct cause of Mr. Hughes's constitutional rights being violated.

100.    Instead, on or around 3:00 A.M. on March 25, 2019, Defendants Garcia and Few arrived at Mr. Hughes's apartment. Mr. Hughes, who had been celebrating his anniversary the previous night, was asleep in bed with his wife when he began to hear the pounding at his door. Alarmed, he went to see who it was, and attempted to peer out the peephole but was unable to see anything as someone was blocking it from the outside. Eventually, as the knocking continued, the individual removed their hand from the peephole and Mr. Hughes was able to identify Defendants Garcia and Few as the officers who investigated the DWI incident a couple nights prior.

101.    Mr. Hughes spoke through the door to ask the officers what they needed, especially at such an early hour. The officers responded that they needed to see Mr. Hughes's Uber App. Mr. Hughes reminded the officers that he had already sent the information from his Uber App to Defendant Garcia's city email. The officers were not swayed and insisted that they needed Mr. Hughes's actual cell phone to be able to review the trip details themselves through the Uber App. Mr. Hughes retrieved his phone and cracked open the door to give it to the officers. However, instead of taking the phone, officers grabbed Mr. Hughes's outstretched arm and pulled him out of his apartment into the hallway and handcuffed him.

102.    Mr. Hughes was not dressed at the time, and Officers allowed his wife to put clothes on him, before they escorted him down to the squad car and took him to the Harris County Joint Processing Center to be booked. In Defendant Garcia and Few's incident report related to the

arrest, Officer Garcia indicated that he talked to Mr. Hughes's wife, who "stated she was not on the scene when this incident occurred and she found out about the incident from him [Mr. Hughes] later that night." Nonetheless, Officer Garcia wrote that "there is a good chance that the Complainant [Gomez] could possibly identify the suspect's wife as being on the scene when this original incident occurred." Defendant Garcia had no evidence to support this claim, and indeed none exists.

103.    Once at the jail, Defendants told Mr. Hughes that he would be booked and released, but that was not the case. Mr. Hughes was placed in the jail's general population for over 24 hours until he was finally allowed to be released the following day, March 26, 2019, at or around 11:00 A.M. On the day he was released, Mr. Hughes was scheduled for a job interview at 1:45 p.m. for a medical sales representative position. Mr. Hughes attended the interview, despite his mental distress, and was not offered the job. Likewise, due to the felony charge of impersonating a peace officer, Mr. Hughes was immediately barred from driving for Uber and his driver account was suspended the same day.

104.    Prior to this incident, Mr. Hughes had never been to jail or been arrested.

105.    At the time of Mr. Hughes's arrest, no reasonable official, with the information available to Defendants, could have objectively concluded that probable cause existed to support the arrest warrant or the third-degree felony criminal charge brought against Mr. Hughes.

106.    Mr. Hughes was forced to hire an attorney to defend him against the frivolous felony charge he was facing as a direct result of Defendants' collective misconduct. As a third degree felony, the charge Mr. Hughes was facing carried a potential sentence of imprisonment of "not more than 10 years or less than 2 years" and a fine up to $10,000.

107.     On June 17, 2019, the State of Texas requested that the criminal action against Mr. Hughes be dismissed on the basis that "[n]o probable cause exist[ed]… to believe the defendant committed the crime." That same day, Harris County Judge Lori Chambers Gray ordered that the case against Mr. Hughes be dismissed.

108.     Mr. Hughes subsequently filed for expunction of the charge against him, and on February 13, 2020, Mr. Hughes's petition for expunction of the criminal case against him was finally granted.

**F.     Defendants Lacked Probable Cause to Arrest and Charge Plaintiff with Impersonating a Peace Officer**

109.     Defendants charged Mr. Hughes with impersonating a public servant and arrested him pursuant to a warrant on March 25, 2019, without probable cause to do so. Defendants' purported probable cause was based solely on Defendant Garcia's affidavit containing the material false statements and omissions.

110.     Defendants Alfred and Few were aware of and/or directed the material omissions and false statements made in Defendant Garcia's affidavit. Defendant Seymour knew or should have known of the material omissions and false statements in Defendant Garcia's affidavit, as Defendant's supervisor responsible for reviewing his incident reports, and should have intervened and/or not approved of the walking of the warrant relying on the false affidavit.

111.     Had Defendant Garcia included all material information and/or omitted the false information identified from his affidavit, there would have undisputedly been no probable cause for Mr. Hughes's arrest.

112.     Probable cause for an arrest exists "if at the time of the arrest, facts and circumstances within the officers' knowledge, **and of which they had reasonably trustworthy**

**information**, were sufficient to warrant a prudent officer to believe the crime had been committed." *See Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534 (1991).

113.     Given the facts and circumstances available to Defendants at the time of Mr. Hughes arrest, no reasonably prudent officer could have believed that Mr. Hughes had committed the crime of impersonating a peace officer on March 23, 2019.

114.     Under Texas law, a person commits the offense of impersonating a peace officer if he "impersonates a public servant with intent to induce another to submit to his pretended official authority or to rely on his pretended official acts ..." Tex. Pen.Code § 37.11(a)(1). Here, there was no probable cause to believe that Mr. Hughes either (1) impersonated a public servant or (2) did so with the intention that the DWI Suspect submit to his "pretended official authority" or rely on "pretended official acts," let alone both. An officer needs probable cause of every element of an offense to secure an arrest.

115.     Regarding the first element, the only purported evidence that Mr. Hughes impersonated a public servant was the DWI Suspect's alleged statement that "Jesse" told the DWI Suspect that he was a police officer prior to handcuffing him. This single statement from an intoxicated, discredited witness with ulterior motives during his telling of a narrative that was demonstrably false is undoubtedly insufficient to support probable cause.

116.     Regarding the second element, Mr. Hughes could not have intended that the Sierra Driver "submit to his ***pretended official authority***," when he was acting pursuant to the actual authority granted by Texas law to "any… person" to "arrest an offender when the offense is committed in his presence or within his view, if the offense is one classed as a felony or as an offense against the public peace." Tex. Code Crim. Proc. art. 14.01(a).

117.     Whether an act constitutes an offense against the public peace depends on the particular circumstances of each case but typically "requires evidence that 'the person's conduct poses a threat of continuing violence or harm to himself or the public." It is clear that Gomez's drunken driving and subsequently running onto the highway posed a continuing threat of har to both himself and the public. Moreover, Texas courts have long accepted DWI as an offense that is by its nature one against the public peace." *Denkowski v. State*, No. 14-16-00273-CR, 2017 WL 3568760, at *4 (Tex. App. – Houston [14th Dist.] Aug. 17, 2017, no pet.) (quoting *Miles v. State*, 241 S.W.3d 28, 40-42 (Tex. Crim. App. 2007)); *see also Funes v. State*, No. 08-19-00053-CR, 2020 WL 4353185, at *3 (Tex. App. – El Paso July 29, 2020, no pet.) (not designated for publication) ("driving while intoxicated is considered a 'breach of the peace' for purposes of the citizen's arrest statute") (collecting cases).

