Exhibit 1

# JUSTICE CAN'T WAIT:

## Independence Day Agenda for Houston Policing

REPORT BY:

**AMERICAN CIVIL LIBERTIES UNION OF TEXAS**

**BLACK LIVES MATTER HOUSTON**

**COMMUNITY JUSTICE ACTION FUND**

**FIEL HOUSTON**

**GRASSROOTS LEADERSHIP**

**HOUSTON JUSTICE**

**IMMIGRANT LEGAL RESOURCE CENTER**

**INDIVISIBLE HOUSTON**

**ONE FAMILY ONE FUTURE**

**PURE JUSTICE**

**RIGHT2JUSTICE COALITION**

**TEXAS ADVOCATES FOR JUSTICE**

**TEXAS APPLESEED**

**TEXAS CIVIL RIGHTS PROJECT**

**TEXAS FAIR DEFENSE PROJECT**

**TEXAS ORGANIZING PROJECT**

**URBAN COMMUNITY NETWORK**

**WORKERS DEFENSE ACTION FUND**

July 4, 2020

# Executive Summary

Houston is where George Floyd was raised and where he was laid to rest. While he did not take his final breaths here, his legacy is tied to ours and how we respond to this national reckoning with policing and police violence targeting Black people.

This report documents the ongoing practice of discriminatory policing in Houston. It shows that Black Houstonians make up just 23% of the population, but 36% of police stops, 49% of citation-eligible arrests, and 63% of those shot by the Houston Police Department. Black people in Houston are suffering disproportionately at the hands of police.

Around the country and across the state, cities are taking action to fundamentally reimagine the role of police in communities. They are disbanding problematic units, banning no-knock warrants, allocating funding for non-police emergency response, and reducing police budgets.

Houston has not yet taken decisive action on policing. George Floyd was buried in Pearland on June 9. On June 10, Houston City Council voted to increase the police budget by $19 million. On June 25, Mayor Turner appointed a Task Force on Policing Reform, with a mandate to deliberate for 60-90 days on a set of recommendations. The task force excludes the voices of advocates who have been working for years on criminal justice reform

**Around the country and across the state, cities are taking action to fundamentally reimagine the role of police in communities.**

in Houston. And at a moment when Black trans people are especially vulnerable, its composition raises serious questions about how LGBTQ issues will be addressed in its work.

These efforts deny the need for urgent action, now. This report includes five model ordinances based on national best practices and responds to the existing recommendations for reform this administration has already received to: (1) limit discretionary arrests for citation-eligible offenses; (2) maximize public access to critical incident body-worn camera footage; (3) create a framework to expand non-police emergency first responders; (4) improve fairness and justice in municipal courts; and (5) ban no-knock warrants. It also calls on the city to increase accountability in the police union contract; move police budget dollars to first responder, non-emergency and public health services budgets; and invigorate the citizens' oversight board with power to act independently.

We release this call to action on Independence Day because the fight for freedom is far from over. The barrier to reform in Houston in the summer of

# THE TIME FOR ACTION IS NOW.

MAYOR TURNER, CHIEF ACEVEDO, MEMBERS OF CITY COUNCIL — WE ARE LOOKING TO YOU TO LEAD.

2020 isn't further study, it is political will. It took 30 years for Houston to negotiate a settlement with the NAACP and MALDEF to formally adopt the requirements of *Brown v. Board of Education*. Changes in policing practices cannot wait that long. In 1965, the civil rights leader Whitney Young reflected on the history of reports on race and policing, writing, "The report is still there, it still reads well, but practically nothing is being done to follow its recommendations." More than 50 years later, that remains the history of task force reports.

Our leaders need to pick a side: will they choose to stall transformative change with a drawn-out task force that is unaccountable to those most affected by the persistent history of discriminatory policing in our communities? Or will they meet the moment and respond to the demand for action from 60,000 people marching in the streets? The Mayor and City Council can vote now on five ordinances that would change policing in Houston. They should do it.

The time for action is now. Mayor Turner, Chief Acevedo, members of City Council, we are looking to you to lead.

## FINDING #1

The City of Houston has not implemented previous police reform recommendations

## FINDING #2

There are significant racial disparities in traffic stops, arrests, and police shootings of civilians by Houston police

## FINDING #3

Houston Police Department transparency failures are deepening community mistrust

## FINDING #4

Houston's current police union contract shields officers from accountability

## FINDING #5

Houston Police Department wastes millions that should be reallocated into non-emergency first responder and public health services

## FINDING #6

Houston Police Department's no-knock raid policy doesn't go far enough to protect the public

# Key Findings

### Finding #1

## The City of Houston has not implemented previous police reform recommendations

- The City of Houston has not fully implemented key policing recommendations from Mayor Sylvester Turner's March 2016 Transition Committee on Criminal Justice Report ("Turner Transition Committee") and from the City of Houston's contractor-produced report presented to Houston City Council in February 2018, *A 10-Year Plan for the City of Houston: A Plan for Fiscal Sustainability and Economic Growth* ("10-Year Plan").

- The City of Houston has not adopted a policy requiring cite and release for eligible offenses, as recommended by both the Turner Transition Committee and the 10-Year Plan. The 10-Year Plan projected that failing to require cite and release would cost the city between $5 and $10 million.

- The City of Houston has not adopted a body camera policy that maximizes public access to footage, as recommended by the Turner Transition Committee. Houston Police Chief Art Acevedo regularly blocks video release and currently retains exclusive control over public release of body camera footage if a suspect dies while in custody or there is an ongoing administrative or criminal investigation.

- The City of Houston isn't doing enough to ensure people aren't jailed because of their inability to pay court fines, as recommended by the Turner Transition Committee. Between June 2014 and March 2020, Houston Police arrested more than 48,000 people for Class C Misdemeanor warrants.

- The Houston Police Department has not increased the proportion of civilians on its workforce as recommended by the 10-Year Plan. The number of sworn officers has increased while the civilian workforce has decreased.

### Finding #2

## There are significant racial disparities in traffic stops, arrests, and police shootings of civilians by Houston police

- Black people are over-represented in traffic stops by the Houston Police Department (HPD). Traffic stops of Black people accounted for 36 percent of all Houston Police stops in 2019, but Black people account for just about 22.5 percent of Houston's population. Put another way, traffic stops of Black people in Houston were 56 percent higher than their proportion in the population.

- Black people are also more likely than white people to be arrested for citation-eligible offenses by the Houston Police Department.[1] Citation-eligible offenses are low-level offenses,

---

[1]   Texas Appleseed obtained arrest records from the Houston Police Department for 6/14/2014 to 3/20/2020. The full analysis has not yet been published. Contact info@texasappleseed.net for more information.

including all Class C misdemeanors and a select number of Class A and B misdemeanors, where officers have the authority under state law to issue a citation or ticket instead of arresting a person accused of a crime. Based on an analysis by Texas Appleseed of arrest data provided by HPD, between June 2014 and March 2020, 49 percent of the people arrested by Houston Police for citation-eligible offenses were Black, while Black people make up just about 22.5 percent of Houston's population.

- Between June 2014 and March 2020, Black people were nine times more likely to be arrested by Houston Police for marijuana possession than white people. Research consistently shows that Black and white people use marijuana and other drugs at similar rates.

- From 2017-2019, Black people made up approximately 22.5 percent of the Houston population, but represented 63 percent of the people shot by the Houston Police Department. These are the years where the tenures of Chief Art Acevedo and Mayor Sylvester Turner have overlapped and during which there is a full dataset on information about police shootings available from Texas Justice Initiative.

