## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| AUSTIN THOMPSON HUGHES | § | |
| | § | |
| **Plaintiff,** | § | CIVIL ACTION NO. 4:21-cv-01994 |
| | § | |
| v. | § | |
| | § | **(JURY TRIAL DEMANDED)** |
| MICHAEL GARCIA and JOSHUA FEW | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

---

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

## TABLE OF CONTENTS

I.  Nature and Stage of Proceedings ........................................................... 1

II.  Issues Presented ...................................................................................... 1

III.  Summary of Argument ............................................................................ 1

IV.  Statement of Undisputed Facts .............................................................. 2

V.  Argument and Authorities ..................................................................... 11

   A. Legal Standard ...................................................................................... 11

   B. Plaintiff is Entitled to Summary Judgment Against Defendants on His §
      1983 Claim Under the Law of the Case ............................................... 12

   C. Plaintiff is Entitled to Summary Judgment on His § 1983 Claim Holding
      Defendants Garcia and Few Liable as a Matter of Law for the Violations of
      His Fourth Amendment Rights…………………………………………….14

      1. Plaintiff Established Liability Against Garcia As a Matter of Law.15

      2. Plaintiff Established Liability Against Garcia As a Matter of Law. 18

VI.  Conclusion ............................................................................................. 21

## TABLE OF AUTHORITIES

42 U.S.C. §1983 ................................................................................................ 5, 16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ........................... 15

*Arizona v. California*, 460 U.S. 605, 618 (1983) ............................................ 17

*Bledsoe v. Willis*, No. 23-30238, 2023 WL 8184814 (5th Cir. Nov. 27, 2023) ........... 21

*Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001) ..................................... 18

*Club Retro, LLC v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009) ..................... 18

*Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992) ....................... 16

*Cooper Tire & Rubber Co. v. Farese*, 248 F. App'x 555, 558 (5th Cir. 2007) ..... 16, 17

*Dauzat v. Carter*, No. 18-30610 (5th Cir. Feb 07, 2019) .......................... 18, 25

FED. R. CIV. P. 56(a) ..................................................................................... 15

*Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1198 (5th Cir. 1986) ..................... 16

*Franks v. Delaware*, 438 U.S. 154 (1978) ........................................ 18, 22, 24

*Fuhrman v. Dretke*, 442 F.3d 893, 896 (5th Cir. 2006) ............................... 18

*Hughes v. Garcia*, 100 F.4th 611 (5th Cir. 2024) .................................. passim

*Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983) ....................................... 19

*Johnson v. La. Dep't of Agric.*, 18 F.3d 318, 323 (5th Cir. 1994) ............... 17

*Laughlin v. Olszewski*, 102 F.3d 190, 193 (5th Cir. 1996) .......................... 15

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) .................... 15

*Lyons v. Fisher*, 888 F.2d 1071, 1074 (5th Cir. 1989) ................................. 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ........... 15

*McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 703 (5th Cir. 2014) .......... 17

*Melton v. Phillips*, 875 F.3d 256, 262 (5th Cir. 2017) ................................ 21

*Morris v. Covan Worldwide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir.1998) ............................. 15

*Office of Thrift Supervision v. Felt*, 255 F.3d 220, 225 (5th Cir. 2001) ........................................ 17

*see also Miles v. Texas*, 241 S.W.3d 28, 39–44 (Tex. Crim. App. 2007).................................... 25

*Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir.1998) ................................................................. 15

*Terwilliger v. Reyna*, 4 F.4th 270, 282 (5th Cir. 2021).......................................................... 19, 24

Tex. Code Crim. Proc. art. 14.01(a)......................................................................................... 24

*Thompson v. Clark*, 596 U.S. 36, 43 (2022) ................................................................................ 19

*Townsend v. Moya*, 291 F.3d 859, 861 (5th Cir. 2002) ................................................................ 16

*U.S. v. Ekpin*, 214 F.Supp.2d 707 (S.D. Tex. 2002) .................................................................... 15

*Universal Sav. Ass'n v. McConnell*, 14 F.3d 52 (5th Cir. 1993)................................................... 16

*Westfall v. Luna*, C.A. No. 4:15-cv-00874-O (N.D. Tex. Aug 19, 2019).................................... 18

*Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013)................................................................... 22

*Willis v. Roche Biomedical Laboratories, Inc.*, 61 F.3d 313, 315 (5th Cir. 1995) ...................... 15

*Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018)......................................................... 6, 17, 19

## I.    NATURE AND STAGE OF PROCEEDINGS

On May 3, 2024, the Fifth Circuit affirmed this Court's denial of qualified immunity to Defendants Garcia and Few on Plaintiff's 42 U.S.C. §1983 claim for unlawful arrest under the Fourth Amendment. Since, the Parties have completed discovery and intend to proceed to trial next month on those claims.

## II.    ISSUES PRESENTED

Whether Plaintiff is entitled to summary judgment as to liability on his § 1983 claims against Defendants Garcia and Few for unlawful arrest in violation of his Fourth Amendment rights?