118.     Mr. Hughes also had probable cause to make a citizen's arrest of Gomez for driving while intoxicated based on his training and observations of Gomez's extremely erratic driving, visible signs of intoxication observed by Mr. Hughes, Gomez's continued attempts to drink alcohol from bottles found in his car, and Gomez's continued attempts to fee in the direction of traffic. *See id.* (collecting cases finding probable cause for DWI based on observations of erratic driving and driver's visible signs of intoxication); *Miles*, 241 S.W.3d at 40-42 (affirming trial court's determination that probable cause existed for a citizen's arrest for DWI testified that he had observed the behavior of numerous drunk drivers in his capacity as a wrecker driver, further stated that appellant "didn't seem coordinated, he didn't have good coordinational skills" and that appellant's "motor skills seemed to be off"); *LeCourias v. State*, 341 S.W.3d 483, 489 (Tex. App.– Houston [14th Dist.] 2011, no pet.) (holding probable cause that defendant drove while intoxicated

existed when witness informed 911 dispatcher of defendant's erratic driving and defendant's performance on the field-sobriety tests was "dismal").

119.    When an officer has actually knowledge of facts and circumstances establishing an affirmative defense to a crime, they are required to consider those facts in their probable cause assessment. Defendants' failure to consider the citizen's arrest law, which provides a complete affirmative defense for Mr. Hughes's actions, was unreasonable.

120.    Given the facts and circumstances available to Defendants at the time of Mr. Hughes's arrest, no reasonable officer could have objectively concluded that probable cause existed to support the arrest warrant against Plaintiff.

**G.    The Customs, Policies and/or Practices of HPD and the Harris County District Attorney's Office Under the Direction of Defendants Ogg and Acevedo Directly Caused the Violations of Plaintiff's Constitutional Rights.**

121.    Mr. Hughes was unlawfully arrested as a result of several faulty customs, policies and/or practices in place at HPD and the Harris County District Attorney's Office as follows:

*i.      Failing to Enforce DWI Offenses*

122.    HPD has a longstanding policy, practice, and/or custom of officers failing to enforce DWIs. Although HPD and Acevedo have kept the total numbers confidential, there have been numerous internal affairs investigations related to HPD officers themselves driving under the influence, as well as, HPD Officers giving civilians a pass for DWI and then lying about the circumstances. [11]

123.    Defendant Acevedo acknowledged this issue in a video to HPD officers in July of 2018, saying: "[u]nfortunately, (we) have seen quite a few internal affairs cases where we're

---

[11] https://www.click2houston.com/news/2019/02/28/accusations-of-hpd-officer-misconduct-and-the-publics-trust/

absolutely kissing off drunk driving."[12]   An article published by Channel 2 Investigates on February 27, 2019, less than a month before Mr. Hughes was arrested, stated that "Houston police declined to cite the exact number of internal affairs investigations triggered by accusations of officers not properly handling DUI cases," but Acevedo again acknowledged the existence of officers accused of this conduct "who then lied about the circumstances."[13]

124.   Channel 2 investigates found that since Defendant Acevedo was sworn in as Chief in 2016 until the video of Acevedo was made in July 2018, internal affairs investigators had sustained complaints against 8 officers accused of DWI themselves, and that since the video had circulated until February 2019, the month before Mr. Hughes had been arrested, there were 6 more HPD officers charged with DWI, showing an increased incidence rate of DWI among HPD officers.[14]   In September of 2018, Acevedo sent a letter acknowledging that the behavior continues to impact HPD.

125.   Leaders of HPD and the Harris County DA's Office, including Defendants Acevedo and Ogg, have long acknowledged the unique problem that DWIs continue to pose for Harris County and the City of Houston.[15] Acevedo acknowledged that Houston and Harris County are the "worst city and the worst county… for DWI and the scourge of DWI," in the country, with Ogg calling Harris County "ground zero for DWI fatalities" and noting that the area "really couldn't do worse."[16] A Houston Chronicle analysis confirmed this fact noted that more people are killed by drunk driving in Houston than in Los Angeles, a city with about twice the

---

[12] *Id.*

[13] *Id.*

[14] *Id.; see also* https://www.chron.com/news/houston-texas/houston/article/HPD-officer-retires-amid-DWI-charge-13795755.php; https://www.fox26houston.com/news/houston-police-officer-charged-with-dwi-while-on-duty.

[15] *See e.g.* https://www.click2houston.com/news/investigates/2019/12/10/a-catastrophic-problem-tracking-dwi-arrests-in-harris-county/

[16] https://www.houstonchronicle.com/news/investigations/article/Out-of-Control-Houston-is-ground-zero-for-13212707.php.

population.[17]

126.     However, despite acknowledging the seriousness of the problem, HPD and the Harris County DA's office both continue to contribute to the lack of enforcement of DWIs and have failed to implement proper training, procedures and enforcement mechanisms to curb the incidence of DWIs.

127.     As of 2018, shortly before the DWI incident here, HPD had committed only about 25 officers and supervisors out of roughly 5,000 personnel to HPD's DWI enforcement unit. Additionally, because "each stop can take hours, requiring field-sobriety tests, trips to hospitals and lengthy bureaucratic waits before technicians can collect a blood sample," many HPD officers improperly fail to investigate suspected DWIs, as Acevedo acknowledged.[18] This has led to a phenomenon where "citizens of Harris County aren't scared to get arrested for a DWI."[19]

128.     Instead of accepting responsibility, Acevedo simply attempted to shift blame to Ogg and the failure of the DA's office to take DWIs seriously. In November 2019, an analysis of DWI convictions found that most drunk drivers accepted a plea deal to avoid jail time which Acevedo called "outrageous" and Ogg called the "right thing to do" in the vast majority of cases.[20] Acevedo acknowledged that DWIs need to be taken "much more seriously, and there has to be consequences," but stated "[w]e're doing our part as a police department… It's time for everyone

---

[17]  *Id.*; *see*  https://www.chron.com/news/houston-texas/houston/article/New-Year-s-Eve-will-be-an-unbelievable-13492273.php?fbclid=IwAR07vgf8fu8b_Awqb9Kom_mWcSX7GPQlDCi90t3T6ipGmDNH5WWsHQ7mEkI (Harris County DA Head of Traffic Enforcement noting "This is an unbelievable crisis that we're facing. We lead the nation, year-in, year-out in fatalities on our roadways, specifically attributable to DWI. We're not anywhere near the size of Los Angeles or New York, and we're not as big as Chicago – and we blow them away every year. It's inexplicable.").