# WHAT IS A CITATION-ELIGIBLE OFFENSE?

Citation-eligible offenses are low-level offenses for which officers have the authority under state law to issue a citation or ticket instead of arresting a person accused of that crime. Police can issue citations for all Class C Misdemeanors, which are intended to be punished by fine alone and no jail time, but officers may use their discretion to make arrests. Class C misdemeanors include traffic violations, possession of drug paraphernalia, disorderly conduct, and many other offenses. The Class A and Class B misdemeanors eligible for citation in lieu of arrest are:

- Possession of Marijuana less than 4 oz., Class A or Class B misdemeanor, Texas Health & Safety Code § 481.12(b)(l) & (2)

- Possession of Controlled Substance less than 4 oz, Penalty Group 2-A, Class A or B misdemeanor, Texas Health and Safety Code § 481.1161(b)(l) & (2)

- Driving while License Invalid, Class A or B misdemeanor, Texas Transportation Code § 521.457

- Theft of Property, Class B misdemeanor, Texas Penal Code § 31.03(e)(2)(A)

- Theft of Service, Class B misdemeanor, Texas Penal Code § 31.04(e)(2)

- Contraband in a Correctional Facility, Class B misdemeanor, Texas Penal Code § 38.114

- Graffiti, Class A or Class B misdemeanor, Texas Penal Code § 28.08(b)(2)

- Criminal Mischief, Class B misdemeanor, Texas Penal Code § 28.03(b)(2)

**Table A**

**June 2014 - March 2020 Houston Police Department Arrests for Citation-Eligible Offenses by Race/Ethnicity**

| Race/Ethnicity | Arrest Count | Arrest Percent | Houston Population Percent |
|---|---|---|---|
| Asian | 374 | 1.29 | 6.9 |
| Black | 14,216 | 48.91 | 22.5 |
| Hispanic | 8,389 | 28.86 | 44.8 |
| Other | 1,491 | 5.13 | 0.4 |
| White | 4,569 | 15.72 | 24.6 |
| Unknown | 28 | 0.10 | 0.8 |
| **Total** | **29,067** | **100** | **100** |

**Table B**

**June 2014 - March 2020 Houston Police Department Misdemeanor Possession of Marijuana Arrests by Race/Ethnicity**

| Race/Ethnicity | Arrest Count | Arrest Percent | Houston Population Percent |
|---|---|---|---|
| Asian | 35 | 0.57 | 6.9 |
| Black | 3,826 | 62.60 | 22.5 |
| Hispanic | 1,549 | 25.34 | 44.8 |
| Other | 275 | 4.50 | 0.4 |
| White | 421 | 6.89 | 24.6 |
| Unknown | 6 | 0.10 | 0.8 |
| **Total** | **6,112** | **100** | **100** |

# Finding #3

## Houston Police Department transparency failures are deepening community mistrust

- While nearly all Houston patrol officers have body-worn cameras, the Houston Police Department lacks critical transparency safeguards in its body camera release policy. That's because the Houston City Council has not adopted a body camera policy that maximizes public release of footage. As a result, Houston Police Chief Art Acevedo currently retains exclusive control over public release of body camera footage if a suspect dies while in custody or there is an ongoing administrative or criminal investigation.

- Houston police killed six Houstonians in as many weeks this year, including at least one unarmed man, but Chief Acevedo has refused to release body-worn camera footage of any of these shootings. When it comes to police body camera videos, the public's interest in prompt oversight of how police officers used force to take a life is overwhelming.

- Police having exclusive control over, and then refusing to release, video of killings which are disproportionately of Black men, defeats the purpose of having body cameras and does significant harm to trust and confidence in the Houston Police Department and their relations with the community.

# Finding #4

## Houston's current police union contract shields officers from accountability

The current Houston Police Officers Union (HPOU) Meet and Confer Agreement hinders meaningful investigation and accountability for officers accused of misconduct. The contract protects officers from the start: 48 hours in advance of being questioned about an incident of alleged misconduct, police officers must be given the written witness statements that supervisors obtained in their investigation if the interrogation of the police

officer rests, even in part, on the witness statements. This allows police officers to tailor their narrative of events before making any official statements. No civilian accused of misconduct is allowed this advantage.

This protection continues by limiting the amount of time the Department can impose a permanent or temporary suspension. In various situations the benefit goes to the officer in ways no other defendant would ever receive. For less egregious misconduct, the Department has 180 days from the date it discovers or becomes aware of the misconduct to impose a temporary suspension for that misconduct. After that date, the Department is barred from doing so. For more egregious misconduct warranting an indefinite suspension, the Department has 180 days from the date the violation occurred — irrespective of when it is discovered or becomes aware of the violation — to impose the indefinite suspension. The only exception to this limitation is when the police officer is charged with a felony or state jail felony. This prevents the Department from holding an officer accountable if misconduct comes to light later than the day it occurred, for instance if the Department discovers the misconduct through body camera video.

And even if discipline is imposed on an officer, the appeals process established in the contract raises serious impartiality issues. An officer may appeal their discipline to an arbitrator, known as an Independent Hearing Examiner (IHE). The committee that appoints these individuals is composed only of HPD employees, some of whom are appointed by the Chief of Police. While there is another avenue for appeal to the Police Officers Civil Service Commission, a civilian body appointed by the Mayor, this Commission's exclusive jurisdiction is restricted to only minor discipline of one to two day suspensions and written reprimands. Disciplinary action more serious than that can go to both an IHE or the Commission; officers may choose who can hear their appeal.

Although this contract expires at the end of December 2020, unless either party cancels the agreement 90 days prior, it will remain in effect indefinitely until a new contract is agreed upon by both parties. This locks in the current terms of the contract, with all of its problems, and continues the union's control over policing in our city rather than awarding that power to the department's bosses: the city's residents.

A final problem rests with state law that has many provisions that similarly protect police officers. The Meet and Confer Agreement can override these state civil service laws if the city and the union can agree on changes. This makes it incumbent on the City of Houston to negotiate and demand investigatory and disciplinary measures that foster accountability and transparency.

## Finding #5

## Houston Police Department wastes millions that should be reallocated into non-emergency first responder and public health services

The Houston Police Department budget makes up 37% of total general fund spending in the Fiscal Year 2021 budget recently adopted by the Houston City Council. It is the largest department in the city, with a budget of nearly $1 billion. For every $1.00 of City of Houston taxpayer funds spent on the police, less than:

- 7 cents is spent on the health department
- 2 cents is spent on neighborhoods and housing, and
- 5 cents is spent on libraries.

## Millions wasted on racially disparate arrests for citation-eligible offenses

A significant amount of police resources and public safety dollars in the City of Houston are devoted to making and processing arrests for low-level citation-eligible offenses, disproportionately of Black Houstonians. This includes the time that an officer spends responding to a call and the time transporting and booking people in jail after arrest. An estimated 9% of offenses from June 2014 to

March 2020 were citation-eligible. In most of these cases, arrest is unnecessary. Instead of arrest, law enforcement could release people on a promise to appear in court or pay a fine. If the City of Houston adopted a strong ordinance reducing these unnecessary arrests, it would free up municipal and county resources to address other pressing issues — from flood control to crime prevention and coronavirus recovery.

## Money wasted on mental health calls not requiring the presence of a uniformed officer

Many calls that Houston Police respond to right now would be better handled by trained mental health professionals. Houston has a large Crisis Intervention Team (CIT), which includes officers with extra mental health training riding with a masters' level mental health expert to answer calls involving mental health and substance abuse issues. As of the CIT 2018 annual report, there were 38,346 calls for the CIT officers, and they were able to respond to 26,987 of those calls with a CIT unit. Already we see that there is an unmet need for mental health first response, since 30% of those calls were picked up by non-CIT officers. CIT officers filed 10,164 emergency detention orders, also known as involuntary commitments, to mental health facilities, making up about 27% of CIT calls total. Only 810, or 3%, of those calls led to some use of force by an officer. If an officer responding to a mental health call isn't required to use force or make an emergency detention in 70% of the calls that they respond to, these figures suggest that a huge percentage of these calls could be handled by non-police alternatives

## Money wasted on arrests for people who are unable to pay fines and fees

Houston routinely arrests people who are unable to pay fines and fees. The analysis of Houston arrest records from 2014-2020 shows that more than 48,000 people were arrested on warrants for Class C Misdemeanors, about 15% of the total arrests

made during that period. The Houston Municipal Court issues warrants for Class C Misdemeanors when people fail to appear in court or fail to pay their fine. In 2019, the Court issued more than 104,000 warrants. A huge portion of arrests could be avoided if the Houston Municipal Court were to change its policies to dramatically reduce or end the practice of issuing warrants on these charges, or if officers were no longer required to make arrests for those warrants. Many options exist for the courts to enforce judgments in low-level cases other than issuing arrest warrants. These options are used throughout the country. In New York City, simply redesigning the citation forms and setting up a text message reminder greatly reduced rates of failure to appear in court.

Another source of unnecessary arrests stem from invalidating driver's licenses for not paying fines owed to the Court. Through the Omnibase Program, the City of Houston prevents people from renewing their driver's licenses until they pay outstanding municipal court fines. These "OmniBase holds" are issued in addition to arrest warrants. The vast majority of people failing to pay these fines are simply unable to, given their financial wherewithal. Given Houston's sprawling nature, driving is a necessity for many residents, who are left with a choice between losing jobs or driving without a license. Many of these residents end up being arrested later on charges of Driving While License Invalid charges, despite the fact that the charges are citation-eligible.

## Finding #6

## Houston Police Department's no-knock raid policy doesn't go far enough to protect the public

A no-knock warrant is a search warrant authorizing police officers to enter premises without first knocking and announcing their presence or purpose prior to entering the premises. These types of warrants are dangerous and they have historically been disproportionately used against people of color in the United States.