## III.    SUMMARY OF ARGUMENT

This claim arises out of the unreasonable investigation, arrest and prosecution of Mr. Hughes by Defendants, acting both collectively and individually, in violation of Mr. Hughes's constitutional rights. Specifically, on March 23, 2021, at approximately 2:30 a.m., Mr. Hughes witnessed a noticeably intoxicated driver weaving back and forth across multiple lanes of Interstate 610 South ("I-610 S") at a high rate of speed. Mr. Hughes, acting as a good Samaritan, called 911 to report the drunk driver, and identified himself; his location on I-610; the color, make, model and license plate number of the vehicle being operated by the apparently intoxicated driver; and a real-time description of the vehicle's movements which included, but were not limited to, weaving back and forth across multiple lanes, hitting both the inside and outside barriers of I-610 S and coming to an abrupt stop on the side of the interstate – all of which was confirmed to 911 call-takers by another identified third-party witness. After confirming that the driver was be highly

1

intoxicated and following several attempts by the driver to flee onto I-610 S in the path of oncoming traffic, Mr. Hughes briefly and lawfully detained the driver while awaiting the arrival of Houston police.

However, Mr. Hughes's decision to intervene in the dangerous and likely lethal actions of the highly intoxicated driver would soon come back to haunt him, as Defendants Garcia and Few, quickly shifted the focus of their investigation from the actual crime that had been committed (DWI) to a knowingly fabricated crime against Mr. Hughes (impersonation of an officer). On March 25, 2021, Defendant Garcia, with the assistance of Defendant Few, submitted a fraudulent affidavit containing several material misstatements and omissions about the March 23rd events for the purpose of securing an arrest warrant against Plaintiff on the charge of impersonating a public servant without probable cause. The Fifth Circuit held that the facts, as alleged in the Second Amended Complaint, established a § 1983 claim against Garcia and Few for violations of Plaintiff's Fourth Amendment right "to be free from police arrest without a good faith showing of probable cause" and without due process of law. *See Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018). Because discovery simply proved the facts in the Second Amended Complaint to be true, Plaintiff is entitled to summary judgment against Defendants on that claim.

## IV.    STATEMENT OF UNDISPUTED FACTS

The discovery in this case simply proved Plaintiff's well-pleaded facts to be true. Thus, the undisputed facts are the same as those accepted by the Fifth Circuit as true in their opinion denying qualified immunity to Defendants. Those facts with citations to the

evidentiary support in the record are as follows:

On March 23, 2019, at approximately 2:37 a.m., Austin Thompson Hughes, a former police officer, was driving for Uber. (Ex. F – Email from A. Hughes to M. Garcia re: Uber Trip Details;  Ex. K - Uber Production; Ex. J - Hughes Dep. at 37:1 -38:16). While driving, he saw a white GMC Sierra pickup truck swerving erratically on Interstate 610 in Houston. (Ex. A – A. Hughes 911 Call #1 Reporting DWI [HUGHES_000147]; Ex. C - Third-Party 911 Call Reporting DWI [HUGHES_000149]; Ex. J - Hughes Dep. 43:20-45: 10). Suspecting the truck's driver was intoxicated, Hughes dialed 911 and followed the Sierra with his Jeep's flashers on. (*Id.*).  During the call, Hughes described the Sierra and his own vehicle and reported the truck swerving at high speed, hitting the concrete barriers on both sides of the highway, and finally coming to a stop. Hughes's two Uber passengers can be heard on the recording confirming Hughes's observations. (Ex. A - A. Hughes 911 Call #1 Reporting DWI [HUGHES_000147]). Hughes stopped behind the Sierra. (*Id.*; Ex. J - Hughes Dep. 43:20-46:15).  At some point during this episode, Hughes's 911 call was transferred to a Houston Medical 911 call-taker. (Ex. A - A. Hughes 911 Call #1 Reporting DWI [HUGHES_000147]; Ex. B - A. Hughes 911 Call #2 Reporting DWI [HUGHES_000148]).

Hughes continued his report to the second 911 call-taker. (*Id.*). He told the call-taker "I need to get [the driver] out of the car because, I mean, they're going to kill somebody." *Id*. Hughes then exited his vehicle, observed that the driver was "obviously intoxicated," and retrieved the driver's keys, license (which was sitting in the Sierra's center cupholder), and bottles of alcohol. (*Id.*; Ex. J, Hughes Dep. at 43:20-50:17). A third-party callCer

corroborated many of these details to another 911 operator, including Hughes "trying to get [the drunk driver] out of the car." Ex. C - Third-Party 911 Call Reporting DWI [HUGHES_000149].

When Hughes returned to his Jeep, still on the phone with 911, he saw the intoxicated driver exit the Sierra and "attempt to flee towards the center of the interstate on foot." (Ex. A - A. Hughes 911 Call #2 Reporting DWI [HUGHES_000148]; Ex. J, Hughes Dep. at 43:20-50:17). Hughes yelled at the driver to get back in his truck in an attempt to prevent him from being hit by oncoming traffic. (*Id.*). The 911 operator then disconnected the call, assuring Hughes emergency units were on their way. (*Id.*).