[18]  *Id.*

[19]  https://www.houstonchronicle.com/news/investigations/article/Out-of-Control-Houston-is-ground-zero-for-13212707.php. (statement from Harris County Sheriff's Sgt. Kirby Burton, who oversees the department's DWI task force).

[20]  https://www.khou.com/article/news/investigations/we-need-to-take-dwis-much-more-seriously-houston-police-chief-responds-to-khou-11-investigation/285-a4bf1f03-a3f0-4900-a3ec-720506a7a505.

else, from the DA's office, to the judges, to the juries, to do their part."[21]

129.    However, it is clear that Acevedo, Ogg, the City of Houston, and Harris County all knew that HPD officers and Harris County prosecutors in charge of enforcing DWI laws did not take DWIs seriously and routinely shirked their responsibilities to enforce DWI laws, as laid out in detail in the 6-part analysis "Out of Control" published by the Houston Chronicle in 2018. Yet each failed to take the steps necessary to cure those failures in their respective departments. The policy, practice and culture of failing to responsibly enforce laws against impaired driving directly caused the violation of Mr. Hughes constitutional rights.

130.    Due to HPD officers Few and Garcia and ADA Alfred's nonchalance of the clear DWI offense, they shifted their focused onto Mr. Hughes. Thus, the failure to arrest the DWI Suspect directly led to the investigation of Mr. Hughes and subsequent violations of his constitutional rights. Additionally, Defendants Garcia and Few were not disciplined for their failure to properly investigate and arrest the DWI Suspect, contrary to HPD's written policy, which demonstrates a ratification of their actions by HPD, Seymour and Acevedo.

131.    By taking the steps necessary to keep an intoxicated and dangerous driver off the road, Mr. Hughes was merely doing the critically important job that HPD routinely refused to do, as was his right under Texas's citizen's arrest statute. Defendants' decision to punish him for these actions was a direct result of the culture of HPD and the DA's office's lax attitude towards DWI offenses.

### ii.    *Condoning Dishonesty in HPD Investigations and Probable Cause Affidavits*

132.    Defendants HPD and Acevedo also have long maintained a custom, policy and/or practice that condones dishonesty in criminal investigations and sworn affidavits.

---

[21] *Id.*

133.     Not only did HPD have a longstanding practice of mishandling and lying about DWI investigations specifically (*see supra*), HPD has also maintained a custom, policy and/or practice that allows and approves of HPD officers making material omissions and false statements in criminal investigations generally, including in probable cause affidavits used to obtain warrants at times when probable cause does not actually exist.

134.     More egregious, when confronted with instances of officer misconduct involving dishonesty in probable affidavits – HPD has a custom of failing to appropriately punish the offending officer and downplays the seriousness of the conduct. HPD's practice of turning a blind eye towards dishonesty in policing fosters an environment where HPD officers are encouraged and/or feel comfortable in continuing to make false statements and material omissions in probable cause affidavits in order to secure warrants that lack the requisite probable cause. Such a policy routinely causes HPD officers to violate the constitutional rights of Houston citizens, and indeed, caused such a violation here.

135.     This culture, policy and practice has even been memorialized in certain written policies. For example, HPD General Order 500-04 regarding "Driving While Intoxicated" issued by Defendant Acevedo on October 3, 2018, and applicable to all employees, instructs the following with regard to "Violent DWI Prisoners:"

> "Violent prisoners shall remain handcuffed and shall be taken directly to a designated jail facility. **Violent prisoners shall not be taken into a video room to be recorded or <u>given a breath test</u>. In such cases, the arresting officer shall complete applicable Driver Improvement Center (DIC) forms, <u>indicating the prisoner refused a breath test</u>** and document in the incident report why a breath or blood specimen was not obtained."

136.     This General Order thus instructs officers to lie on DIC forms to state that violent prisoners "refused" a blood test, when in fact, they were not requested to take one. Additionally,

all potentially applicable DIC forms require an officer's signature attesting to the veracity, and can be used as evidence of a suspect's refusal to a breath test in a DWI trial and to suspend the suspect's license based on the false refusal indicated in the form.[22]

137.   A previous version of Gen. Order 500-04 contained substantially similar instructions with regards to violent prisoners, but those instructions were redacted from the public view. In an article published on March 15, 2016, the HoustonPress obtained an unredacted version of the policy and noted "that it apparently instructs the arresting officer to deny a breath test for violent prisoners, then to write on the arrest report that the suspect was offered a breath test but refused."[23] The article also correctly indicated that "[r]efusing a breath test can have a serious impact on a future sentencing, and this policy clearly denies 'violent' suspects the option to take one. It does not, however, define what a 'violent prisoner' is." *Id*. These criticisms are equally applicable to the policy today.

138.   Tellingly, when the HPD press officer was asked to explain why HPD's 2001 policy "appears to instruct officers to fill out a misleading report,… [he] did not have an answer" but instead stated "[r]eally, only one person can speak for policy formation for the department, and that's the chief of police." *Id*. Although Acevedo issued a new policy in 2018, he kept the instructions to officers to file a misleading report. This is undeniable evidence of the longstanding

---

[22] *See e.g. Block v. State*, No. 14-95-00227-CR, 1997 WL 530767, at *1 (Tex. App. – Houston [14th Dist.] Aug. 28, 1997) (holding that "the DIC-24 form setting out the written warnings given to appellant and indicating his refusal was relevant evidence and properly admitted"); *see also* List of DIC Forms at: https://www.dps.texas.gov/Internetforms/SectionDetail.aspx?ID=14&SpeclSection=Driver%20Improvement; (DIC-24, "Peace Officer DWI Statutory Warning" (requiring signature certifying that officer informed suspect of the consequences of refusing to voluntarily give a specimen, requested a specimen, and, to indicate refusal, that "[t]he subject refused to allow the taking of a specimen and further refused to sign below as requested by this officer."); DIC-25, "Notice of Suspension Temporary Driving Permit," (indicating refusal for adult requires signature of officer and states that the suspect's license will be suspended because the suspect "REFUSED to provide a specimen or specimens of breath or blood following an arrest for an offense prohibiting the operation of a motor vehicle… while intoxicated…")).

[23] https://www.houstonpress.com/news/whats-so-secret-about-hpds-dwi-policy-8217296.

pattern and/or practice at HPD of making and/or condoning material false statements of officers during criminal investigations.