We have seen the tragic consequences of no-knock warrants here in Houston. On January 28, 2019, four Houston Police Department Officers were shot and the occupants of the home – Dennis Tuttle and Rhogena Nicholas – were killed during a no-knock raid. When officers swarmed in, the resident shot at them, believing the police to be intruders. Officers fired back, killing both occupants. Later, it was discovered the officers' statements in the sworn affidavit in support of the no-knock warrant were fabricated.

The Houston Police Department changed its policy following its disastrous January 2019 raid, but its changes do not go far enough. No-knock raids should be banned.

# Recommendations

## Recommendation #1

### Increase transparency and accountability for misconduct in Houston's police union contract

Mayor Sylvester Turner's Office should open the contract negotiations to the public, and the Mayor and City Council should provide notice to cancel the current contract before October 2, 2020 if the new contract does not make important changes, including:

1. Eliminating the rule that blocks disciplinary action 180 days after alleged egregious misconduct by an officer. Serious misconduct must be addressed even if the Chief learns about it long after it occurred.

2. Ending the 48-hour rule that gives officers accused of misconduct a full two days after an incident before they submit to an interview and that allows them to see any evidence against them in advance. No civilian accused of misconduct is given this special treatment.

3. Ensuring the appeals process for police officers accused of misconduct is fair and impartial.

4. Increased independence in police oversight, with investigatory powers resting outside the chain of command.

## Recommendation #2

### Implement a policy that eliminates discretionary arrests for citation-eligible offenses

Consistent with recommendations in both

the 10-Year Plan and the Turner Committee Recommendations from four years ago, the Houston Police Department should adopt a citation in lieu of arrest policy that eliminates discretionary arrests. The end of this report contains a model cite and release ordinance that the Houston City Council should act on now. The City of Houston's new cite and release policy should at least include:

1. A requirement to use citations, tickets or warnings for Class C and eligible Class A and Class B Misdemeanors;

2. Very limited exceptions to the requirement, which require a supervisor's permission to employ; and

3. Regular, transparent reporting to monitor how the policy is being implemented, how often exceptions are being made, and the reasons for those exceptions.

The City should also work with the Harris County District Attorney's Office and the Harris County Public Defender to develop and expand pre-charge and pre-plea diversion programs so that cited individuals are not charged whenever possible, and if charged, these charges are ultimately dismissed. This will ensure that individuals cited can keep a clean record, free of arrest, charge, and conviction.

## Recommendation #3

### Implement a body camera release policy that maximizes public access to body camera footage of critical incidents

When police officers take a life, the public needs to know how they conducted themselves. The end of

this report contains a model body camera ordinance that the City Council should act on now. The City of Houston's body camera release policy must do the following:

1. Maximize prompt public access to footage, especially when a police shooting, an in-custody death, or another critical incident is recorded;

2. Require release of body-worn camera footage within 24 hours of police shootings; and

3. Include important privacy safeguards.

## Recommendation #4

### Redirect budget allocations from the Houston Police Department to social service agencies better suited to certain emergency first response

Alternatives to policing have gained increasing attention over the last month as protests continue and cities come to terms with the brutality of their police departments. In an attempt to respond to growing calls for defunding and dismantling, local officials have also begun to seek ways to shift problem-solving from police to individuals or agencies more likely to offer actual solutions. One such alternative is community-based emergency response systems. At their core, these programs use community-based, trained teams to respond to issues like mental health crises, substance use, and homelessness in lieu of relying upon armed police officers. The teams include medics, crisis counselors, and social workers, and operate independently from law enforcement. Their use is growing around the country. And their existence shows us that we can address challenges that we face without resorting to violence, incarceration, and punishment.

Law enforcement has become the default response to almost every problem. Vulnerabilities have been outsourced to police officers so that they no longer just respond to "crimes," but to any crisis within a community. This includes mental and behavioral health emergencies, drug overdoses, and homelessness — challenges that we have

criminalized because we have not adequately addressed them through sufficient social services, accessible housing, and universal healthcare. This outsourcing has had devastating results. The Treatment Advocacy Center has found that people with an untreated mental illness are 16 times more likely to be killed during a police encounter than other civilians who come into contact with law enforcement. A report by the Ruderman Family Foundation estimates that up to half of the people killed by police have some sort of disability, with a significant portion experiencing mental illness. Tragedies like those of Randy Lewis, Osaze Osagi, Jaron Thomas, Anthony Hill, Pamela Turner, and Charleena Lyles show the danger of dispatching police to handle a mental or behavioral health crisis. And policing reforms, like increasing the number of officers with "crisis-intervention-training," have not been shown to mitigate this danger.

Police are no better at addressing crises related to lack of housing. Instead of compassion and connections to social services, police have been dispatched to forcibly remove people from public spaces, throw away their belongings, and charge them with crimes. Police encounters with unhoused people often end in violence, abuse, and incarceration. And while much of the country sees substance use as a health issue, rather than a criminal one, police are still sent to respond to potential drug overdoses. Instead of safe injection sites and readily available treatment, people struggling with substance use end up with criminal charges and online notoriety. In sum, when people are in crisis, they need help, not handcuffs. Sending police to respond to and support individuals in these moments is not just a bad idea, it is a dangerous one. That is why it is imperative that communities adopt community-based crisis response teams.

Cities and counties seeking to implement these alternatives in their own communities already have successful models to look to for inspiration. The CAHOOTS (Crisis Assistance Helping Out On The Streets) program in Eugene, Oregon has been in

operation for decades, and currently responds to about 20 percent of the 911 calls the community receives. Portland and Denver are both in the early stages of promising pilot programs, and Austin has recently expanded its Mobile Crisis Outreach Team and implemented telehealth services to respond to mental and behavioral health crises. As communities call for decreasing police budgets, local governments can reallocate those funds to new programs or existing social services that are able to develop or expand their crisis response. Lack of funding is no excuse for inaction on this issue. As organizers have noted in protests across the country, funding is rarely an issue when we're talking about policing. It is time to spend money on programs that actually keep us safe and promote our collective well-being. As communities around the country call for fundamental changes to and even complete abolishment of policing, we must stop deploying armed law enforcement to crises that are better addressed by social workers, medics, and counselors. This shift is urgent and necessary.

We recommend that Houston City Council and Mayor Turner implement a model crisis response program that follows these principles:

1. **Be separate from law enforcement.** A crisis response program should be entirely separated from law enforcement. This includes team members, managers, and anyone in an oversight position. One of the common ways teams are dispatched is through 911 calls that are routed to the crisis response team, but a city or county could also create a number that routes directly to the crisis response team.

2. **Include on-site, on-demand emergency and preventative services.** Crisis response programs should provide both emergency and preventive services. This means meeting people where they are and referring people to necessary services and treatment. Ideal crisis response teams include both a medic and a crisis worker who can provide "immediate stabilization in case of urgent medical need or psychological crisis, assessment, information,

referral, advocacy and (in some cases) transportation to the next step in treatment."

3. **Be fully funded through law enforcement budget reallocation.** Funding must be provided to both create and operate a crisis response team. As cities and counties grapple with budget shortfalls due to the COVID-19 pandemic, shifting money out of police budgets and to these more effective programs makes sense and makes the development of this alternative to policing feasible.

The end of this report contains a model ordinance that the Houston City Council can act on now.

## Recommendation #5

### Redirect budget allocations from the Houston Police Department to services that prevent crime and promote stability in Houstonians' lives

In addition to shifting funding from the Houston Police Department to non-police emergency responder programs, the Houston City Council should carefully evaluate whether spending such a large portion of its budget on policing is the best use of that money. For FY 2021, the Houston Police Department will receive $965,146,748 in taxpayer dollars. By contrast, to look at just a few other areas, Housing and Community Development, the Health Department, and Libraries combined together will receive only $138,892,848. These are vital services that improve people's lives in ways that make crime less likely to begin with.

Texas has one of the worst shortages of affordable housing in the country, and Houston has the lowest per capita rate of available affordable housing units, with only 19 available for every 100 extremely low income renters. Building affordable housing not only addresses housing shortages but also has been shown to reduce crime. When people are stably housed, they commit fewer nonviolent offenses, including survival crimes like theft, robbery, trespassing, loitering, and prostitution. For people

returning to society from incarceration, providing housing can lead to a 40% reduction in rearrests.

The Houston Health Department is set to receive less than one-tenth of what the Police Department will receive, at $94,302,696. As discussed above, emergency responder programs to deal with health issues like mental health and substance use disorder should be moved outside of the department. We also need front-end investment in mental health care and treatment that reduce crime and the need for crisis response in the first place. Recent research showed that adding treatment facilities decreases both violent and financially-motivated crime.