The drunk man continued to move into oncoming traffic on foot. Hughes felt that the best and safest option would be to physically restrain the suspect so he had his Uber passenger retrieve handcuffs from his Jeep and used them to temporarily detain the DWI Suspect while he continued to wait for police. (Ex. J, Hughes Dep. at 43:20-50:17). At no point did Hughes identify himself as a police officer. (Ex. J, Hughes Dep. at 149:14-19) ("Q. Did you ever tell Mr. Gomez you were a Police Officer? A. No."). Hughes's two Uber passengers stayed "[f]or awhile; and then,… got another Uber and left before Officers arrived on scene. (Ex. J, Hughes Dep at 54:10-12). When HPD Officers Michael Garcia and Joshua Few arrived on the scene (roughly 17 minutes after Hughes's initial 911 call), they re-handcuffed the drunk driver and asked Hughes to meet them at a nearby gas station so they could take his statement. (Ex. D - Incident Report; Ex. H, Garcia Dep. 63:10-64:11; 204:7-205:2; Ex. I, Few Dep. at 20:18-23:13; 109:17-110:12; 116:12-14). At the gas station, Officer Garcia interviewed the drunk driver while Officer Few interviewed

Hughes. (*Id*.; Ex. I, Few Dep. at 20:18-23:13, 26:1-27:12; Ex. H, Garcia Dep. at 92:22-94:17, 78:7-83:20). Hughes recounted his observations of the pickup truck's erratic movements, the driver's multiple collisions with the median and concrete barrier, and his assessment of the driver's intoxication. (Ex. I, Few Dep. at 20:18-23:13; Ex. D - Incident Report). Few believed Hughes's statement to be credible and Hughes showed no signs of intoxication. (Ex. I, Few Dep. at 24:9-13, 26:1-3, 52:2-5, 90:1-9).

Hughes also told Few "he used to be a police officer." (*Id*.). When Garcia finished taking the drunk driver's statement, he asked Hughes for his Uber passengers' contact information. (Ex. H, Garcia Dep. at 63:10-67:10; 135:3-141:20, 169:3-9, 177:7-16; Ex. D; Ex. F). Hughes explained that Uber's privacy policies prevented him from accessing that information. (*Id*.). But he showed Garcia his Uber app, including the details of his most recent trip. (*Id*.). Later, at Garcia's request, Hughes emailed Garcia screenshots of his Uber trip details. (*Id*.). Inexplicably, the officers did not arrest the drunk driver. (Ex. D; Ex. H, Garcia Dep. at 66:25-67:3; Ex. I, Few Dep. at 26:24-27:1; 74:4-75:24)

Few and Garcia then prepared an incident report. (Ex. D; Ex. I, Few Dep. at 125:23-126:1; Ex. H, Garcia Dep. at 127:8-128:24). The incident report recounted the drunk driver's statement to Garcia at the scene as follows:

> On 3-23-2019 I was at a *flea market* with Jesse and his friends (Uber drivers [*sic*] alias). Jesse said that we could go back to his place and that he lived on 59 south near downtown. I told Jesse that I lived on I10 and he said that he would take me home later. I said okay because I had been drinking on night [*sic*] and had *more than 7 beers. I was too drunk to drive* but I had a friend *at the bar* that could of [*sic*] taken me home. Jesse said let's go to his house and he offered to drive so we went. Mid way [*sic*] during the trip I was not familiar with where I was at.

> I started to ask Jesse where he was taking me. I finally asked
> Jesse to just take me home and[] that is when he got mad. *Jesse
> asked if I had something going on with his wife*. I told Jesse no.
> Jesse then asked me what I got going on with his wife. I was
> confused and asked what he meant. Jesse said he knows there
> is something going on. *Jesse stopped my truck on the freeway*
> and got out of it. He came to my passenger side door and was
> trying to get me out of the car. I was confused at this point and
> only wanted to know what was going on. Jesse kept telling me
> I am fucked and how I was going to be deported. I was on the
> freeway so I could not just get away from Jesse. Finally Jesse
> told me to turn around and put my hands behind my back.
> When I did not do it fast enough Jesse kneed my legs to force
> me to comply. I asked Jesse why he was doing this and who
> gave him the right to do this. Jesse told me he was a police
> officer. Jesse then put me in handcuffs. My leg was hurting
> making it hard for me to stand and I had scratches on my wrists
> from him trying to handcuff me.

Ex. D (emphasis added). The report credited the drunk driver's version of events—despite

the obvious fact that Hughes's name is not "Jesse"; Hughes and the drunk driver had never

met; there is no evidence that Hughes accused the stranger of fooling around with Hughes's

wife; Hughes never drove the drunk driver anywhere; multiple independent witnesses and

911 callers (including Hughes's own, recorded 911 call) and the Uber app screenshots

confirm Hughes was not driving the white GMC Sierra; and there is no evidence of a flea

market open in Houston at 2:00 a.m., much less a flea market that doubles as a bar where

the drunk driver could drink more than 7 beers. (*Id*.; Exs. A-F, K). But the report did

indicate that Garcia conducted a field sobriety test on the drunk driver and that Garcia "got

6/6 clues" suggesting intoxication under the horizontal gaze nystagmus ("HGN") test. (Ex.

D; Ex. H, Garcia Dep. at 165:16-20). As to Hughes's statement, Few reported Hughes told

him about his Uber passengers, his decision to stop the drunk driver, and explained he had

handcuffs in his Jeep because "he was a police officer . . . at one time." (*Id*.; Ex. I, Few Dep. at 82:12-20). The report also included some details from the Uber screenshots Hughes provided. Ex. D. But the report misinterpreted the scheduled destination shown in the screenshots as Hughes's actual stopping point, ignoring the fact Hughes had obviously stopped on the freeway before reaching that destination. (Ex. D, Ex. F, Ex. K).