139.   Defendant Garcia included a substantially similar false statement in his probable cause affidavit when he indicated that Mr. Hughes "would not" provide the names and phone numbers of the two females in his vehicle at the time he observed the DWI Suspect, when in actuality, Mr. Hughes told Defendant Garcia on multiple occasions that he did not have that information since Uber did not provide its drivers with the names and phone numbers of passengers pursuant to its privacy policy.

140.   Gen. Order 500-04 is likely not the only HPD policy issued by Acevedo that instructs officers to falsely document facts in their criminal investigations. For instance, Gen. Order 500-01 regarding "Effecting Arrests and Searches" issued by Defendant Acevedo on May 2, 2019, contains several redactions related to how officers are instructed to document verbal consents to searches. The inexplicable redactions that, based on the previous redactions in 500-04, may contain instructions to officers file misleading reports, include the following:

- "Verbal Consent: When an officer receives only verbal consent to proceed with a search, the officer shall document the outcome of that consent to search request [THREE LINES REDACTED]"

- "The consent request, including the outcome of that consent to search request (granted, refused, withdrawn), shall be documented [REDACTED]"

- When an officer completes a written consent form, receives verbal consent, or records consent on a recording device, the officer shall document the outcome of that consent to search request (granted, refused, withdrawn) [REDACTED]"

- "If an officer records a verbal consent to search request, the officer shall document the outcome of that consent [REDACTED]."

141.   Like the previously redacted misleading instructions contained in Gen. Order 500-04, the instructions hidden by HPD's redactions here would not obviously appear to "endanger officer safety" or put officers at a tactical advantage, thus necessitating the secrecy. Instead, it is

likely that such redactions instruct officers to use misleading documentation in relation to verbal consents to search.

142.    Apart from these written policies, there are numerous examples of HPD officers making false statements in connection with criminal investigations, including in probable cause affidavits, sufficient to demonstrate a practice and/or policy.

143.    Examples of recorded dishonesty in criminal investigations analogous to the dishonesty here include the following:

- HPD officer lied about material facts in a probable cause affidavit to secure a search warrant leading to the Harding Street drug raid that ended in two citizens being murdered. Defendant Acevedo commented that he didn't "have any indication it's a pattern or practice following evidence shows otherwise:

    o    The Houston Chronicle found numerous instances in which HPD officers "filed false affidavits when they asked judges for search or arrest warrants[;]… performed sloppy investigative work and represented their use of confidential informants, according to disciplinary records and court documents," and finding at least 8 officers accused of misrepresenting casework. The investigation also uncovered few consequences for officers that do lie in affidavits, for instance one HPD officer was suspended for just 10 days for filing false police reports in six incidents; [24]

    o    When asked about the Houston Chronicle investigation, and particularly the number of other instances of officers filing false affidavits, Defendant Acevedo stated as follows: "one of the incidents that was reported on by the *Chronicle*, I think when it is all said and done, it's not going to be the smoking gun that it was portrayed as early on. But I'll wait until those facts come out. And they will come out. When you look at our department and you look at the kind of work they've done, I think that on balance, there's been a lot worse out there…" This is typical of Defendant Acevedo and HPD's policy of downplaying misconduct, particularly the filing of false affidavits. Defendant Acevedo has also publicly stated that HPD officers "had probable cause to be there," at the Harding Street raid, despite the HPD officer lying in his probable cause affidavit. These kinds of statements demonstrate to officers that such conduct is acceptable to HPD leadership. [25]

---

[24] https://www.houstonchronicle.com/news/houston-texas/houston/article/deadly-Houston-misconduct-botched-raid-police-14850548.php
[25] *Id.*

- o   Auditors found more than 400 errors in a review of 252 cases and noticed that almost 40% of the time case agents "failed to document pertinent details in the offense report, such as who was present, location of the evidence, and other information that would aid the prosecution."[26]

- Follow up investigation by Harris County DA's Office found numerous instances of "sergeants… lying in documents by stating falsely that they witnessed the undercover officers handle drug transactions… and officers lying in government documents to enrich themselves by boosting each other's overtime hours," which Ogg called a "straight-up graft, and has resulted in the indictments of 11 officers; "[27]

- Numerous other instances of officers lying in criminal investigation records to enrich themselves, including

  - o   four officers listing one another as witnesses on traffic tickets to help themselves accrue more overtime pay for testifying in court when officers were not actually witnesses;[28]

  - o   Houston Chronicle's investigation of HPD disciplinary records finding "numerous instances when officers were disciplined for overtime or payroll irregularities" (noting five examples);[29]

- HPD officer lied to secure at least 2 DWI arrests, including one in which he falsely claimed that suspect failed to use her turn signal, was driving drunk, failed a field sobriety test and refused to consent to blood test, when in actuality suspect was not intoxicated, didn't fail to use her turn signal, passed the filed sobriety test, and was given a blood test indicating a blood alcohol level of .06;[30]

- HPD officer who lied to secure DWI conviction had been found guilty of misconduct by HPD 35 times, including for manipulating DWI arrests so he would have to be called to testify in order to pad overtime.[31]

Despite these numerous instances of dishonest behavior, Acevedo still blindly supports HPD

officers, as demonstrated by his response to the numerous instances of dishonesty uncovered in

---

[26] https://www.houstonchronicle.com/news/houston-texas/houston/article/HPD-narcotics-audit-shows-sloppiness-lack-of-15381193.php
[27] https://www.houstonchronicle.com/news/houston-texas/houston/article/Ogg-announces-new-charges-against-Houston-15380722.php; https://www.houstonchronicle.com/news/houston-texas/houston/article/Harris-County-prosecutors-continue-fight-to-keep-16468558.php.
[28] https://www.houstonchronicle.com/news/houston-texas/article/Four-suspended-HPD-officers-used-ticket-scheme-to-3877815.php
[29] https://www.houstonchronicle.com/news/houston-texas/crime/article/After-indictments-HPD-Chief-Acevedo-opens-15902326.php
[30] https://www.houstonpress.com/news/indicted-hpd-cop-accused-of-lying-about-dwi-arrests-8512442
[31] https://www.usatoday.com/in-depth/news/investigations/2019/10/14/brady-lists-police-officers-dishonest-corrupt-still-testify-investigation-database/2233386001/

the aftermath of the 2019 raid.[32] In 2019, there was also a substantial increase in no probable cause rulings of local judges and magistrates in Harris County, "citing a lack of sufficient evidence to continue with a criminal charge" (noting 3,217 no probable cause findings in misdemeanor and felony cases in 2019, a ~70% increase).[33] Instead of examining how HPD contributed to such findings, "Acevedo called the increase in no probable cause findings disheartening, saying he is confident in the validity of the charges his officers pursue." [34]