## Recommendation #6
## Improve fairness in Houston's Municipal Courts

The Houston City Council should end its contract between the Texas Department of Public Safety and the City of Houston allowing for the suspension of drivers' licenses for those unable to pay fines and fees through the OmniBase Program and pass an ordinance that ensures:

1. When imposing fines, courts only impose fine amounts that are truly affordable, without causing someone to have to forgo necessary personal expenses;

2. Fines and costs are waived for people who cannot afford to pay them;

3. There are alternative ways for people to resolve fines, such as a manageable number of community service hours; and

4. Warrants are only issued for failure to appear after more than one attempt has been made to reach the individual who has received a citation.

The Mayor and the City Council should also make the policies and practices at the municipal court around the criminalization of poverty part of the hiring and evaluation process for municipal judges, especially the presiding judge, whose current term is up for renewal in December 2020.

## Recommendation #7
## End dangerous no-knock warrants

A model ordinance to end dangerous no-knock warrants that the Houston City Council can act on now is included at the end of this report.

On June 11, 2020 Louisville Metro Council became the latest jurisdiction to ban the use of no-knock warrants entirely, following the tragic death of Breonna Taylor. We recommend Houston do the same by adopting a similar ordinance that bans no-knock warrants and quick-knock raids and affirmatively requires law enforcement to always both knock and clearly identify themselves as law enforcement.

The practice of "quick-knock" raids, where law enforcement knock or announce themselves and then immediately and forcibly enter the home, should be limited to a very narrow set of circumstances where the underlying investigation involves an offense that by its nature includes a grave risk of serious physical harm or death (e.g., murder, rape, terrorism, human trafficking), and where circumstances justify immediate entry to prevent imminent physical harm or death.

# Model Ordinances

## Model Ordinance #1

### Eliminating discretionary arrests for citation-eligible offenses

*This model ordinance may require additional detail before enactment. Discussion regarding any revisions to this ordinance should be made transparent and include members of the Right 2 Justice coalition in Houston.*

**City of Houston, Texas, Ordinance No. 2020-###**

**AN ORDINANCE ELIMINATING DISCRETIONARY ARRESTS FOR CITATION-ELIGIBLE OFFENSES, PROVIDING FOR TRANSPARENCY, AND PROVIDING AUTHORITY TO USE DOCUMENTS AND PROCEDURES TO ESTABLISH IDENTITY**

\*\*\*\*\*

**WHEREAS,** it is in the best interest of our local community to minimize unnecessary and costly arrests that separate families and funnel vulnerable communities into incarceration; and

**WHEREAS,** the City wishes to uphold constitutional protections, to eliminate any racial disparities associated with discretionary arrests, and to ensure the efficient and equitable use of City resources; and

**WHEREAS,** state law allows use of citation in lieu of arrest for certain misdemeanor offenses, including possession of marijuana, driving while license invalid, and city ordinance violations; and

**WHEREAS,** each year the Houston Police Department (HPD) makes tens of thousands of arrests for citation-eligible offenses, which translates to lost hours of officer time; and

**WHEREAS,** data provided by the HPD shows significant disparities by race in the use of arrest, especially for Black residents; and

**WHEREAS,** reducing arrests for low-level offenses would have a positive budgetary impact on the City, thereby increasing the resources available to achieve other local needs, goals, and priorities.

**BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF HOUSTON, TEXAS:**

SECTION 1.

(a) Except as provided by Subsection (b), the Houston Police Department shall issue a citation, ticket or warning, rather than arrest for individuals suspected of committing any citation-eligible offense as provided by the Texas Code of Criminal Procedure section 14.06.

(b) An officer may arrest an individual accused of the offenses described in Subsection (a) if:

> (1) The individual is subject to an outstanding arrest warrant from a criminal law enforcement agency;

> (2) The individual demands to be taken before a magistrate;

> (3) The individual is publicly intoxicated to the degree that they present a serious risk of physical harm to themselves or others;

> (4) The subject could not provide satisfactory evidence of personal identification to allow for citation. In determining whether the subject is able to provide satisfactory evidence of personal identification, it shall be acknowledged that not all persons are able to produce a government-issued ID. Therefore, the City shall accept other forms of identification, regardless of expiration date, including but not limited to: any state or federally-issued ID, library card, community organizational membership card, student ID, church ID, or other forms of identification, as well as photos of the aforementioned forms of identification. Additionally, in the absence of a physical ID, a verbal verification of a subject's identity and address shall suffice and may be obtained by contacting a family member, friend, or any person who has personal knowledge of the subject.

(c) Before making an arrest for a citation-eligible offense, the officer shall contact a supervisor to obtain approval. In any case where an arrest is made for a citation-eligible offense, the specific reason(s) for the arrest and supervisor approval shall be included in the incident report. If an incident report fails to contain a valid reason for an arrest in cases of the above-listed offenses, or include reasons for arrests not listed herein, there shall be an investigation into the incident and appropriate disciplinary action may be necessary.

SECTION 2.

For the purposes of this Section, an individual who lives, works, or goes to school in the county where the offense was allegedly committed will be deemed to be a resident of the county

SECTION 3.

(a) The Houston Police Chief shall send a quarterly public memorandum to the City Council, for the purposes of transparency, to provide data concerning the use of discretionary arrest for citation-eligible offenses.

(b) The report or memorandum should document anonymized records of every instance that a Houston police officer made an arrest for a citation-eligible offense. The memorandum should include the following data for each instance:

> (1) a documented reason for the stop;

> (2) the particular offense alleged;

> (3) the reason for the arrest as provided in Section 1, subsection (b) of this ordinance;

> (4) the age, race and ethnicity of the person arrested; and

> (5) the general location, such as the zip code of the incident.

(c) The report or memorandum should not include information that would jeopardize any ongoing criminal investigation or prosecution, and the report should include the number of unduplicated officers making such discretionary arrests.

SECTION 4.

All relevant City policies and internal operating procedures shall be updated in accordance with this Ordinance, including but not limited to: updating the Houston Police Department General Manual, training officers on the new guidelines for issuing citations in lieu of arrest, and updating internal databases and systems to remove any guidelines under the manual that are no longer in effect due to this Ordinance.

There shall be monthly meetings between the City Police Department and other interested stakeholders, especially community organizations and individuals directly impacted by the policing and arrests of immigrant communities and communities of color, in the development of policies, procedures, and practices related to this Ordinance. These meetings shall be open to public participation.

## Model Ordinance #2

### Maximizing Public Access to Critical Incident Body-Worn Camera Footage

**City of Houston, Texas, Ordinance No. 2020-###**

**AN ORDINANCE REGULATING THE USE OF WEARABLE BODY CAMERAS BY THE HOUSTON POLICE DEPARTMENT**

**\*\*\*\*\***

**BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF HOUSTON, TEXAS:**

SECTION 1.

(a) Only Houston Police Department (HPD) officers with the authority to conduct searches and make arrests shall be permitted to wear a body camera. Such body cameras shall be worn in a location and manner that maximizes the camera's ability to capture video footage of the officer's activities.

(b) With the exception of instances identified in subsection (h) below, both the video and audio recording functions of the body camera shall be activated whenever an HPD officer is responding to a call for service or at the initiation of any other law enforcement or investigative encounter between an HPD officer and a member of the public, except that when an immediate threat to the officer's life or safety makes activating the camera impossible or dangerous, the officer shall activate the camera at the first reasonable opportunity to do so. The body camera shall not be deactivated until the encounter has fully concluded and the HPD officer leaves the scene.

(c) An HPD officer who is wearing a body camera shall notify the subject(s) of the recording that they are being recorded by a body camera as close to the inception of the encounter as is reasonably possible.

(d) Notwithstanding the requirements of subsection (b):

 (1) Prior to entering a private residence without a warrant or in non-exigent circumstances, the HPD officer shall ask the occupant if the occupant wants the officer to discontinue use of the officer's body camera. If the occupant responds affirmatively, the officer shall immediately discontinue use of the body camera;

 (2) When interacting with an apparent crime victim, the HPD officer shall, as soon as practicable, ask the apparent crime victim, if the apparent crime victim wants the officer to discontinue use of the officer's body camera. If the apparent crime victim responds affirmatively, the officer shall immediately discontinue use of the body camera; and

 (3) When interacting with a person seeking to anonymously report a crime or assist in an ongoing law enforcement investigation, the HPD officer shall, as soon as practicable, ask the person seeking to remain anonymous, if the person seeking to remain anonymous wants the officer to discontinue use of the officer's body camera. If the person seeking to remain anonymous responds affirmatively, the officer shall immediately discontinue use of the body camera.