Despite the inconsistencies in the drunk driver's story, the Sierra driver's obvious intoxication, and the corroborating evidence for Hughes's statement, the report did not address the incident as a DWI investigation. (Ex. D). Instead, it addressed an offense for "Impersonating an Officer" and identified Hughes as the suspect. (Ex. I, Few Dep. at 33:3-24; Ex. D). The report thus credited the drunk driver's statement that Hughes "told [the drunk driver] he was a police officer." (*Id*.). Officer Few submitted the report. (Ex. I, Few Dep. at 33:3-24; Ex. H, Garcia Dep. at 126:19-22; 127:16; 143:15-18; 149:24-150:10).

Two days later, Garcia signed a probable cause affidavit based on that incident report. (Id.; Ex. E – PC Affidavit). The affidavit asserted Hughes "unlawfully, intentionally impersonate[d] a public servant, namely a peace officer with intent to induce [the drunk driver] to submit to his pretended official authority and to rely on his pretended official acts, by stating he was a Police Officer." (*Id*.) The affidavit included information gathered by both Garcia and Few during the investigation. (Ex. E; Ex. H, Garcia Dep. at 126:19-127:16; 183:8-25; 177:21-180:3; Ex. I, Few Dep. at 91:6-20, 95:18-109:16).

The affidavit again recounted several details allegedly from Hughes's 911 call. (Ex. E).  But the affidavit omitted critical information, like Hughes's play-by-play of the Sierra swerving erratically down the highway, his description of his own vehicle, and Hughes

yelling at the drunk driver to get back in the car. (Ex. E, Ex. H, Garcia Dep. at 184:9-190:10; 191:3-20; 213:9- 216:25; 220:3-18; Ex. I, Few Dep. at 91:8-106:4, 107:9-.109:13) Instead, the affidavit claims Hughes can be heard on the 911 call asking the drunk driver for his identification. (Ex. E) This statement was false – Hughes never made that request and he cannot be heard doing so in any of the 911 recordings. (Exs. A-C, Ex. H,  Garcia Dep. at 188:10-190:3; 203:5-10).

The affidavit then provided a different version of the drunk driver's statement than the incident report offered. (Compare Ex. D *with* Ex. E). The affidavit states as follows:

> [The drunk driver] told me that *while he was being detained and handcuffed by Mr. Hughes, he asked Mr. Hughes if he was a police officer and Mr. Hughes replied, 'Yes, I am a police officer.'* [The drunk driver] stated that when he refused to turn around, Mr. Hughes struck him multiple times with knees to his legs. [The drunk driver] stated that he had been drinking at a flea market on Airline Dr. and met Mr. Hughes and his *two female* friends there. [The drunk driver] stated that they talked most of the night and Mr. Hughes invited [the drunk driver] to his house to have some drinks. [The drunk driver] stated that Mr. Hughes offered to drive his white pickup truck and [the drunk driver] agreed since he had been drinking. [The drunk driver] stated that Mr. Hughes told him he lived on the 59 freeway going to downtown. Mr. Hughes and [the drunk driver] headed out and *two females drove Mr. Hughes's jeep.* [The drunk driver] stated that mid trip he became uncomfortable with the situation and asked to be taken home. [The drunk driver] stated that an argument began and Mr. Hughes got upset and pulled the vehicle over on the freeway. [The drunk driver] stated that Mr. Hughes got out and began ordering him out of the vehicle. [The drunk driver] stated he was forced out of the vehicle and then handcuffed. [The drunk driver] stated that he was hit several times in the leg during this process by Mr. Hughes. [The drunk driver] stated the [sic] he felt pain and wanted to pursue charges.

(Ex. E (emphasis added)).

The new details—like the previously undiscussed "two female friends" who purportedly drove Hughes's Jeep to the scene on Interstate 610—appeared nowhere in the incident report and contradicted Hughes's statement. (*Id*.; Ex. H, Garcia Dep. at 184:9-190:10; 191:3-20; 213:9- 216:25; 220:3-18; Ex. I, Few Dep. at 43:18-23, 91:8-106:4, 107:9-.109:13). Moreover, Garcia reported that an "Officer A. Walters" assisted in interviewing Hughes. (Ex. E). But there is no other evidence "Officer A. Walters" had any involvement in this case at any time. (Exs. A-D; Ex. I, Few Dep. at 31:2-7; 96:69-97:17).

The new version of the statement also omitted key facts suggesting the drunk driver's unreliability. For example, the affidavit made no mention of the drunk driver calling Hughes "Jesse" or the apparent confusion about whether the drunk driver was drinking at a "flea market" or a bar. (*Id*.; Ex. H, Garcia Dep. at 184:9-190:10; 191:3-20; 213:9- 216:25; 220:3-18; Ex. I, Few Dep. at 91:8-106:4, 107:9-.109:13). And perhaps most tellingly, the probable cause affidavit omitted that the officers' sole basis for believing Hughes committed a felony—the drunk driver's statement—came from the ramblings of a man who flunked all six clues in the HGN intoxication test. (*Id*.; Ex. I, Few Dep. at 93:5-8 ("Q. [D]id you have any evidence that Mr. Hughes stated he was a police officer? A. I did not. The only thing Mr. Hughes told me was that he used to be a police officer in Detroit."); Ex. H, Garcia Dep. at 184:9-190:10; 191:3-20; 213:9- 216:25; 220:3-18; Ex. I, Few Dep. at 91:8-106:4, 107:9-.109:13).