144.    This blind backing of officers is also apparent from evidence showing that officers who have demonstrated dishonesty in investigations are not punished. Although HPD investigations are all internal and are not available for public review, a 2013 analysis by the Texas Observer was able to compiled HPD disciplinary records from 2007 to 2012 and found that "during that span, HPD received an average of 1,200 complaints per year, less than a third of which ended in any kind of discipline, and [m]ore than half of those punishments were written reprimands, which have little effect on an officer's record and no effect on his or her paycheck."[35] The investigation also found that "[o]nly 7 percent of all complaints against Houston officers ended in serious discipline, meaning a three-day suspension or more…  Officers who left crime scenes, failed to secure evidence, lied to superiors, falsified forms and, in one case, allegedly pocketed drugs continue to police the streets of Houston."[36]

145.    At the time of Mr. Hughes's unlawful arrest, HPD disciplinary policies and procedures had changed very little since the Observer's investigations and still involved very little

---

[32]     https://www.houstonchronicle.com/news/houston-texas/crime/article/After-indictments-HPD-Chief-Acevedo-opens-15902326.php

[33] https://www.houstonchronicle.com/news/houston-texas/houston/article/NO-PROB-CAUSE-14835088.php

[34] *Id.*

[35] https://www.texasobserver.org/crimes-unpunished/; *see also* https://www.texasobserver.org/horror-every-day-police-brutality-houston-goes-unpunished/ (noting that "[o]ut of 706 complaints about excessive force, HPD disciplined only 15 officers. For 550 shootings, HPD disciplined none. The message is clear: Either Houston police almost never abuse their power, or they abuse it with impunity.")

[36] *Id.*

transparency.[37] Just last year HPD refused to sign an agreement with the Harris County DA's Office asking them "to tell the DA's office whenever a potential police witness is charged with or investigated for a crime, relieved of duty or suspended for misconduct allegations, taken off casework, determined to be untruthful through an administrative investigation, or found guilty of misconduct that could call into question their integrity." *Id*. Still the Harris County prosecutors have kept a database of police that they have found with credibility and disciplinary problems, and noted that as of February 2020, the list included 227 current members of HPD, and because it is confidential, may possibly include Officers Garcia and/or Few.[38]

146.    Given the numerous instances of dishonesty and lack of discipline for dishonest officers, Defendant City of Houston, through HPD and Defendant Acevedo, has demonstrated a policy and/or practice of allowing HPD officers to submit false affidavits in order to secure warrants without the requisite probable cause.

### iii.    HPD Officers Routinely Engage in Race-based Policing

147.    HPD officers also frequently use race in their policing, both in determining when and who to detain and what charges to pursue. For example, in a 2020 ACLU report, a review of HPD arrest data found that "between June 2014 and March 2020, 49 percent of the people arrested by Houston Police for citation-eligible offenses were Black, while Black people make up just about 22.5% of Houston's population."[39] Likewise, in 2019, Black people accounted for 36% of all HPD traffic stops. This data suggests that, when given the choice, HPD police are more likely to pursue criminal investigations against Black people than people of other races.

---

[37] https://kinder.rice.edu/urbanedge/2020/11/19/police-oversight-houston-lax-compared-austin-and-dallas-and-needs-reform; https://www.houstonchronicle.com/news/houston-texas/houston/article/Critics-say-Houston-needs-more-robust-civilian-15338422.php
[38] https://www.houstonchronicle.com/news/houston-texas/houston/article/Many-police-agencies-decline-to-sign-agreements-15032398.php.
[39] https://www.aclutx.org/sites/default/files/field_documents/justice_cant_wait_040720.pdf

148.    For "impersonation" in particular, data provided by HPD from June 2018 to the present demonstrates that Black people accounted for 35 out of 81 total arrests, or about 43%, despite being only 22.5% of the population.[40]

149.    HPD officers use race when determining whether to pursue and/or detain Black people in a manner disproportionate to their proportionate representation in the population, including on impersonation-type charges. This data is illustrative of HPD's unconstitutional race-based practices.

150.    Mr. Hughes, a black man, was victimized by these race-based practices when Defendants Garcia and Few chose to pursue charges of impersonation against him without probable cause as opposed to arresting the DWI Suspect.

151.    Had Defendants Garcia and Few not been engaging in race-based policing practices, they would have investigated the DWI Suspect and not targeted Mr. Hughes for crimes without probable cause.

### iv.    Policy of HPD and Harris County DA's Office to accept joint responsibility for criminal investigations

152.    Written policies of HPD and the Harris County District Attorneys' Office operate to ratify a joint policy whereby HPD officers and assistant district attorneys work in concert to secure warrants and/or criminal charges without probable cause. In particular, through the written policies, Harris County Assistant District Attorneys work with HPD officers in the investigations of crimes and then they collectively determine which evidence to gather and submit in order to successfully secure a warrant.

153.    The relevant written policies include HPD General Order 500-07, which states that "[t]he Houston Police Department shall work cooperatively with district attorney's offices to help

---

[40] See HPD arrest distribution data provided at https://txucr.nibrs.com/Report/ArrestDistribution.

reduce the number of cases dismissed… as well as protect officers from frivolous Internal Affairs complaints." General Order 500-07 further requires HPD officers to speak with an assistant district attorney "[b]efore filing charges… to ensure that the charges will be accepted." In accordance with this policy, HPD officers and Harris County assistant district attorneys then work together to ensure that the affidavits contain sufficient information to secure a charge or warrant, regardless of its veracity and without including any disqualifying information. HPD General Order 500-07 was executed by Defendant Acevedo.

154.    Likewise, Defendant Ogg established a similar written policy for the Harris County District Attorney's Office. Defendant Ogg's Policy, Evidence Integrity HCDAO 2017 CAP, also has the stated intention that Harris County assistant district attorneys "collaborate with law enforcement agencies… [to] solve and prosecute crimes more effectively." In accordance with this policy, the Harris County District Attorney's Office "is responsible for review of every criminal case that law enforcement seeks to file in Harris County, making it the literal 'front door' of our local criminal justice system." Indeed, "[u]nlike most jurisdictions where police officers 'direct file' their cases following arrest, in Harris County, the District Attorney reviews all cases prior to filing charges or authorizing the jailing of an individual." The policy further admits that the application of the probable cause standard by the district attorney at such an early stage "prior to an accused even appearing in court is nationally unique."

155.    The resulting policy and/or custom is that Harris County Assistant District Attorneys direct police officers in the investigation to ensure that probable cause can be established to secure a warrant or charge, regardless of if the totality of the facts and circumstances available to the officer would in fact demonstrate probable cause. The policy allows police officers to be

intentionally selective, at the direction of the district attorney, in both gathering and presenting evidence to ensure that the affidavit demonstrates probable cause, whether or not it actually exists.