(e) All offers by HPD officers to discontinue the use of a body camera pursuant to subsection (d), shall be recorded by the body camera prior to discontinuing use of the body camera, including the and the responses thereto, shall be recorded by the body camera prior to discontinuing use of the body camera.

(f) Body cameras shall not be used surreptitiously.

(g) Body cameras shall not be used to gather intelligence information based on First Amendment protected speech, associations, or religion, or to record activity that is unrelated to a response to a call for service or a law enforcement or investigative encounter between a law enforcement officer and a member of the public.

(h) HPD officers shall not activate a body camera while on the grounds of any public, private or parochial elementary or secondary school, except when responding to an imminent threat to life or health.

(i) If an officer does not activate the body camera in response to a call for service or at the initiation of any other law enforcement or investigative encounter and the encounter does not fall into the instances enumerated in subsection (d), the officer must include the reason in the incident report.

(j) Body camera video footage shall be retained by the Houston Police Department, or an authorized agent thereof, for six (6) months from the date it was recorded, after which time such footage shall be permanently deleted.

> (1) During the six (6) month retention period, the following persons shall have the right to inspect the body camera footage because HPD has determined it serves a law enforcement purpose:
>
>> (A) Any person who is a subject of body camera video footage, and/or their designated legal counsel;
>>
>> (B) A parent of a minor subject of body camera video footage, and/or their designated legal counsel;
>>
>> (C) The spouse, next of kin or legally authorized designee of a deceased subject of body camera video footage, and/or their designated legal counsel;
>>
>> (D) The HPD officer whose body camera recorded the video footage, and/or their designated legal counsel, subject to the limitations and restrictions in this Ordinance;
>>
>> (E) The superior officer of the HPD officer whose body camera recorded the video footage, subject to the limitations and restrictions in this Ordinance; and
>>
>> (F) Any defense counsel who claims, pursuant to a written affidavit, to have a reasonable basis for believing a video may contain evidence that exculpates a client.
>
> (2) The right to inspect subject to subsection (i)(1) shall not include the right to possess a copy of the body camera video footage, unless the release of the body camera footage is otherwise authorized by this Ordinance or by another applicable law.
>
> (3) When a body camera fails to capture some or all of the audio or video of an incident due to malfunction, displacement of camera, or any other cause, any audio or video footage that is captured shall be treated the same as any other body camera audio or video footage under the law.

(k) Notwithstanding the retention and deletion requirements in subsection (i):

> (1) Video footage shall be automatically retained for no less than ten (10) years if the video footage captures an interaction or event involving:

(A) Any use of force;

(B) An encounter about which a complaint has been registered by a subject of the video footage; or

(C) an offense involving a Class B misdemeanors and above

(2) Body camera video footage shall also be retained for no less than ten (10) years if a longer retention period is voluntarily requested by:

(A) The HPD officer whose body camera recorded the video footage, if that officer reasonably asserts the video footage has evidentiary or exculpatory value;

(B) Any HPD officer who is a subject of the video footage, if that officer reasonably asserts the video footage has evidentiary or exculpatory value;

(C) Any superior officer of the HPD officer whose body camera recorded the video footage or who is a subject of the video footage, if that superior officer reasonably asserts the video footage has evidentiary or exculpatory value;

(D) Any HPD officer, if the video footage is being retained solely and exclusively for police training purposes;

(E) Any member of the public who is a subject of the video footage;

(F) Any parent or legal guardian of a minor who is a subject of the video footage; or

(G) A deceased subject's spouse, next of kin, or legally authorized designee.

(l) To effectuate subsections (k)(2)(E), (k)(2)(F) and (k)(2)(G) and to further law enforcement purposes, any member of the public who is a subject of video footage, the parent or legal guardian of a minor who is a subject of the video footage, or a deceased subject's next of kin or legally authorized designee, shall be permitted to review the specific video footage in question in order to make a determination as to whether they will voluntarily request it be subjected to a ten (10) year retention period.

(m) All video footage of an interaction or event captured by a body camera shall be provided to the person or entity making the request in accordance with the procedures for requesting and providing government records set forth in the Public Information Act codified in the Texas Government Code, Chapter 552 and Texas Occupational Code § 1701.661 (a).

(1) Notwithstanding the public release requirements in subsection (m), the following categories of video footage shall not be released to the public in the absence of express written permission from the non-law enforcement subject(s) of the video footage:

(A) Video footage not subject to a minimum ten (10) year retention period pursuant to subsection (k); and

(B) Video footage that is subject to a minimum ten (10) year retention period solely and exclusively pursuant to subsection (k)(1)(B) or (k)(2); and

(C) Video footage of a recording made in a private space, or of a recording involving the investigation of conduct that constitutes a misdemeanor punishable by fine only and does

not result in arrest, without written authorization from the person who is the subject of that portion of the recording or, if the person is deceased, from the person's authorized representative.

(2) Notwithstanding any time periods established for acknowledging and responding to records requests in the Public Information Act, responses to requests for video footage that is subject to a minimum ten (10) year retention period pursuant to subsection (k)(1)(A), where a subject of the video footage is recorded being killed, shot by a firearm, or grievously injured, shall be prioritized and the requested video footage shall be provided as expeditiously as possible, but in no circumstances later than twenty-four (24) hours following receipt of the request.

(3) Whenever doing so is necessary to protect personal privacy, the right to a fair trial, the identity of a confidential source or crime victim, or the life or physical safety of any person appearing in video footage, redaction technology may be used to obscure the face and other personally identifying characteristics of that person, including the tone of the person's voice, provided the redaction does not interfere with a viewer's ability to fully, completely, and accurately comprehend the events captured on the video footage.

> (A) When redaction is performed on video footage pursuant to subsection (l)(3), an unedited, original version of the video footage shall be retained pursuant to the requirements of subsection (j) and (k).

> (B) Except pursuant to the rules for the redaction of video footage set forth in subsection (m)(3) or where it is otherwise expressly authorized by this Ordinance, no other editing or alteration of video footage, including a reduction of the video footage's resolution, shall be permitted.

(4) The provisions governing the production of body camera video footage to the public in this Ordinance shall take precedence over all other state and local laws, rules, and regulations to the contrary where permitted.

(n) Because the Houston Police Department believes transparency serves a law enforcement purpose, body camera video footage shall not be withheld from the public on the basis that it is an investigatory record or was compiled for law enforcement purposes, such as the Public Information Act exception in the Texas Government Code 552.108, where any person under investigation or whose conduct is under review is a police officer or other law enforcement employee and the video footage relates to that person's on-the-job conduct. Any privacy concerns raised by disclosure is governed by Subsection m(3).

(o) Any video footage retained beyond six (6) months solely and exclusively pursuant to subsection (k)(2)(D) shall not be admissible as evidence in any criminal or civil legal or administrative proceeding.

(p) No government agency or official, or law enforcement agency, officer, or official may publicly disclose, release, or share body camera video footage unless:

> (1) Doing so is expressly authorized pursuant to this Ordinance or another applicable law; or

> (2) The video footage is subject to public release pursuant to subsection (m), and not exempted from public release pursuant to subsection (m)(1).

(q) An officer or HPD employee commits a Class A misdemeanor if they release a recording created with a body camera without permission of HPD.

(r) If an officer is accused of misconduct, supervisors should review the body camera video footage that forms the basis of the complaint of misconduct to investigate the incident. Where the complaint of misconduct involves use of force that results in injury or death, supervisors should ensure the body camera video footage of the incident that forms the basis of the complaint is provided to the Internal Affairs Division.

(s) Video footage that is not subject to a minimum ten (10) year retention period shall not be:

> (1) Viewed by any superior officer of the HPD officer whose body camera recorded the footage absent a specific allegation of misconduct; or

> (2) Subjected to facial recognition or any other form of automated analysis or analytics of any kind, unless:

>> (A) A judicial warrant providing authorization is obtained;

>> (B) The judicial warrant specifies the precise video recording to which the authorization applies; and

>> (C) The authorizing court finds there is probable cause to believe the video footage contains evidence that is relevant to an ongoing criminal investigation.

(t) Where HPD authorizes a third-party to act as its agent in maintaining body camera footage, the agent shall not be permitted to independently access, view, or alter any video footage, except to delete videos as required by law or agency retention policies.

(u) Should any HPD officer, employee, or agent fail to adhere to the recording or retention requirements contained in this Ordinance, intentionally interfere with a body camera's ability to accurately capture video footage, or otherwise manipulate the video footage captured by a body camera during or after its operation, appropriate disciplinary action shall be taken against the individual officer, employee or agent;

(v) The disciplinary action requirement in subsection (t) may be overcome by contrary evidence or proof of exigent circumstances that made compliance impossible.