Finally, as to Hughes's statement, the affidavit omitted any corroborating evidence supporting Hughes's account of the incident. (*Id*.). For example, the affidavit omitted the third-party 911 call and the screenshots from Hughes's Uber app. Id. Instead, the affidavit

reported Hughes "would not" disclose his passengers' contact information. (Ex. E; Ex. F; Ex. H, Garcia Dep. at 191:3-192:20).

Despite these misstatements, omissions, and inconsistencies, Garcia submitted the probable cause affidavit to the District Attorney's office. (Ex. E). The DA charged Hughes with felony impersonation of a public servant, and the 262nd Criminal District Court of Harris County issued a warrant for Hughes's arrest. (Ex. E; Ex. L).

At about 3:00 a.m. on March 25, Officers Few and Garcia went to Hughes's home to arrest him. (Ex. D; Ex. I,  Few Dep. at 127:21-131:13; Ex. H, Garcia Dep. at 224:15-227:13_. But Hughes, who was asleep with his wife at the time, answered the officers through the door. Few and Garcia asked to see Hughes's Uber app, insisting they needed to see his actual cell phone, rather than the screenshots he had already sent. (*Id*.; Ex. J, Hughes Dep. at 91:19-97:12). Hughes cracked open the door to give [his cell phone] to the officers. However, instead of taking the phone, the officers grabbed Mr. Hughes's outstretched arm and pulled him out of his apartment into the hallway and handcuffed him. (*Id*.). Hughes was placed in the jail's general population for over 24 hours before being released on March 26. (*Id.*). Hughes was charged with third-degree felony impersonation of a peace officer under Texas Penal Code § 37.11. (Ex. L.).  The charge carried a minimum sentence of 2 years in prison, a maximum of 10 years in prison, and a possible fine up to $10,000. *See* Tex. Penal Code § 37.11(b); Tex. Penal Code § 12.34. Hughes hired a defense attorney. (Ex. J, Hughes Dep. at 97:24-98:3).

Almost three months later, on June 17, 2019, "the State of Texas requested that the criminal action against Mr. Hughes be dismissed on the basis that 'no probable cause

existed . . . to believe the defendant committed the crime.'" (Ex. M).  The county judge

dismissed the case the same day. (*Id*.).

## V.    ARGUMENT AND AUTHORITIES

### A.  Legal Standard

"The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." FED. R. CIV. P. 56(a). Material facts are those facts "that might affect the outcome

of the suit under the governing law." *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir.1998)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The facts are to be

reviewed with all 'justifiable inferences' drawn in favor of the party opposing the motion."

*U.S. v. Ekpin*, 214 F.Supp.2d 707 (S.D. Tex. 2002) (quoting *Morris v. Covan Worldwide*

*Moving, Inc.*, 144 F.3d 377, 380 (5th Cir.1998)). However, factual controversies are

resolved in favor of the nonmovant "only when there is an actual controversy – that is,

when both parties have submitted evidence of contradictory facts." *Id*. (quoting *Laughlin*

*v. Olszewski*, 102 F.3d 190, 193 (5th Cir. 1996)). The non-moving party's burden "is not

satisfied with some metaphysical doubt as to the material facts, by conclusory allegations,

by unsubstantiated assertions, or by only a scintilla of evidence." *Willis v. Roche*

*Biomedical Laboratories, Inc.*, 61 F.3d 313, 315 (5th Cir. 1995) (quoting *Little v. Liquid*

*Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). Ultimately, "[w]here the record taken as a

whole could not lead a rational trier of fact to find for the non-moving party, there is no

'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986) (citation omitted).

"Where the summary judgment movant bears the burden of proof at trial, the summary judgment evidence must affirmatively establish the movant's entitlement to prevail as a matter of law." *Universal Sav. Ass'n v. McConnell*, 14 F.3d 52 (5th Cir. 1993) (unreported); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1198 (5th Cir. 1986) ("if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor"). To establish liability under § 1983, a civil rights plaintiff must establish two elements: (1) state action, *i.e.*, that the conduct complained of was committed under color of state law, and (2) a resulting violation of federal law, *i.e.*, that the conduct deprived the plaintiff of rights secured by the Constitution or laws of the United States. *See Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992); *see also Townsend v. Moya*, 291 F.3d 859, 861 (5th Cir. 2002) (In short, "[s]ection 1983 provides a claim against anyone who, 'under color of' state law, deprives another of his or her constitutional rights."). Here, there is no genuine dispute of material fact as to either element, and Plaintiff is entitled to judgment as a matter of law.