156.     Pursuant to these written policies, Defendant Garcia called Defendant Alfred at the outset of the case to determine the best way to conduct the investigation and present the evidence in order to allow the Defendants to bring a charge of impersonating a public servant against Mr. Hughes, despite overwhelming evidence that he did not commit such an offense. Working together, Defendants Alfred, Garcia and Few were able to manipulate the investigation, as well as the facts presented in the probable cause affidavit, to charge Mr. Hughes though probable cause clearly did not exist under the totality of the circumstances.

## COUNT ONE – 42 U.S.C. § 1983
## <u>VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS</u>
### *Unlawful Arrest and Prosecution Through the Wrongful Institution of Legal Process*
*(Defendants Garcia, Few, Seymour and Alfred, in their individual capacities)*

157.     Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

158.     The Fourth Amendment, as incorporated and applied to the states through the Fourteenth Amendment, protects "[t]he right the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; amend. XIV. It is clearly established that the Fourth Amendment specifically protects the people's right "to be free from police arrest without a good faith showing of probable cause." *Winfrey v. Rogers,* 901 F.3d 483, 494 (5th Cir. 2018).

159.     As described in the in the preceding paragraphs, Defendants Garcia, Few, Seymour and Alfred (hereinafter, the "Individual Defendants"), while acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived

Plaintiff of his clearly established constitutional rights, including the right to be free from police arrest without probable cause under the Fourth and Fourteenth Amendments.

160.    At the time of Plaintiff's arrest, the Individual Defendants knew or should have known that they did not have probable cause to arrest Plaintiff on the charge of impersonating a peace officer.

161.    In the manner described more fully above, the Individual Defendants conducted a reckless criminal investigation, and knowingly included false statements and material omissions in the warrant used to justify Plaintiff's arrest. Absent this misconduct, the arrest and subsequent prosecution of Plaintiff could not and would not have been pursued.

162.    Additionally, and as explained more fully in the preceding paragraphs, Defendant Garcia, while acting under the color of state law, deprived Plaintiff of his clearly established rights under the Fourth Amendment, as applied to the states through the Fourteenth Amendment, by:

    a.  Knowingly preparing a probable cause affidavit for an arrest warrant that contained numerous material omissions and false statements;

    b.  Presenting the affidavit knowing of its falsity and material omissions, yet swearing under oath to the truthfulness of its contents;

    c.  Obtaining an arrest warrant based on that faulty affidavit authorizing the arrest of Plaintiff on a felony charge;

    d.  Going, together with Defendant Few and with the express approval of Defendant Seymour, all acting under color of law, to execute the arrest warrant against Plaintiff and transport him to jail to be booked on the baseless charge.

163.    Defendants would not have obtained the arrest warrant and/or charged Plaintiff if the probable cause affidavit did not include the material omissions and false statements.

164.    Each of the Individual Defendants participated in the reckless criminal investigation of Plaintiff and planned, executed and/or approved of the arrest and prosecution of Plaintiff knowing that probable cause did not exist for the charge against him. Defendant Garcia

made the material omissions and false statements in the probable cause affidavit at the direction of and/or in cooperation with Defendants Few and Alfred, as part of their reckless criminal investigation. Defendant Seymour expressly approved and allowed Plaintiff's arrest despite the fact that he knew and/or should have known of the material omissions and false statements in the affidavit as a result of the reckless investigation.

165.     The Individual Defendants' misconduct, as described fully herein, directly resulted in the unjust arrest and criminal prosecution of Plaintiff, in violation of his rights under the Fourth and Fourteenth Amendments of the United States Constitution.

166.     Alternatively, the Individual Defendants are liable for failing to intervene in the violation of Plaintiff's rights. In the Fifth Circuit "an officer may be liable under § 1983 under a theory of bystander liability where the officer (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017).

167.     Defendants Few, Alfred and Seymour were aware that the warrant was fraudulently obtained by the false affidavit of Defendant Garcia, and that no probable cause existed to arrest Plaintiff. Defendants also knew that Plaintiff's constitutional rights would be violated if he were to be arrested without probable cause. Defendants had an opportunity to prevent the unlawful arrest of Plaintiff by intervening and/or refusing to approve the arrest to prevent other Defendants from violating Plaintiff's rights in the manner described above but failed to do so.

168.     Thus, the Individual Defendants violated 42 U.S.C. § 1983 by detaining Plaintiff in violation of his Fourth Amendment expectation of privacy and guarantee to security from unreasonable search and seizure without reasonable suspicion and/or probable cause and by failing to provide supervision and/or proper training, where it was necessary and/or required by law.

169.     The Individual Defendants' misconduct, as described in this Count, was objectively unreasonable in light of the facts and circumstances known to them at the time, and was undertakenintentionally with willful indifference to Plaintiff's constitutional rights.

170.     At the time of Individual Defendants' actions described herein, Defendant Alfred was assisting officers in the investigation of the crime, prior to a finding of probable cause, and was not acting in a prosecutorial capacity. Therefore, Defendant Alfred is not entitled to absolute immunity.

171.     At the time of Individual Defendants' actions described herein, no reasonable officer or investigator with the same information could have believed that his or her actions were lawful in light of clearly established law. Therefore, the individually named Defendants are not entitled to qualified immunity.

172.     As a direct and proximate result of Defendants' misconduct and the violations of Plaintiff's constitutional rights, Plaintiff suffered a loss of liberty when he was falsely arrested and held in custody, and suffered and will continue to suffer emotional distress, embarrassment, humiliation, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent.

### COUNT TWO – 42 U.S.C. § 1983
### <u>VIOLATION OF FOURTEENTH AMENDMENT</u>
### *Violation of Procedural Due Process for Filing False Report*
### *(Defendant Garcia, in his individual capacity)*

173.     Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

174.     Defendant Garcia knowingly provided a false report to law enforcement and the Harris County District Attorney's Office regarding the incident.

175. But for the false report, Plaintiff would not have been criminally charged. *See e.g. Cole v. Carson*, 802 F.3d 752 (5th Cir. 2015), *vacated on other grounds sub nom.*, *Hunter v. Cole*, 137 S.Ct. 497 (2016).

176. An objectively reasonable police officer would have known that providing a false statement to law enforcement for the purpose of causing an unlawful arrest and continued detention, would violate clearly established law.