SECTION 2.

(a) The Department's Office of Technology Services shall be responsible for:

> (1) Deploying and maintaining and supporting the functionality of the body cameras, peripheral devices; and cables, video transfer devices, work station software, system settings, and any other equipment located on-site.

> (2)Maintaining a master inventory of HPD body cameras and equipment and conducting an annual inventory.

> (3) Coordinating with Houston Information Technology Services (HITS) Department to maintain network connectivity, server availability, backup copies, and storage availability.

> (4) Providing assistance with other technological issues.

(b) Upon notification of equipment malfunction or damage, a division shall contact the Office of Technology Services for further direction. The Office of Technology Services shall have sole responsibility to liaise with the equipment manufacturer for parts and replacement, if needed. The Office of Technology Services personnel shall also be responsible for issuing replacement body cameras and assuming responsibility for updating the database to reflect changes in equipment status and assignment.

(c) This Ordinance shall be made publicly available on HPD's website.

(d) Nothing in this chapter shall be read to contravene any laws governing the maintenance, production, and destruction of evidence in criminal investigations and prosecutions.

(e) As used in this Act:

> (1) "Law enforcement officer" shall mean any person authorized by law to conduct searches and effectuate arrests and who is employed by the state, by a state subsidiary, or by a county, municipal, or metropolitan form of government.

> (2) "Subject of the video footage" shall mean any identifiable law enforcement officer or any identifiable suspect, victim, detainee, conversant, injured party, or other similarly situated person who appears on the body camera recording, and shall not include people who only incidentally appear on the recording.

> (3) "Use of force" shall mean any action by a law enforcement officer that

>> (A) results in death, injury, complaint of injury, or complaint of pain that persists beyond the use of a physical control hold, or

>> (B) involves the use of a weapon, including a personal body weapon, chemical agent, impact weapon, extended range impact weapon, sonic weapon, sensory weapon, conducted energy device, or firearm, against a member of the public, or

>> (C) involves any intentional pointing of a firearm at a member of the public.

> (4) "Video footage" shall mean any images or audio recorded by a body camera.

SECTION 3. This Act shall take effect [DATE]

## Model Ordinance #3

### Emergency Non-Police Responders

*This model legislation is inspired by bills that have been introduced in CA, IL, and FL, in consultation with experts who have studied effective community-based responses to crises.*

RECITALS:

(a) The complexities of emergency issues surrounding crises in mental health, intimate partner violence, community violence, substance abuse, and natural disasters can, at times, be addressed more safely, with greater impact, and more cost-effectively and efficiently with community organizations/non-law enforcement responders staffed by mental and behavioral health care specialists, social workers, or counselors, who often have deeper knowledge and understanding of the issues, trusted relationships with the people and communities involved, and specific knowledge and relationships surrounding the emergency.

(b) Furthermore, young people of color, people with disabilities, people who are gender nonconforming, people who are formerly incarcerated, people with immigration status issues, and people who are unhoused or homeless, face significant barriers to engaging with law enforcement and other first responder personnel. Data demonstrates that these populations often do not reach out for needed help when dealing with crises in their communities because of their fear and challenges with engaging law enforcement, which puts lives and families at risk for continued harm and trauma. People who specialize in working with these populations, understanding their issues, and maintaining deep relationships in their communities have a more successful track record of engaging and supporting them.

(c) Government entities from the national to the local level have defunded systems of care, including health care and mental health care, over decades. Governments have not invested in systems that address many people's individual and community needs. We have come to rely on police officers to respond to calls for people who are in crisis, as well as for calls that should not and cannot be addressed by law enforcement. Such calls include, but are by no means limited to: complaints that people are unhoused and should be moved; complaints involving disputes between neighbors; complaints that a person looks "suspicious" or is doing something that the caller believes to be incorrect; or complaints regarding parking, and requests that cars be ticketed or towed.

(d) Further, when people are experiencing distress or crisis, there are limited resources available to assist them through the crisis, including facilities where they can be transported to and cared for. In the absence of these facilities, people have been taken to county jails or hospital emergency rooms. Incarceration and emergency rooms are not only the most expensive responses to meet people's needs, they are often entirely inappropriate responses.

(e) People in cities and counties throughout the state have recognized the need to expand innovative approaches to both emergencies and social problems and have created programs to do so.

(f) These alternative approaches have strengthened non-law enforcement responses to emergencies and other needs in places throughout the [state/county/city] by deepening the involvement of peer counselors, preventing violence, deescalating volatile situations, protecting property and the environment, reducing law enforcement use of force, and ensuring the health and safety of communities while, at the same time, saving money by decreasing calls for law enforcement services and the sole reliance upon officers or the

use of emergency hospitalization for situations that do not present a threat of physical harm to others.

(g) Despite the innovative approaches led by community organizations and local governments the [state/county/city] does not have a policy, a set of protocols, or dedicated funding to support appropriate responses to calls for assistance or to create [the state/county/city's] own crisis and support team to address people's needs that do not require a police response.

(h) This funding seeks to remedy those issues by articulating a policy framework and grant process to support innovative approaches to build capacity and to make grants [for community organizations or local governments] to support appropriate and humane responses to the multitude of people's needs.

(i) It is the intention of this funding to reduce the over-reliance on armed law enforcement to respond to crises that do not require law enforcement. As a result, it is the intention that as local governments establish and scale up civilian crisis response systems, they should dramatically reduce their reliance on law enforcement and reduce those budgets accordingly.

SECTION 1. FUNDING

(a) The [Act/Policy] is hereby established, as a [xx (number) year program, subject to renewal], for the purposes of creating, implementing, and evaluating the Grant Program in accordance with this article.

(b) The [Title] Grant Program is hereby established. The office shall establish rules and regulations for the act with the goal of making [grants to local governments/budget allocations to non-law enforcement departments within a local government, or community based organizations] in order to establish appropriate responses to crises and other assistance that should not be addressed by responses from law enforcement.

(c) The program shall expand the participation of community organizations and non-law enforcement care workers in emergency and other responses for vulnerable populations. Vulnerable populations include people of color, elderly people, people with disabilities, people who are gender nonconforming, people who are likely to face disproportionate police contact, people who are formerly incarcerated, people with immigration status issues, people who are unhoused, people facing mental health crises, people involved in intimate partner violence, vulnerable youth, people likely to be engaged in community violence, people challenged by substance abuse, and people living in areas that are environmentally insecure with vulnerable populations and subject to natural or climate disasters or public health emergencies.

(d) This program may also be used to provide technical assistance and support to local governments and community-based organizations to identify and engage with frequent users of emergency and other services. Such Frequent User System Engagement (FUSE) technology would allow first responders to identify individuals who are homeless or who have great needs and who frequently use resources such as emergency rooms in hospitals, or are sent to jails, and connect them to housing and a wide variety of resources. As mandated in [below section] all such FUSE information obtained shall be subject to all relevant federal and state privacy law protections, including but not limited to, the Health Insurance Portability and Accountability Act (HIPAA) [and other state privacy laws]. The fact that a person is a FUSE shall not be used to deny services.

(e) This program shall also provide funding for services, including health respite, temporary respite, temporary shelter, and supportive housing for people who are unhoused or in need of immediate services.

(f) This program may also be used to ensure that schools and other facilities that serve children, homeless

youth, or other young adults have access to the emergency response team, and to fund "school wellness centers" at schools or other facilities that are dedicated to addressing the particular mental and behavioral health needs of children and young adults.

SECTION 2. PROGRAM REQUIREMENTS: CRISIS RESPONSE

(a) Funds should be provided to [local governments, departments within local governments, community-based organizations, non-profits, or a combination of these entities].

(b) The core components of any program funded under this Act should include the following:

(c) Crisis response teams must be entirely independent of law enforcement systems, including through their funding structure and oversight.

(d) The local government who is either receiving the grant or dispersing the funds to a community based organization must have a clear set of restrictions in place, or be willing to adopt a clear set of restrictions, as to when law enforcement officers shall be summoned to respond to calls. These restrictions should ensure that emergency 911 calls are only routed to law enforcement officers when:

> (1) There is a threat of immediate physical injury or death to another;

> (2) There was a serious or violent crime committed and immediate investigation by law enforcement is required;

> (3) The civilian crisis response team calls for law enforcement; or

> (4) Sufficient other circumstances dictate that the only appropriate response to an unfolding situation requires the response by law enforcement officers.

(e) The crisis response team should respond to all calls for help involving mental health crisis or indications of mental or behavioral health distress, along with substance overdose, including:

> (1) In hospitals, when a person is refusing physical restraints, medication, or any person's physical health is being put at risk;

> (2) All domestic calls where the caller indicates the person is having a mental health crisis; or

> (3) All calls indicating an overdose or potential overdose.