## B. Plaintiff is Entitled to Summary Judgment Against Defendants on His § 1983 Claim Under the Law of the Case.

"The law of the case doctrine provides that a decision of a factual or legal issue by an appellate court establishes the law of the case and must be followed in all subsequent proceedings in the same case in the trial court...." *Cooper Tire & Rubber Co. v. Farese*, 248 F. App'x 555, 558 (5th Cir. 2007) (quoting *Lyons v. Fisher*, 888 F.2d 1071, 1074 (5th

Cir. 1989)); *see also Arizona v. California*, 460 U.S. 605, 618 (1983) ("when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"). The doctrine "applies not only to things decided explicitly but also to matters settled 'by necessary implication:' 'those matters that were fully briefed to the appellate court and were necessary predicates to the ability to address the issue or issues specifically discussed are deemed to have been decided tacitly or implicitly, and their disposition is law of the case.'" *Cooper Tire*, 248 F. App'x at 558 (quoting *Office of Thrift Supervision v. Felt*, 255 F.3d 220, 225 (5th Cir. 2001)). Under the law of the case doctrine, a trial court may "not revisit the determinations of an earlier court unless (i) the evidence on a subsequent trial was substantially different, (ii) controlling authority has since made a contrary decision of the law applicable to such issues, or (iii) the decision was clearly erroneous and would work ... manifest injustice." *McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 703 (5th Cir. 2014).

The Fifth Circuit routinely applies the law of the case doctrine to cases involving interlocutory appeals of qualified immunity claims, such as this. *See e.g. Winfrey v. Rogers*, 901 F.3d 483, 491 (5th Cir. 2018) (holding that law of the case doctrine applies to appeal in qualified immunity case); *Johnson v. La. Dep't of Agric.*, 18 F.3d 318, 323 (5th Cir. 1994) (summary judgment reversed because court of appeals previously found fact issues on qualified immunity). Where, as here, the appellate court ruled on the applicability of qualified immunity at the pleadings stage, the trial court remains bound to that decision on summary judgment so long as "the facts adduced do not differ meaningfully from the facts [the appellate] court assumed to be true at the motion to dismiss stage." *Dauzat v. Carter*,

13

No. 18-30610 (5th Cir. Feb 07, 2019) (law of the case required denial of qualified immunity on motion for summary judgment where the "material facts recited by the district court in its original opinion denying qualified immunity at the motion to dismiss stage remain[ed] almost entirely unrebutted"); *see also Westfall v. Luna*, C.A. No. 4:15-cv-00874-O (N.D. Tex. Aug 19, 2019) (quoting *Fuhrman v. Dretke*, 442 F.3d 893, 896 (5th Cir. 2006) ("The Court finds that the Law of the Case Doctrine precludes Defendants' motion for summary judgment based on qualified immunity on the excessive-force claim[] [because] [a]lthough Defendants have introduced additional evidence, it is not 'substantially new' evidence… therefore, the same underlying fact issues remain.").

### C. Plaintiff is Entitled to Summary Judgment on His § 1983 Claim Holding Defendants Garcia and Few Liable as a Matter of Law for the Violations of His Fourth Amendment Rights.

In *Hughes v. Garcia*, 100 F.4th 611 (5th Cir. 2024), the Fifth Circuit evaluated Defendants' entitlement to qualified immunity under the same facts that were proven in discovery. More specifically, the Fifth Circuit held that Defendants violated Plaintiff's Fourth Amendment rights by arresting and prosecuting him without probable cause under *Franks v. Delaware*, 438 U.S. 154 (1978). Because there is no genuine dispute as to any material fact that was previously accepted as true by the Fifth Circuit, Plaintiff is entitled to summary judgment as to Defendants' liability on his §1983 claim.

As a baseline, "[t]he constitutional claim of false arrest requires a showing of no probable cause." *Club Retro, LLC v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009) (citing *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001)). Similarly, "the gravamen of the Fourth Amendment claim for malicious prosecution . . . is the wrongful initiation of charges

without probable cause." *Thompson v. Clark*, 596 U.S. 36, 43 (2022). Probable cause in turn requires "a probability or substantial chance of criminal activity, not an actual showing of such activity." *Winfrey v. Rogers*, 901 F.3d 483, 495 (5th Cir. 2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)). Both violations therefore turn on whether a reasonable officer would believe the suspect had committed a crime. *See Terwilliger v. Reyna*, 4 F.4th 270, 282 (5th Cir. 2021) ("[C]ourts must look to the totality of the circumstances and decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer[,] demonstrate a probability or substantial chance of criminal activity." (emphasis added) (quotations omitted)). Here, the Fifth Circuit held that "[t]he officers' probable-cause case hinges on the drunk driver's allegation that Hughes said, in effect, 'I am a police officer.'" *Hughes*, 100 F.4th at 621.

### 1. *Plaintiff Established Liability Against Few As a Matter of Law.*

Hughes established a *Franks* violation against Few because (1) Few contributed false statements to the incident report, knowing that report would be used in the warrant affidavit and (2) Few knew Officer Garcia had omitted critical information in the two documents and failed to correct them. *Id*. at 622. First, Few is liable for a *Franks* violation because he produced information containing false statements or material omissions made with at least "reckless disregard for the truth," and he knew that information would be used in a warrant affidavit. *Id*. (quoting *Winfrey*, 901 F.3d at 494).