177. As a result of Defendant Garcia's fabrication of evidence, Plaintiff was arrested and charged with impersonating a public official, a third degree felony punishable by 2 to 10 years in prison. Plaintiff spent over 24 hours in jail and was forced to spend thousands of dollars to hire a criminal defense attorney to fight the meritless charge he faced which were based on the fabricated evidence of Defendant Garcia.

178. On July 17, 2019, the charges against Plaintiff were dismissed on the basis that "[n]o probable cause exist[ed]… to believe the defendant committed the crime."

179. Defendant Garcia was at all times acting under the color of law.

180. As a direct and proximate result of Defendant Garcia's conduct, Plaintiff suffered a loss of liberty when he was falsely arrested and held in custody, and suffered and will continue to suffer emotional distress, embarrassment,humiliation, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent.

## COUNT THREE– 42 U.S.C. § 1983
## VIOLATION OF FOURTH AND FOURTEENTH AMENDMENT
### *Failure to Supervise*
*(Defendant Seymour, in his individual capacity)*

181. Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

182.    In a 1983 claim for failure to supervise or train, the plaintiff must show that: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir.1998).

183.    "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. (quoting *Smith*, 158 F.3d at 912.).

184.    An official's actual knowledge of a substantial risk may only be inferred if the "substantial risk" was obvious. *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).

185.    Defendant Seymour's failure to supervise Defendants Garcia and Few caused a violation of Plaintiff's constitutional rights under the Fourteenth and Fourth Amendments.

186.    Defendant Seymour was responsible for supervising the actions of Defendants Garcia and Few pursuant to HPD policy, including Gen. Order 200-08, which states, in relevant part, as follows:

> "Supervisors shall actively enforce the law and the policies and procedures of the Houston Police Department. Supervisors shall not permit or otherwise fail to prevent violations of the law or the regulations, policies, or procedures of the Houston Police Department by any employee. Supervisors who fail to take appropriate action when they are aware or should have been aware an employee was in violation of the law or department policy shall be held accountable."

Gen. Order 200-08, "Conduct and Authority," Houston Police Department (May 9, 2019); *see also* Gen. Order 300-27, "Standards of Productivity," Houston Police Department (Aug. 23, 2018) (noting that supervisors are expected to monitor and review the daily activities of subordinates

with respect to areas including but not limited to quality of work, quality of investigations and/or reports, interactions with citizens, judgment, etc.).

187.     Had Defendant Seymour been properly supervising Defendants Garcia and Few, he would have noticed the failure of Defendants Garcia and Few to properly investigate the suspected DWI and the discrepancies between the incident report, Defendant Garcia's affidavit, and the available evidence. Viewing any of these red flags should have caused the investigation into Plaintiff to be more thoroughly reviewed, and the lack of probable cause would have been discovered prior to his arrest and subsequent prosecution.

188.     Furthermore, had Defendant Seymour been properly supervising Defendants Garcia and Few, he would've reviewed their work in support of the arrest, prior to approving the execution of the arrest warrant on Plaintiff. Had he done so, he would've noticed the discrepancies between the probable cause affidavit supplied by Defendant Garcia and the incident report, and would have determined that probable cause for the arrest did not exist, which would have prevented Plaintiff from being falsely arrested and prosecuted.

189.     Thus, Defendant Seymour's failure to supervise Defendants Garcia and Few directly caused Plaintiff's constitutional violations from being falsely arrested and maliciously prosecuted under the Fourth Amendment to the United States Constitution.

190.     Defendant Seymour was at all times acting under the color of law.

191.     As a direct and proximate result of Defendant Seymour's conduct, Plaintiff suffered a loss of liberty when he was falsely arrested and held in custody, and suffered and will continue to suffer emotional distress, embarrassment, humiliation, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent.

### COUNT FOUR– 42 U.S.C. § 1983:
### <u>MUNICIPAL LIABILITY</u>
### *Constitutional Deprivation through Policy, Custom or Practice*
### *(Defendants City of Houston and Harris County)*

192.     Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

193.     Local governing bodies, or municipalities, may be held liable under 42 U.S.C. §1983 for constitutional deprivations committed pursuant to a policy, custom, or practice of the municipality. Even absent an officially adopted policy, a custom or practice that is so persistent and widespread that it fairly represents a municipal policy will support liability against the municipality. A pattern of unconstitutional conduct may be shown on the part of municipal employees who are not policymakers.

194.     In addition, a failure to train may give rise to municipal liability if the failure to train amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton v. Harris*, 489 U.S. 378, 388 (1989).

195.     Defendants City of Houston and Harris County (collectively, "Municipal Defendants") knowingly failed to maintain policies, practices, and training that met the minimum standards in the industry.

196.     At all times relevant to this action, Defendants City of Houston and Harris County have maintained policies, customs and/or practices that caused and were the moving force behind the violation of Plaintiff's constitutional rights, as described in this Complaint.

197.     The acts and/or omissions of each Individual Defendant was caused by said policies, customs or practices.

198.    The policymakers for Defendants City of Houston and Harris County had actual or constructive knowledge about said policies, customs or practices and/or were deliberately indifferent as to said policies, customs or practices.

199.    Said policies, customs and practices include the following:

a.  Municipal Defendants' policy of failing to sufficiently enforce DWI violations;

b.  Defendant City of Houston's failure to train HPD officers on properly handling DWI incidents;

c.  Defendant City of Houston's policy or custom of allowing HPD officers to misrepresent facts in a criminal investigation for personal gain and use false affidavits to obtain warrants, including arrest warrants, without sufficient probable cause;

d.  Defendant City of Houston's policy or custom of allowing HPD officers to violate policies related to criminal investigations and collection/reporting of evidence;

e.  Defendant City of Houston's policy or custom of allowing HPD officers to engage in race-based policing, specifically by disproportionately targeting black people for arrest and prosecution of certain crimes, including impersonation;

f.  Municipal Defendants' written policies that encourage HPD officers and assistant district attorneys to manipulate investigations and the presentation of evidence in order to secure warrants without the requisite probable cause;

g.  Municipal Defendants' failure to train HPD officers and assistant district attorneys on how to work together to conduct a proper criminal investigation, as opposed to cherry-picking facts to support probable cause;

h.  Defendant Harris County's policy of assigning assistant district attorneys with criminal investigation responsibilities without properly training them regarding those investigatory responsibilities.

200.    Municipal Defendants, through their policymakers, including Defendants Acevedo and Ogg, had actual or constructive knowledge about, but were deliberately indifferent to, all of the policies, customs, and practices of HPD and the Harris County District Attorney's Office referenced in this Complaint. All such policies, customs, and practices were the moving force behind, and cause of, the deprivation of Plaintiff's constitutional rights and resulting damages.

Theconduct of each Individual Defendant as described in this Complaint was caused by said policies,customs, and practices.