(f) A crisis response team that responds to calls involving mental or behavioral health issues must be staffed with mental health care experts or crisis-trained social workers. Calls indicating an overdose or potential overdose shall be responded to by the crisis team and the appropriate medical health response, such as an EMT.

(g) Crisis response teams should be mobile and capable of providing on-site, on-demand services and transportation.

(h) Crisis response teams must be equipped to provide referrals for community services or treatment.

(i) The crisis response team should strive to prevent crises before they occur and engage with vulnerable populations to provide referrals for preventive care.

(j) The crisis response team should strive to create the technical capacity to identify and engage with

frequent users of the crisis system in order to determine what resources they need so as to reduce their use of emergency systems of care.

(1) Any such information collected shall be subject to all privacy laws, including HIPAA, [other relevant state laws]

(2) The fact that a person is a frequent user may not be used to deny services to that person.

(k) Crisis response teams should also respond to calls that involve disputes between people or other calls that do not require law enforcement. Such calls include, but are not limited to:

(1) Responding to an unhoused person;

(2) addressing behavior by somebody who is unhoused;

(3) calls regarding a "suspicious person" or other calls not indicting a present and immediate threat of violent behavior; or

(4) disputes between parties.

(l) A local government should provide that their Emergency Response Communication Systems, such as 9-1-1, have staff trained to route calls to the appropriate response team.

(m) Staff at the Emergency Response Communication Systems should receive mental health and substance use disorder training, and have clear guidance on when to direct the crisis response team to respond to a call.

(n) If the grantee has authority to amend an existing Emergency Response Communication System or to create a separate Emergency Response Communication System, a non-9-1-1 number that goes directly to the crisis response team should be made available. If a non-911 number is created for the crisis response team, calls to 911 shall still be routed to crisis response teams in the appropriate situations as detailed here.

(o) Data Collection and Reporting. The grantees, whether a local government entity or community based organization shall produce data to be provided on a yearly basis:

(1) The number of calls responded to by the crisis response team;

(2) The nature of the calls responded to by the crisis response team;

(3) The number of individuals served by the crisis response team;

(4) The number of instances where the crisis response teams requested law enforcement back-up.

(5) This data must be anonymized so as not to identify any individual who has used the system.

(6) [Other information]

(p) Any grantee must ensure that crisis response teams are managed outside of law enforcement. Grantees must ensure that an oversight committee is in place, ensure adequate training programs and protocols, and ensure that care is being provided appropriately.

(1) Committees must include advocates from health and disability communities and must reflect

the racial demographics of the jurisdiction.

(2) The Committee should prepare annual reports to compile the data and assess the effectiveness of the program.

(q) [If grant made to local government] Appropriate law enforcement staff reductions should be made within one year of the crisis response teams operation.

(1) Funding should instead be directed to supporting and maintaining the crisis response team or creating a non-law enforcement city department to run the crisis response teams.

(2) Law enforcement must also track and report data for all calls as provided under subsection 13.

SECTION 3. FUNDING FOR REFERRAL SERVICES

(a) Local governments and community-based organizations may also apply for funding for continued care for people in need in order to facilitate the operation of the crisis response team and to ensure that people who are in crisis receive appropriate care. Such funding may include:

(1) Temporary day or overnight shelters for people who are experiencing homelessness.

(2) Technical assistance to identify and engage with frequent users of services.

(3) Mental health and substance use disorder facilities in order that the crisis response team has the ability to transport individuals in a problematic situation or in need of treatment to a safe facility.

(4) Temporary housing or supportive housing for individuals who are unhoused.

(5) Resources to ensure that schools and other programs that serve children, homeless youth, or other young adult populations are able to communicate with the crisis response team.

(6) A coordinated system of care for children and schools, including a wellness center for children, whether located at a school or other facility that serves children, homeless youth, or young adults, who are experiencing crisis or trauma.

(7) Technical and other assistance to ensure that there is a direct line of communication between the crisis response teams and hospitals, and to support the mental health services provided by these hospitals.

## Model Ordinance #4

### Increasing fairness in Houston Municipal Courts

**City of Houston, Texas, Ordinance No. 2020-###**

**AN ORDINANCE TO ENSURE FAIRNESS AND JUSTICE FOR ALL IN HOUSTON MUNICIPAL COURT**

**\*\*\*\*\***

**BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF HOUSTON, TEXAS:**

SECTION 1. Section 16 of the Houston Municipal Code is amended as follows:

Sec. 16-43. Representation of defendants by counsel; informing defendants of rights.

(a) All defendants in municipal courts are entitled to be represented by counsel and the judges of each respective municipal court shall so instruct each defendant prior to any plea in the case. If requested, the judge shall grant a reasonable continuance to allow the defendant to retain counsel.

(b) If the defendant is charged with an offense involving moral turpitude, if the defendant faces the possibility of arrest or confinement in jail, or if the defendant is a juvenile charged with a non-traffic offense, the court shall, prior to any plea in the case, inform the defendant of the accusation against him, of the right to be represented by counsel and of the right to have counsel appointed if the defendant is indigent and financially unable to employ counsel.

(c) If the court determines that a defendant charged with an offense involving moral turpitude or a defendant facing the possibility of arrest or confinement in jail is indigent, the court shall appoint counsel to represent the defendant. In cases where a juvenile is charged with a non-traffic offense, if the court determines that the juvenile is indigent, that it is in the best interest of the juvenile, and that it is in the interest of justice to do so, the court shall appoint counsel to represent the juvenile defendant. Indigency is to be determined by the court. The defendant shall file an oath or affirmation of indigency under the penalties of perjury stating that he is financially unable to employ counsel. For a juvenile defendant, the court may, in the interest of justice, require a parent or guardian to join the aforesaid oath or affirmation. The court may appoint counsel on the basis of that oath or may hold a separate hearing to determine the defendant's financial ability to pay.

Sec. 16-46. Docket.

(a) The clerk of the municipal courts, under the direction of the presiding judge, shall keep an electronic docket in which he shall enter the proceedings in each trial, which docket shall show:

    (1) The style of the action.

    (2) The nature of the offense charged.

    (3) The date each warrant was issued, whether such warrant was a warrant for failure to appear or a capias pro fine, and any arrest of defendant made pursuant to such warrant including the date of arrest and arresting agency.

    (4) All pleas, written motions and orders of the court.

(5) The jury charge and verdict, if the trial is by jury.

(6) The judgment of the court.

(7) Written findings of ability to pay in each case following an inquiry pursuant to Tex. Code of Crim. Pro. art. 45.041(a-1) and Sec. 16-51, as well as any alternative sentence imposed, including deferral of payment, payment plan, community service, and/or reduction or waiver of the standard fine.

(8) Motion for new trial, if any, and the decision thereon.

(9) If an appeal was taken.

(10) The time when, and the manner in which the judgment was enforced.

(11) Notation of each written communication provided to defendant, each written communication received from the defendant, and a brief description of each phone call or in-person conversation with the defendant.

(12) Any community service hours completed by defendant and date they were completed.

(13) The race, gender, ethnicity and zip code of residence of defendant.

(b) This electronic docket shall be posted online and searchable by the public.

Sec. 16-47. - Failure of defendant to appear at trial.

(a) It shall be unlawful for any person knowingly to fail to appear for the arraignment or trial of any charge against the person pending in the municipal courts of the city.

(b) Notice provided to the defendant before issuing a warrant as required by Tex. Code of Crim. Proc. art. 45.014(e) after a person has failed to appear shall be provided by phone and/or text, as well as by certified mail, return receipt requested. Each notice shall explain that a person will not be arrested on warrants issued in fine-only cases if they appear in court, pursuant to state law, and explain the options that are available if a person is unable to pay their fines. The notices should explain that if the person cannot afford to pay the citation, they may instead complete community service or have the balance reduced or waived.

(c) Before issuing a warrant, the court shall issue a summons pursuant to Tex. Code of Crim. Proc. 15.03(b) and give the defendant at least 30 days to appear.

Sec. 16-48. Plea by defendant.

(a) At the defendant's first appearance in court, the charge shall be read to the defendant, and the court shall advise the defendant of the options to plead guilty, not guilty, or no contest. The judge shall also advise the defendant that if she is found guilty, and fines and costs are assessed that the defendant is unable to pay, the defendant will be entitled to alternative options including a payment plan, community service, or full or partial waiver. Defendants shall then plead thereto, and the plea shall be entered upon his docket by the judge of one of the municipal courts. All pleas must be made to the judge by the defendant or his legal representative.