Here, Few submitted the incident report entitled "Impersonating an Officer." That report omitted critical pieces of information from Hughes's statement while including

statements from the drunk driver that the officers' own lawyer called "crazy." Oral Arg. at 8:01-17. For example, the incident report relayed an entire narrative from Officer Garcia's conversation with the drunk driver. Among other things, the drunk driver referred to Hughes as "Jesse," suggested the drunk driver and "Jesse" were drinking at a flea market or a bar at 2:00 a.m., implied Hughes and the drunk driver had a prior relationship, and said Hughes was driving the white Sierra. (Ex. D). But Hughes's name is not Jesse; no flea markets in Houston are open and serving beer at 2:00 a.m.; Hughes did not know the drunk driver; and Hughes's black Jeep was also at the scene when the officers arrived. The incident report noted none of these obvious inconsistencies. *Id*. Few had access to ample evidence suggesting both that Hughes's statement was reliable and that the drunk driver's was not. Indeed, Few believed Mr. Hughes's statement to be "credible", and yet, failed to note any of the inconsistencies between Hughes and Gomez's statements, nor did he note any of the evidence corroborating Hughes's statement in the incident report. (Ex. D). Additionally, Hughes sent the officers screenshots of his last Uber trip, corroborating his story.(Ex. F). But the report misstated the information in the screenshots, suggesting the displayed endpoint of the ride should have matched Hughes's actual stopping point, when in reality it reflected only the requested destination. (Ex. D; Ex. F). Moreover, Few had access to Hughes's recorded 911 calls, with the play-by-play description of the white Sierra's actions and the Uber passengers' voices. (Exs. A-C). Yet, few submitted the incident report without explaining any of the note discrepancies, evidence corroborating Mr. Hughes's statement and undermining Mr. Gomez's statement, or conducting any further investigation into the veracity – or lack thereof – of Mr. Gomez's statements. (Ex.

D). "Finally and most importantly, the inconsistencies or falsehoods in the drunk driver's story should have decreased or eliminated its relative weight[,] [b]ut Few's report contained none of these facts." *Id*.; (Ex. D). "That evinces at a bare minimum that Few recklessly disregarded the truth." *Id*. And there can be little doubt Few submitted the incident report "for the purpose of its being included in [the] warrant application." *Id*. (quoting *Melton v. Phillip*s, 875 F.3d 256, 262 (5th Cir. 2017)). Few knew the incident report would be used to prosecute Hughes, and indeed, was with Garcia when the PC affidavit was submitted to the District Attorney's office to obtain an arrest warrant, and also "walked the warrant" – ultimately arresting Hughes. Few conducted Hughes's interview. He submitted the incident report labeled "Impersonating an Officer," indicating the focus of the investigation had already shifted to Hughes. He went with Garcia two days later and arrested Hughes. That Few completed the incident report while Garcia completed the warrant affidavit does not absolve Few of liability given these strong indications that he knew exactly what purpose the incident report would serve. *See Bledsoe v. Willis*, No. 23-30238, 2023 WL 8184814 (5th Cir. Nov. 27, 2023) (per curiam) (unpublished) (denying qualified immunity as to both officers where one initially investigated and the other prepared the warrant affidavit). Few, as the only officer to interview Hughes, knew his reckless omissions and misstatements would be used in the warrant affidavit, "and that is all [Plaintiff] must show." *Id*. at *5.

Second, Hughes established a plausible claim against Few as a bystander. Bystander liability attaches when an officer "(1) knows that a fellow officer is violating an individual's

constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (citations omitted). Here, Few knew, and admitted to knowing, the information Garcia contributed to the incident report (and then to the warrant affidavit) contained material misstatements and omissions that did not accurately reflect the evidence from their investigation. (*See* Ex. I, Few Dep. at 43:18-23, 91:8-106:4, 107:9-.109:13). Few had access to substantial evidence contradicting the drunk driver's narrative and Garcia's recitation of the facts. (*Id.*). Even if Few himself did not write the false statements, he submitted the report containing them. Moreover, he reviewed the PC affidavit prior to arresting Plaintiff and thus – "knew of the harm about to be perpetrated" and "ha[d] a reasonable opportunity to prevent the harm… [but] [chose] not to act." *Hughes*, 100 F.4th at 622 (citing *Whitley*, 726 F.3d at 646)). Accordingly, Hughes has established bystander liability against Defendant Few. *Id.*

### 2. *Plaintiff Established Liability Against Garcia As a Matter of Law.*

As the Fifth Circuit explained, Hughes made a standard *Franks* claim against Garcia and, therefore, Garcia is liable if he knowingly, or with reckless disregard for the truth, included false statements or material omissions in the warrant affidavit. *See Hughes*, 100 F.4th at 622 (citing *Franks*, 438 U.S. at 155–56). In addition to his incident report contributions, Garcia prepared and submitted the warrant affidavit that directly led to Hughes's arrest. That affidavit contained numerous false statements and material omissions. Most importantly, Garcia materially altered the drunk driver's statement from the incident report. The version of the drunk driver's statement in the warrant affidavit

patched many of the obvious holes in the incident report. For example, it omitted any reference to "Jesse." It also resolved the inconsistency as to whether the drunk driver was at a flea market or a bar, only mentioning a flea market (though it again did not address which flea markets in Houston were open and serving beer at 2:00 a.m.). And the new version of the story explained that Hughes's Jeep arrived at the side of the highway because "two female friends drove [the] jeep." Compare Ex. D with Ex. E. By altering these details, Garcia's affidavit manufactured a more credible narrative.