201.     As a direct and proximate result of Defendants' misconduct and the violations of Plaintiff's constitutional rights, Plaintiff suffered a loss of liberty when he was falsely arrested and held in custody, and suffered and will continue to suffer emotional distress, embarrassment, humiliation, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent.

**COUNT FIVE– 42 U.S.C. § 1983:**
**SUPERVISORY LIABILITY**
***Failure to Adequately Train and Supervise***
*(Defendants Acevedo and Ogg)*

202.     Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

203.     In order to establish supervisor liability for constitutional violations committed by subordinate employees, a Plaintiff must show, as relevant here, that the supervising personnel was "personally involved" in the alleged constitutional violations. *Turner v. Driver*, 848 F.3d 678, 695-96 (5th Cir. 2017); *Peha v. City of Rio Grande City*, 879 F.3d 613, 620 (5th Cir. 2018).

204.     To show personal involvement, the supervisor must know about the violation and personally direct the violation, facilitate it, approve it, condone it, turn a blind eye to it for fear of what he might see, or acquiesce in its continuance. *Turner*, 848 F.3d at 696 & n.88 (citing *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012); *Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996)).

205.     Defendants Acevedo and Ogg implemented and/or failed to implement the aforementioned policies, training, and supervision, which were the moving force that caused Plaintiff's constitutional injuries.

206.    Defendant Acevedo enforced a policy that authorized police officers to make false statements and omit material information in incident reports and probable cause affidavits in order to support false charges, which was relied upon by Individual Defendants to violate Plaintiff's constitutional rights.

207.    Defendant Acevedo enforced a policy that authorized Defendant Garcia's unlawful statement to law enforcement.

208.    Defendant Acevedo knew that HPD officers routinely made false statements and material omissions in affidavits for the purpose of securing warrants without probable cause, but failed to discipline officers for doing so.

209.    Defendant Acevedo knew that HPD officers routinely failed to enforce DWI laws, including by giving civilians a pass for DWI and then lying about the circumstances, but failed to discipline officers for doing so.

210.    Defendant Acevedo through approval, as well as, repeated failures of oversight and deliberate indifference, fostered an environment where police officers felt comfortable directing and allowing police officers to include material omissions and false statements in probable cause affidavits to support unlawful arrests on charges unsupported by probable cause.

211.    Defendant Acevedo had the authority to prevent the false criminal charges from being filed, and to withdraw the criminal charges once they were filed but refused to do so.

212.    An objectively reasonable police chief would have known that maintaining such deficient policies and training would violate clearly established law.

213.    Defendant Ogg enforced a policy that authorized Assistant District Attorneys to direct HPD officers to make false statements and omit material information in probable cause

affidavits in order to support bringing criminal charges without probable cause. Said policy was relied upon by Defendant Alfred to violate Plaintiff's constitutional rights.

214.     Defendant Ogg enforced a policy that authorized Defendant Garcia's unlawful statement to law enforcement.

215.     Defendant Ogg knew that assistant district attorneys, who lacked adequate training in the investigation of crimes, worked with law enforcement to secure criminal charges through probable cause affidavits that they knew containing material omissions and/or false statements but failed to discipline assistant district attorneys for doing so.

216.      Defendant Ogg through approval, as well as, repeated failures of oversight and deliberate indifference, fostered an environment where assistant district attorneys felt comfortable directing and allowing police officers to include material omissions and false statements in probable cause affidavits to support unlawful arrests on charges unsupported by probable cause.

217.     Defendant Ogg had the authority to prevent the false criminal charges from being filed, and to withdraw the criminal charges once they were filed but refused to do so.

218.     An objectively reasonable District Attorney would have known that maintaining such deficient policies and training would violate clearly established law.

219.     As a direct and proximate result of the Defendants' conduct, Plaintiffs suffered, and will continue to suffer, embarrassment, humiliation, physical and psychological harm, pain and suffering, and financial harm, some or all of which may be permanent.


### COUNT SIX – 42 U.S.C. § 1983:
### CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS

220.     Each of the previous paragraphs of this Complaint is incorporated as if fully restated herein.

221.    Following the March 23, 2019 incident, the Defendants reached an agreement with the Gomez and amongst themselves to unlawfully pursue Plaintiff for the crime of impersonating a police officer without probably cause, thereby depriving Plaintiff of his constitutional rights, as described in this Complaint.

222.    In this manner, Defendants, acting in concert with one another, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

223.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

224.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

225.    As a result of the Defendants' misconduct and the violations of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to financial harm and emotional distress.

## **DAMAGES**

226.    As a result of the foregoing unlawful and wrongful acts of Defendants, jointly and severally, Plaintiff has been caused to suffer general damages which include, but are not limited to, the following: both physical and emotional injury, pain and suffering, and emotional and mental distress, and shock.

227.    Said injuries have caused Plaintiff to incur special damages which include but are not limited to: lost wages, medical expenses, attorney's fees and the cost of his bond.

228.    Pursuant to the Civil Rights Attorney's Fees Award Act, 42 U.S.C.S. §1988, a prevailing party in a §1983 case is entitled to recover its attorney's fees. Hence, Plaintiff further prays for all costs and attorney fees associated with bringing the present case to trial.

229.    In addition, Plaintiff prays for punitive damages against the individual Defendant. Punitive damages are designed to punish and deter persons such as the individual Defendants who have engaged in egregious wrongdoing. Punitive damages may be assessed under §1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.

230.    When viewed objectively from the standpoint of the Defendants, at the time of the occurrence, said Defendants' conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

231.    As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by Defendants, Plaintiff is entitled to recover exemplary and/or punitive damages in an amount within the jurisdictional limits of this Court.

## **JURY DEMAND**

232.    Plaintiff hereby demands a trial by jury on all issues so triable.

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment against Defendants for:

(a) Compensatory damages to compensate for out-of-pocket losses, pain, suffering,and emotional distress suffered as a result of Defendants' actions or inactions articulated in this Original Complaint;

(b) Punitive damages in a sum as to deter the Defendants from conduct of this nature in the future;

(c) A declaration that Defendants' conduct, as set forth in this Original Complaint violated Plaintiff's rights under the Fourth Amendment to the United States Constitution;

(d) An award of attorneys' fees and costs;

(e) Such other relief as this Court deems just and proper.

Respectfully submitted this 27th day of September, 2021,

LAW OFFICE OF COURTNEY WARREN PLLC

By:  /s/ Courtney B. Warren
Courtney B. Warren
Texas Bar No. 24110511
402 Hunt Street
Houston, TX 77003
courtney@cwarrenlaw.com
Telephone: (512) 797 3855
**Attorney for Plaintiff**