(b) No plea of guilty shall be accepted except by the judge of one of the municipal courts. Before entering a plea of guilty or no contest, the judge shall advise the defendant that such a plea waives the right to a

jury trial where the defendant could remain silent, and would be presumed innocent unless the City proved its case beyond a reasonable doubt. The judge shall also ask the defendant about any promises that have been made in exchange for the plea. Should the defendant plead guilty before the municipal court, the judge thereof shall thereupon enter the plea on the judge's docket and assess a fine and costs as may be authorized by law. If a plea of not guilty shall be entered to the complaint, a trial shall be had, either by the court or by a jury, as the defendant may elect.

Sec. 16-50. Fines to be paid to clerk or officer.

All fines assessed by the municipal courts shall be paid to the clerk of the municipal courts or some officer designated by the presiding judge to receive the same. No person is to be imprisoned for nonpayment of a fine or for not completing community service or otherwise failing to comply with the court's orders.

Sec. 16-51. Alternative method for payment of fine.

(a) When a defendant has been found guilty, by plea or conviction, or when a person who has previously been convicted returns to court because they cannot pay, the court shall conduct an ability to pay inquiry at the time a fine or costs are imposed pursuant to Tex. Code of Crim. Proc. art. 45.041(a-1) and 45.0445.

> (1) As part of that hearing, the court shall ask affirmatively whether the defendant is able to pay the standard fine and costs that day without foregoing necessary household expenses for themselves and their dependents. If the defendant indicates he or she is able to pay without foregoing necessary household expenses for themselves and their dependents, the court need not proceed further with the inquiry.

> (2) If the defendant asserts their inability to pay, the court shall inquire into the defendant's finances, including defendant's income, expenses, dependents, receipt of income-based government assistance, disability status and assistance, ability to perform community service, and any special circumstances. The court shall create a standard form to facilitate collection of this information.

> (3) A defendant whose income is 250% of the federal poverty line or less; who receives income-based government assistance; who is serving a sentence in a correctional institution; who is residing in a public mental health facility or is the subject of a proceeding in which admission or commitment to such a mental health facility is sought; who is enrolled in middle school or high school; or who is 18 years of age or younger, may be presumed by the court to be unable to pay.

> (4) If the court finds that the defendant is unable to pay, court costs and any other fees shall be waived pursuant to Tex. Code of Crim. Proc. art. 45.0491(d). The court shall then tailor a fine to the defendant's resources. In tailoring the fine amount, they Court may offer the defendant one of the following options: (i) a substantially reduced fine in the amount that defendant could pay within 30 days without foregoing necessary household expenses; (ii) a reasonable payment plan of no more than 10% of defendant's discretionary income per month; (iii) community service; or (iv) waiver of what is owed.

> (5) Before a court orders defendant to complete community service, the court shall determine that community service will not constitute an undue hardship on defendant given defendant's employment, parenting or family obligations, lack of transportation, lack of housing, physical or mental health, disability, or any other special circumstances, as prescribed under Article 45.0491(c). Each hour of community service performed may be given credit of at least $20 per hour. The maximum number of community service hours that the court can assess for one person

is 40 hours, after completion of which all outstanding fines and costs in all cases pending before the court shall be considered satisfied.

(6) Any order for payment plan or community service shall clearly state in writing defendant's obligations, including information about the consequences of noncompliance, and be signed by defendant.

(7) All findings about defendant's ability to pay and alternative sentences shall be made in writing.

(c) Any defendant who is found unable to pay in full according to this section shall not be submitted to the Department of Public Safety Failure to Appear Program pursuant to any contract made by the court or city in accordance with Tex. Transportation Code chapter 706.

(d) The court shall create a walk-in docket or similar process for defendants who have previously been ordered to pay a fine or cost that they later find themselves unable to pay. In such cases, the court shall conduct an ability to pay inquiry as outlined in section (a) and modify defendant's sentence in accordance with the court's findings.

SECTION 2. The following sections are added to the Houston Municipal Code:

Sec. 16-56. Capias pro fines.

(a) When issuing a notice for a hearing pursuant to Tex. Code of Crim. Proc. art. 45.045(a-2), the court shall provide notice of the hearing to the person, through text message, email, phone call and letter. The notice shall explain that the person will not be arrested if they come to court voluntarily, even after the warrant is issued, pursuant to state law. The notice shall also explain the options that are available to a person if they cannot pay and how to request those options from the court.

Sec. 16-57. Information available to the public.

(a) The court shall include information regarding defendant's legal rights and alternative sentences available if defendant is unable to pay on the court's website, posted at the court where it is clearly visible, and on any written document mailed, emailed, or otherwise distributed to defendants. The notices should explain that if the person cannot afford to pay the citation, they may instead complete community service or have the balance reduced or waived.

(b) The Court shall post on its website and at the courthouse information assuring individuals that they will not be arrested on Municipal Court warrants while at the Court.

(c) All written communications from the court to people with pending cases shall provide assurance that a person will not be arrested on warrants issued in fine-only cases if they appear in court. Such communications will also include information about what options are available if the person cannot pay their fines and costs and how to request those options.

## Model Ordinance #5

### Banning No-Knock Warrants Ordinance

*This model ordinance is inspired by the recent legislation passed by Louisville Metro Council*

**City of Houston, Texas, Ordinance No. 2020-###**

**AN ORDINANCE BANNING NO-KNOCK SEARCH WARRANTS AND REGULATING THE EXECUTION OF SEARCH WARRANTS**

**\*\*\*\*\***

**WHEREAS,** a ban of no-knock search warrants will enhance safety for both the citizens of Houston and for the law enforcement officers who protect them; and

**WHEREAS,** specific restrictions and limitations on the use of all search warrants are clearly required to achieve public safety.

**BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF HOUSTON, TEXAS:**

SECTION I. A new section of Chapter _____of the City of Houston Code of Ordinances is created as follows:

(a) For the purpose of Chapter _____ of the City of Houston Code of Ordinances, the following definitions shall apply unless the context clearly indicates or requires a different meaning:

   (1) No-knock search warrant: Any search warrant issued by a judge and executed upon a premises that does not require those executing the warrant to knock and announce themselves and their purpose at the premises.

   (2) Quick-Knock Search Warrant: Any search warrant executed upon a premises where the law enforcement authority knocks but does not give occupants a meaningful opportunity to answer the door or respond.

(b) No Houston Police Department (HPD) police officer or any other law enforcement or public safety official shall seek, execute, or participate in the execution of a no-knock warrant at any location within the boundaries of Houston.

(c) Any HPD police officer or any other law enforcement or public safety official charged with the execution of any search warrant shall be accompanied only by such other persons as may be reasonably necessary and dressed in clothing clearly identifying them as law enforcement for the successful execution of the warrant with all practicable safety.

(d) Before entering a premises, any executing officer shall:

   (1) Physically knock on an entry door to the premises in a manner and duration that can be heard by the occupants;

   (2) Clearly and verbally announce as law enforcement having a search warrant in a manner than can be heard by the occupants; and,

(3) Absent exigent circumstances, wait a minimum of 20 seconds or for a reasonable amount of time for occupants to respond, whichever is greater, before entering the premises.

(A) Any HPD police officer or any other law enforcement or public safety official charged with the execution of any search warrant shall be accompanied only by such other persons as may be reasonably necessary and dressed in clothing clearly identifying them as law enforcement for the successful execution of the warrant with all practicable safety.

(B) Quick-Knock Raids can be conducted only when the following circumstances are present:

(1) When HPD or other law enforcement entities executing a search warrant has determined that circumstances involve serious physical harm or death, like murder, hostage-taking, active shooters.

(2) HPD and other law enforcement entities must show that the quick and forcible entry and any accompanying military-style tactics, are necessary to prevent imminent physical harm.

(3) Any requests to use this approach should be approved by the Police Chief or designated supervisor.

(A) An employee of HPD or other law enforcement entity who violates this chapter may be subject to disciplinary action, such as oral reprimands, written reprimands, suspension without pay, and/or discharge, under the appropriate union contract, civil service commission rules, or department work rules.

(B) Complaints of a violation of this section by an employee of HPD or other law enforcement entity shall be received and investigated by the respective Internal Affairs Division and the Harris County District Attorney's Office. The results of any such investigation shall be provided to the complainant in writing within seven days of the completion of the investigation, which shall occur no later than one year after receipt of the complaint or in accordance with time frames specified in any applicable collective bargaining agreement, whichever is shorter.

(C) Where a serious injury or death occurs during deployment or a vulnerable individual was present, the city council shall appoint an independent investigator to determine what went wrong. An Independent Police Oversight Board shall have access to all relevant investigation information from this independent investigator as well as the Harris County District Attorney's Office.

SECTION II: This Ordinance shall take effect upon its passage and approval.






