Garcia's affidavit also omitted external evidence undermining the drunk driver's credibility or supporting Hughes's. For example, the affidavit failed to mention the HGN test or that Garcia "got 6/6 clues" indicating intoxication. It excluded reference to the Uber receipts showing Hughes picked up his passengers at approximately 2:30 a.m. and so could not have been out drinking with the drunk driver at a flea market. Then, despite admitting that he listened to the recording of Hughes's 911 call, Garcia omitted the stated purpose of the call, Hughes's description of his Jeep and the Sierra, Hughes's real-time descriptions of the drunk driver's actions, Hughes's explanation for restraining the driver, and his repeated exclamations to the driver to "stay" and "get back in the car." *Id*. Finally, Garcia did not mention the third-party 911 call that corroborated Hughes's statement, despite admitting to having access to and listening to at least one of the 911 calls made.

The affidavit also added false details, beyond those in the drunk driver's narrative. Most significantly, Garcia's affidavit claimed an "Officer A. Walters" was also at the scene. According to Garcia, "Walters" reported that Hughes "handed documents to [Walters] that he said he retrieved from [the drunk driver's] vehicle." But Officer Walters's

name appears nowhere else in the record, including the incident report, and Hughes's statement made no mention of any officer other than Few and Garcia arriving at the scene. "All told, Garcia's affidavit made at least eight material misstatements or omissions. Any reasonable officer would have known, based on the evidence available, that the affidavit contained these errors." *See Terwilliger*, 4 F.4th at 284 (holding *Franks* liability attaches to a defendant who acts "contrary to the information provided to him"). Therefore, based on the summary judgment evidence, Hughes established that Garcia violated his clearly established Fourth Amendment rights by producing and submitting the affidavit.

The Fifth Circuit also correctly applied the "corrected affidavit" analysis under the same facts that have been proven in discovery. Under the "corrected affidavit" analysis, officers are liable for their false statements only if those statements were "necessary to the finding of probable cause." *Franks*, 438 U.S. at 155–56. The Court "consider[ed] whether probable cause existed to arrest Hughes for the felony of impersonating an officer even without the erroneous statements and omissions in the affidavit," and held that "**[t]he answer is easily 'no.'**" *See Hughes*, 100 F.4th at 623 (emphasis added). Indeed, the Court found that "[o]nce the officers' misstatements and omissions are corrected, there is no basis to find probable cause that Hughes committed a felony. To the contrary, in the absence of the officers' misstatements and omissions, Hughes effectuated a valid citizen's arrest under Texas law." *Id*. (citing Tex. Code Crim. Proc. art. 14.01(a) ("A peace officer or any other person, may, without a warrant, arrest an offender when the offense is committed in his presence or within his view, if the offense is one classed as a felony or as an offense against

20

the public peace.")); *see also Miles v. Texas*, 241 S.W.3d 28, 39–44 (Tex. Crim. App. 2007). As the Fifth Circuit explained:

> The only evidence suggesting Hughes ever impersonated a law enforcement officer—thus the only evidence that could possibly have established probable cause—came from the drunk driver's statement. As discussed above, the drunk driver reportedly told Officers Few and Garcia that Hughes had claimed to be a police officer. But even the officers' counsel admitted that this assertion came in the midst of the drunk driver's 'crazy statement[s].' Given the vast inconsistencies (indeed, impossibilities) reflected in both versions of the drunk driver's statement, the driver's obvious intoxication, and the evidence supporting Hughes's account, no reasonable officer could have suspected Hughes committed a felony. Therefore, a corrected warrant affidavit could not have established probable cause to arrest and prosecute Hughes.

*Id.*

Because discovery merely proved the same facts that the Fifth Circuit assumed to be true for purposes of its previous analysis, the same conclusion is required here and Plaintiff is entitled to summary judgment. *See e.g. Dauzat v. Carter*, No. 18-30610 (5th Cir. Feb 07, 2019).

## VI.    <u>CONCLUSION</u>

WHEREFORE, Plaintiff respectfully requests that the Court grant this motion and grant summary judgment on liability for purposes of Plaintiff's §1983 claims against Defendants Few and Garcia.


Respectfully submitted this 13th day of August, 2025,

By:/s/ *Courtney B. Warren*
Courtney B. Warren
LAW OFFICE OF COURTNEY WARREN PLLC
Texas Bar No. 24110511
402 Hunt Street
Houston, TX 77003
courtney@cwarrenlaw.com
Phone: (713) 828-9385

AND

Keith B. French
KEITH B. FRENCH LAW, PLLC
Texas Bar No. 24115073
kfrench@peoplefirstfirm.com
2010 E. Broadway St., Suite 132
Pearland, Texas 77581
Tel.: (832) 243-6153
Fax: (832) 243-1927

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2025, a true and correct copy of the foregoing was served via email on all counsel of record in accordance with the Federal Rules of Civil Procedure.

/s/*Courtney B. Warren*
Courtney B. Warren